**No. 26-10302**

---

**In the United States Court of Appeals
for the Fifth Circuit**

---

CHARLES ZIEGENFUSS; DAVID MONTGOMERY; BRIAN ROBINSON;
FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation,

*Plaintiffs-Appellants*,

v.

FREEMAN MARTIN, in his official capacity as Director and Colonel of the Texas Department of Public Safety,

*Defendant-Appellee*

---

On Appeal from
United States District Court for the Northern District of Texas, 4:24-cv-1049

---

# BRIEF FOR PLAINTIFFS-APPELLANTS

---

R. Brent Cooper
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9500
brent.cooper@cooperscully.com

Bradley A. Benbrook
*Counsel of Record*
Stephen M. Duvernay
Jamie G. McWilliam
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

No. 26-10302

*Charles Ziegenfuss, et al. v. Freeman Martin*

I certify that the following persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal:

1) Plaintiffs-Appellants:

Charles Ziegenfuss

David Montgomery

Brian Robinson

Firearms Policy Coalition, Inc., a nonprofit corporation, has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

2) Defendant-Appellee:

Freeman Martin, in his official capacity as Director and Colonel of the Texas Department of Public Safety

3) Counsel for Plaintiffs-Appellants:

BENBROOK LAW GROUP, P.C.
Bradley A. Benbrook
Stephen M. Duvernay
Jamie G. McWilliam

COOPER & SCULLY PC
R. Brent Cooper

4) Counsel for Defendant-Appellee:

Office of the Attorney General of Texas
Ken Paxton
Brent Webster

Ralph Molina
Ryan D. Walters
Zachary L. Rhines
Kyle S. Tebo

5) District Court-Appointed *Amici Curiae* and supporting counsel:

GIBSON, DUNN & CRUTCHER LLP
Gregg Costa
Kylie Calabrese
Alexa Acquista
Andrew Mitchell
Arjun Ogale

Eric Ruben
Associate Professor of Law
SMU DEDMAN SCHOOL OF LAW

*/s/ Bradley A. Benbrook*
Bradley A. Benbrook
*Counsel of Record for*
*Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The Court should decide this appeal with the benefit of oral argument because it presents important questions about the Second Amendment-protected right to publicly carry firearms for self-defense.

# TABLE OF CONTENTS


CERTIFICATE OF INTERESTED PERSONS .......... i

STATEMENT REGARDING ORAL ARGUMENT .......... iii

TABLE OF CONTENTS .......... iv

TABLE OF AUTHORITIES .......... vi

JURISDICTIONAL STATEMENT .......... 1

STATEMENT OF THE ISSUES .......... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

STATEMENT OF THE CASE .......... 5

A. Plaintiffs Challenge Texas' Prohibition On Carrying Firearms In Places Law-Abiding Texans Visit Every Day .......... 5

1. Businesses Deriving 51% or More of Their Sales From Alcohol .......... 6

2. Sporting Events .......... 7

3. Racetracks .......... 8

B. Procedural History .......... 9

STANDARD OF REVIEW .......... 11

ARGUMENT .......... 11

I. The District Court Correctly Held That "Standing And Sovereign Immunity Pose No Barriers" To This Case .......... 11

II. The District Court Should Have Granted Plaintiffs' Motion For Summary Judgment .......... 14

A. Legal Principles Governing The Evaluation Of Each Purported Sensitive Place At Issue Here .......... 14

1. The Conduct Criminalized By The Carry Bans Is Covered By The Text Of The Second Amendment .......... 14

2. The Supreme Court Has Explained How To Ascertain The Principles Underlying Our Historical Traditions At The Proper Level Of Generality .......... 16

a. Establishing A Historical Tradition Requires Identifying A Widely Representative Regulatory Analogue ........... 16

b. Purported Analogues Must Be Relevantly Similar........ 17

3. The Second Amendment's Scope Is Anchored To How The Right Was Understood At The Founding, Not Reconstruction ........................................................................ 19

4. The Supreme Court Has Instructed Lower Courts How To Apply These Principles To Carry Bans In Alleged "Sensitive Places" ............................................................................... 25

B. The Carry Bans Here Are Inconsistent With The Principles Underlying Our Historical Tradition Of Firearms Regulation........... 27

1. There Is No Historical Tradition That Justifies The Ban On Carrying Firearms In Bars Or Restaurants Serving Alcohol ... 27

a. There Is No Founding Era Tradition To Support The 51% Ban .......................................................................... 29

b. The District Court Improperly Relied On 19th Century Regulations That Conflicted With The Regulatory Regime At The Founding ............................................. 34

2. There Is No Historical Tradition Justifying The Ban On Carrying Firearms At Sporting Events .................................... 38

a. The Sporting/Interscholastic Event Carry Ban Is Not Relevantly Similar To Narrow Student Restrictions ..... 39

b. There Is No Historical Tradition Justifying The Prohibition On Carry At Professional Sporting Events ........................................................................... 43

3. There Is No Historical Tradition That Justifies The Ban On Carrying Firearms At Racetracks............................................. 48

III. The District Court Abused Its Discretion In Denying Plaintiffs' Motion For Leave to Amend ......................................................................................... 50

CONCLUSION............................................................................................... 55

CERTIFICATE OF SERVICE ........................................................................ 56

CERTIFICATE OF COMPLIANCE................................................................ 58

# TABLE OF AUTHORITIES

## Cases

*Aforigho v. Tape Prods. Co.*,
334 F.R.D. 86 (S.D. Tex. 2020) ........ 53

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) ........ 15, 35

*Babbitt v. United Farm Workers Nat'l Union*,
442 U.S. 289 (1979) ........ 13

*Callan v. Deutsche Bank Tr. Co. Americas*,
11 F. Supp. 3d 761 (S.D. Tex. 2014) ........ 54

*Carver v. Atwood*,
18 F.4th 494 (5th Cir. 2021) ........ 51

*Chitimacha Tribe of La. v. Harry L. L. Co.*,
690 F.2d 1157 (5th Cir. 1982) ........ 52

*Christian v. James*,
176 F.4th 189 (2d Cir. 2026) ........ 20

*Church of Scientology of Cal. v. United States*,
506 U.S. 9 (1992) ........ 13

*City of Austin v. Paxton*,
943 F.3d 993 (5th Cir. 2019) ........ 11

*Clark v. America's Favorite Chicken Co.*,
896 F. Supp. 611 (E.D. La. 1995) ........ 54

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........ 2, 15, 20, 38

*Dobbin Plantersville Water Supply Corp. v. Lake*,
108 F.4th 320 (5th Cir. 2024) ........ 12

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) ........ 21, 22, 37

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ........ 21

*In re Southmark Corp.*,
88 F.3d 311 (5th Cir. 1996) ........ 51

*Kipke v. Moore*,
165 F.4th 194 (4th Cir. 2026) ........ 15

*Lara v. Comm'r Penn. State Police*,
125 F.4th 428 (3d Cir. 2025) ........ 20, 41

*Mayeaux v. La. Health Serv. & Indem. Co.*,
376 F.3d 420 (5th Cir. 2004) ... 53

*McCauley v. Univ. of the Virgin Islands*,
618 F.3d 232 (3d Cir. 2010) ... 42

*Miss. State Democratic Party v. Barbour*,
529 F.3d 538 (5th Cir. 2008) ... 13

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ... 20

*N. Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*,
898 F.3d 461 (5th Cir. 2018) ... 53

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ... passim

*Nat'l Press Photographers Ass'n v. McCraw*,
90 F.4th 770 (5th Cir. 2024) ... 13

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
719 F.3d 338 (5th Cir. 2013) ... 11

*Nat'l Rifle Ass'n v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) ... 20

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ... 21

*Reese v. BATFE*,
127 F.4th 583 (5th Cir. 2025) ... passim

*Rolf v. City of San Antonio*,
77 F.3d 823 (5th Cir. 1996) ... 52

*Sanchez v. R.G.L.*,
761 F.3d 495 (5th Cir. 2014) ... 12

*Steffel v. Thompson*,
415 U.S. 452 (1974) ... 13

*Stem v. Gomez*,
813 F.3d 205 (5th Cir. 2016) ... 11

*Stripling v. Jordan Prod. Co.*,
234 F.3d 863(5th Cir. 2000) ... 52

*Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*,
37 F.4th 1078 (5th Cir. 2022) ... 11

*Timbs v. Indiana*,
586 U.S. 146 (2019) ... 21

*United States v. Allam*,
140 F.4th 289 (5th Cir. 2025) ........ passim

*United States v. Connelly*,
117 F.4th 269 (5th Cir. 2024) ........ passim

*United States v. Daniels*,
124 F.4th 967 (5th Cir. 2025) ........ 20

*United States v. Rahimi*,
602 U.S. 680 (2024) ........ passim

*Virginia v. Moore*,
553 U.S. 164 (2008) ........ 21

*Waffenschmidt v. MacKay*,
763 F.2d 711 (5th Cir. 1985) ........ 51

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) ........ 12

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) ........ 15

*Worth v. Jacobson*,
108 F.4th 677 (8th Cir. 2024) ........ 20

*Zaidi v. Ehrlich*,
732 F.2d 1218 (5th Cir. 1984) ........ 53

**Statutes**

Tex. Govt. Code § 411.2031(d-1) & (e) ........ 39

Tex. Govt. Code §§ 411.2031(d-1) & (e) ........ 8

Tex. Penal Code § 46.01(15) ........ 9

Tex. Penal Code § 46.02(a)(2)(A) ........ 42

Tex. Penal Code § 46.02(a-6) ........ 6, 35

Tex. Penal Code § 46.03(a)(1) ........ 8, 39

Tex. Penal Code § 46.03(a)(4) ........ 8

Tex. Penal Code § 46.03(a)(7) ........ 3, 6

Tex. Penal Code § 46.03(a)(8) ........ 4, 7, 39, 43

Tex. Penal Code § 46.03(g) ........ 9

**Other Authorities**

"American Independence," Samuel Adams Speech (Aug. 1, 1776),
https://tinyurl.com/3zued27k ........ 44

1 Sawyer, FIREARMS IN AMERICAN HISTORY (1910) .......................................... 44

Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty Univ. L. Rev. 653 (2014)................................................................ 46

Howland, *Let's Not "Spit the Bit" in Defense of "The Law of the Horse": The Historical and Legal Development of American Thoroughbred Racing*, 14 MARQ. SPORTS L. REV. 473 (2004) ..................................................................... 48, 49

John Adams, Argument for the Defense (Dec. 1770), Nat'l Archives: Founders Online, https://bit.ly/35FCuRh ................................................................. 45

Kopel & Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203 (2018) ............................................... 25, 40

McWilliam, *Second Amendment Principles*, 33 WM. & MARY BILL RTS. J. 1127 (2025) 25, 45

*Monuments of Colonial New York: George III and Liberty Poles*, Gotham Ctr. (Oct. 15, 2020), https://tinyurl.com/bdzkafap ............................................ 44

Thompson, RUM PUNCH AND REVOLUTION: TAVERNGOING AND PUBLIC LIFE IN EIGHTEENTH-CENTURY PHILADELPHIA (Penn 1999) .................................. 27, 28

**Rules**

Fed. R. Civ. P. 15(a)(2)........................................................................ 51

Fed. R. Civ. Proc. 65(d) ....................................................................... 51

**Regulations**

1 Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England (White ed., 1853)............................................................... 45

Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 The Colonial Laws of New York From the Year 1664 to the Revolution 244–46 (1894) ................................ 31, 32

Acts of Mar. 10, 1655, Act XII, *reprinted in* 1 William Waller Hening, The Statutes at Large: Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619 at 401–02 (1823) ......................... 31

An Act for Punishment of Crimes and Offenses, within the District of Columbia § 40 (1816) ................................................................................. 29

An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 ................. 29

Statute of Northampton, 2 Edw. 3, c.3 ...................................................... 29

Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony (Brown & Parsons eds., 1850)................................. 45

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' federal constitutional claims under 28 U.S.C. § 1331. Plaintiffs timely appealed on March 24, 2026, the same day the clerk entered judgment. ROA.924; ROA.925. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

Whether Texas' criminal bans on carrying firearms set forth in Texas Penal Code §§ 46.03(a)(7), (a)(8), and (a)(4) violate the Second Amendment.

Whether the district court abused its discretion in denying Plaintiffs' motion for leave to amend.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Second Amendment "guarantees a general right to public carry" for self-defense. *N.Y. State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1, 33 (2022) . That right does not evaporate when a law-abiding Texan walks into a bar or restaurant that happens to generate 51% of its revenue from alcohol, attends a sporting event, or goes to the races. Yet Texas imposes criminal liability on citizens who wish to carry firearms in any of those ordinary places (collectively, the "Carry Bans"). Each of these Carry Bans violates the Second Amendment.

Under *Bruen*, the Second Amendment's plain text covers the proposed course of conduct here, so the burden shifts to Texas to demonstrate that each of its Carry

Bans "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. Texas cannot meet that burden—and, notably, did not even try: it conceded in the district court that the Carry Bans violate the Second Amendment. The district court appointed *amici* to defend the law and upheld all three restrictions by misapplying *Bruen* and ignoring important Fifth Circuit precedent.

At root, the court ignored *Bruen*'s instruction that, when modern regulations "address[] a general societal problem that has persisted since the 18th century"—here, the potential for violence from the "mix of firearms and alcohol," ROA.914, and the risk of violence in crowded places—"the lack of a distinctly similar historical regulation addressing that problem" is important evidence that the modern regulations violate the Second Amendment, 597 U.S. at 26–27, and there is no need to elasticize the process of analogical reasoning. The district court wrote that crediting the absence of Founding Era precedent here would create an intolerable "use it or lose it 'trap'" because "[t]he Founders knew that they would not anticipate all of the modern social conditions to come." ROA.911-912. This reasoning is utterly incompatible with *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), and it ignores that the "modern social conditions" addressed in the Carry Bans all existed at the Founding.

The lower court made other systematic errors. It leaned heavily on a narrow set of late-19th-century territorial, local, and post-Reconstruction statutes to fill the

void left by the absence of relevant regulations at the Founding—precisely the practice that the Supreme Court and this Court have repeatedly condemned. Making matters worse, the district court read the "sensitive places" doctrine so broadly that it swallowed the general right to carry, treating any crowded public place as a potential gun-free zone despite *Bruen*'s explicit warning against doing so.

The district court's judgment should be reversed:

**51% Ban.** Texas criminalizes carrying firearms in bars and restaurants that derive 51% or more of their income from the sale of alcohol. Penal Code § 46.03(a)(7) (the "51% Ban"). There is no historical tradition justifying this ban. Taverns and public houses were omnipresent at the Founding. Despite the potential risk of violence associated with carrying arms in taverns, there is *zero evidence* that any Founding Era legislature banned carry. (Even today, Texas is an outlier, as only 13 other States outlaw carrying in bars.) The laws the district court invoked—affray statutes and colonial laws restricting discharge of firearms at specific events—share neither the "how" nor the "why" of Texas' blanket prohibitions. This Court's decision in *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024), already rejected most of these same purported analogues. And contrary to the court's reasoning below, a handful of post-Civil War local and territorial regulations cannot resurrect a tradition that never existed.

***Ban At Sporting And Interscholastic Events.*** Texas forbids carry "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place … ." Penal Code § 46.03(a)(8). Here too there is an absence of relevant regulation at the Founding. The district court mischaracterized a narrow historical tradition of disarming students *on school grounds*—based on schools' *in loco parentis* authority—as justification for broadly prohibiting all law-abiding *adults* from carrying at any sporting or interscholastic event anywhere. This case challenges carrying *off campus*, since a separate statute criminalizes carrying on campus and is not at issue here. In addition, the district court's effort to justify the ban on carrying at professional sporting events by reference to post-1868 laws targeting "crowded places of amusement" directly defies *Bruen*'s instruction that places are not sensitive "simply because [they are] crowded." 597 U.S. at 31.

***Racetrack Ban***. Texas similarly criminalizes carrying at racetracks, a practice for which there is no Founding-Era support. The district court relied on a single 1868 Tennessee law to uphold the ban—precisely the kind of solitary late-in-time "outlier" *Bruen* identified as incapable of establishing a historical tradition. Horseracing was well-established in colonial America, and no jurisdiction thought to disarm spectators who went to watch and bet on the ponies.

Finally, the district court abused its discretion in denying Plaintiffs leave to amend their complaint to add local officials with concurrent enforcement authority over the Carry Bans. The amendment was prompted by Texas' own late-breaking standing arguments, would not have changed Plaintiffs' legal theory, and would have caused no prejudice.

The judgment below should be reversed.

## STATEMENT OF THE CASE

### A. Plaintiffs Challenge Texas' Prohibition On Carrying Firearms In Places Law-Abiding Texans Visit Every Day.

Plaintiffs are three law-abiding citizens who live in and are licensed to carry in Texas and Firearms Policy Coalition, Inc. ("FPC"), a nonprofit membership association with members licensed to carry in Texas, including the named, Individual Plaintiffs. ROA.115-116 [¶4-8]; ROA.123 [¶4-7]; ROA.119 [¶4-7]. FPC exists to protect, defend, and advance the People's rights, especially but not limited to the inalienable, fundamental, and individual right to keep and bear arms, and to protect the means by which individuals may exercise the right to carry and use firearms. ROA.127 [¶4]. The Individual Plaintiffs intend and desire to carry firearms in locations barred by the Carry Bans, and only decline to do so for fear of arrest and prosecution. ROA.115-116 [¶4-8]; ROA.123 [¶4-7]; ROA.119 [¶4-7].

This case challenges three statutory prohibitions on carrying firearms (collectively referred to below as the "Carry Bans"):

### 1. Businesses Deriving 51% or More of Their Sales From Alcohol.

Texas imposes criminal liability on peaceable people who exercise their right to bear arms "on the premises of a business that has a permit or license issued under [the] Alcoholic Beverage Code, if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption … ." Penal Code § 46.03(a)(7) (the "51% Ban").[1] Based on this definition, Section 46.03(a)(7)'s ban reaches not just bars, but many restaurants and other establishments Statewide. Violating this ban is a third-degree **felony**. Penal Code § 46.03(g). Third-degree felonies are punishable by imprisonment for between two and ten years and a fine of up to $10,000. *Id.* § 12.34. Plaintiffs would carry in "51%" businesses but have not done so because of the prohibition for fear of prosecution. ROA.115 [¶5]; ROA.123 [¶5]; ROA.119 [¶5].

The 51% Ban operates as a blanket prohibition on carrying arms in these locations, regardless of whether an individual is consuming alcohol. Importantly, Texas law **separately** bans carrying firearms while intoxicated. Penal Code § 46.02(a-6). Plaintiffs do not challenge that restriction. Indeed, all Plaintiffs have

[1] The "51%" determination is based on the Texas Alcoholic Beverage Commission's authority to monitor each license holder's gross receipts under Alcoholic Beverage Code § 104.06. Penal Code § 46.03(a)(7).

confirmed that they would not consume alcohol while carrying at "51%" businesses. ROA.115 [¶5]; ROA.123 [¶5]; ROA.119 [¶5].

While it is not relevant for the legal analysis under *Bruen*, it is nevertheless worth observing that Texas is among a distinct minority of States banning carrying in bars and restaurants. According to anti-gun-rights group Everytown for Gun Safety, only 14 States (including California, Illinois, New York, and New Jersey) maintain such bans.[2]

### 2. Sporting Events.

Texas criminalizes carrying "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place … ." Penal Code § 46.03(a)(8).[3] Violating this Carry Ban is a class A misdemeanor. Penal Code § 46.03(g-2). Class A misdemeanors are punishable by a fine of $4,000 or less, up to a year in jail, or both. *Id.* § 12.21. The Plaintiffs have each confirmed that they either have been forced to disarm themselves while attending sporting events (against their wishes), or have chosen not to attend sporting events, because of the Carry Ban. ROA.115 [¶6]; ROA.123 [¶6]; ROA.119 [¶6].

---

[2] Everytown for Gun Safety, *Which states prohibit the concealed carry of guns in bars?*, https://everytownresearch.org/rankings/law/no-guns-in-bars/.

[3] The statute contains a narrow exemption only where a "person is a participant in the event and a firearm, location-restricted knife, club, or prohibited weapon listed in [Penal Code] Section 46.05(a) is used in the event." Penal Code § 46.03(a)(8). That exception does not apply to Plaintiffs.

Plaintiffs do not challenge separate restrictions that overlap with certain locations that are covered by the sporting event ban's broad language, specifically:

- The prohibition on carrying firearms "on the premises of a [primary or secondary] school," Penal Code § 46.03(a)(1), which overlaps with the Carry Ban's ban on carrying at sporting or "interscholastic events" taking place at a high school.

- The regulatory regime permits licensed carry at public or private colleges, subject to campus-specific policies and regulations. *See* Tex. Govt. Code §§ 411.2031(d-1) & (e). To the extent particular colleges in Texas have adopted such restrictions, they are not at issue here.

- Private property owners (or lessees) may prohibit guests from entering their property while carrying firearms, consistent with the general rule that private property owners may condition the terms on which guests may enter the property. *See*, *e.g.*, AT&T Stadium, *A to Z Guide - Prohibited Items and Behavior* (prohibiting "firearms and weapons of any kind"), https://attstadium.com/stadium-info/a-to-z-guide/. Plaintiffs do not challenge the authority of privately-owned sports venues to regulate or restrict carry on their property.

**3. Racetracks**.

Texas imposes criminal liability on citizens who exercise their right to bear arms "on the premises of a racetrack." Penal Code § 46.03(a)(4). A "racetrack" is defined as a facility licensed "for the conduct of pari-mutuel wagering on horse

racing or greyhound racing." Penal Code § 46.01(15) (incorporating definition in Occupations Code § 2021.003(41)). Violating this ban is a third-degree felony. Penal Code § 46.03(g). Plaintiff Ziegenfuss will not go to racetracks because of this Carry Ban, but he would do so if he were permitted to carry his personal firearm for self-defense. ROA.115-116 [¶7].

* * *

In addition to the immediate criminal penalties associated with violating any of these Carry Bans, a violation can also result in a lifetime ban on an individual's ability to exercise their right to keep and bear firearms under state and federal law. *See* Penal Code § 46.04(a); 18 U.S.C. § 922(g)(1).

**B. Procedural History.**

Plaintiffs filed this lawsuit in October 2024. ROA.12-24. Texas filed an Answer in February 2025. ROA.70-75. Soon after the Answer was filed, the district court observed that Plaintiffs' challenges "appear to be purely legal in nature," ROA.78, and the parties agreed (at the district court's invitation) to proceed directly to summary judgment. ROA.79-80. The parties filed cross-motions for summary judgment in April 2025. ROA.84-131; ROA.132-175. Plaintiffs and the State filed simultaneous cross-opposition briefs on May 14 (ROA.183-194; ROA.195-222) and reply briefs on May 28 (ROA.235-248; ROA.249-263).

In Texas' summary judgment briefing, it conceded that the Carry Bans violate the Second Amendment but claimed that Plaintiffs' suit was nevertheless barred by supposed procedural barriers. *See* ROA.144. This unusual maneuver led to two material developments.

First, the district court issued an order appointing *amicus curiae* to defend the merits of the Carry Bans. ROA.181-182 (appointing Professor Eric Ruben and the Hon. Gregg Costa as *amici curiae*); *see* ROA.8.

Second, Texas' procedural gamesmanship required that Plaintiffs file a motion to amend their complaint. In its summary judgment briefing, the State argued (for the first time) that Plaintiffs lack standing because, even if the Court writes an opinion explaining why the Carry Bans violate the Second Amendment, local jurisdictions with concurrent enforcement authority will continue to enforce the Carry Bans. ROA.264-319; *see* ROA.155-158; ROA.260-261. To obviate Texas' argument, and given the very early stage of the case, Plaintiffs proposed amending the complaint to name officials who share concurrent enforcement authority with DPS: sheriffs and district attorneys in five counties in and around the Dallas/Fort Worth area where Plaintiffs live and travel, as well as the executive director of the Texas Alcoholic Beverage Commission. ROA.269.

The district court denied Plaintiffs' motion to amend on July 24, 2025. ROA.362.

On September 12, 2025, *amici* filed their brief on the merits. ROA.372-418. Plaintiffs filed their response on October 10. ROA.856-892.

On December 11, 2025, the district court held oral argument on the cross-motions for summary judgment. ROA.11. On March 24, 2026, the district court issued an opinion and order granting Texas' motion for summary judgment and denying Plaintiffs' motion, ROA.902-923, along with a judgment of dismissal, ROA.924. Plaintiffs filed a notice of appeal the same day. ROA.925.

## STANDARD OF REVIEW

Each of the core issues in this appeal is subject to de novo review. *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013) (constitutionality of state statutes); *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1083 (5th Cir. 2022) (standing); *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (sovereign immunity). The district court's denial of a motion to amend is reviewed for abuse of discretion. *Stem v. Gomez*, 813 F.3d 205, 209 (5th Cir. 2016).

## ARGUMENT

### I. The District Court Correctly Held That "Standing And Sovereign Immunity Pose No Barriers" To This Case.

While Texas conceded that the Carry Bans violate the Second Amendment, it argued that the district court should not resolve the merits based on supposed jurisdictional barriers, most notably (1) that Plaintiffs failed to establish

redressability because DPS does not have "primary" enforcement responsibility over the Carry Bans; and (2) that the DPS Director lacked a sufficient connection with the enforcement of the Penal Code sections at issue to fall within the *Ex parte Young* exception to sovereign immunity. The district court swiftly—and rightly—rejected both arguments. ROA.906-908.[4]

Plaintiffs satisfied the redressability element necessary for Article III standing. Texas claimed that local law enforcement officers sharing concurrent jurisdiction with DPS will continue to enforce the Carry Bans even after an injunction, which (the State argued) would negate redressability. Complete and perfect relief, however, is not the standard for redressability. When "establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would *completely remedy* the harm." *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (emphasis added) (citation omitted). As the district court put it, "the redressability prong need not be met with a perfect remedy; a 'partial remedy' suffices." ROA.907 (quoting

---

[4] Texas also insisted that Plaintiffs could not assert a cause of action against Director Martin because "neither States nor state officials are 'persons' within the meaning of" 42 U.S.C. § 1983. ROA.151. This went unaddressed by the district court, likely because it is not a serious argument. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989). This Court has repeatedly rejected similar arguments, affirming that the "persons" distinction poses no bar to lawsuits, like this one, that only seek prospective relief. *See, e.g.*, *Dobbin Plantersville Water Supply Corp. v. Lake*, 108 F.4th 320, 328 (5th Cir. 2024).

*Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)). Since DPS has the authority and responsibility to enforce the Carry Bans, that is the end of the matter. "Because all that is needed is a 'scintilla of enforcement by the relevant state official,' Plaintiffs have standing against DPS." ROA.907 (quoting *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024)).[5]

Texas' sovereign immunity argument fares no better. Given the structure and function of DPS, this Court has (not surprisingly) found that the Director of DPS "easily" meets *Ex parte Young*'s "connection" requirement because he is "*directly* responsible for enforcing Texas's criminal laws," and "DPS and [Texas Highway Patrol] officers arrest people for violating Texas law, exercising 'compulsion or constraint' in service of the law." *Nat'l Press Photographers Ass'n*, 90 F.4th at 786 (citation omitted). As the district court recognized, the State's concession that "'DPS has authority to enforce every portion of the State's criminal law'" combined with

[5] Texas also argued that Plaintiffs didn't face a "credible threat" of enforcement. While the district court did not address this issue, it suffices to lay out why the argument fails on first principles. "[I]t is not necessary that [a party] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Plaintiffs confirmed their "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed" by Section 46.03, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), and substantiated their "'serious interest' in acting contrary to" the Carry Bans, *Miss. State Democratic Party v. Barbour*, 529 F.3d 538, 545 n.8 (5th Cir. 2008) (cleaned up). That is the end of the matter. Plaintiffs are not required to violate the law before suing.

its tacit admission that DPS has "some responsibility for enforcing [the Carry Bans], even if not the 'primary responsibility'" confirms that "Director Martin, as head of DPS, is adequately connected to enforcement of" the unconstitutional laws. ROA.907-908 (citation omitted).

In sum, there are no justiciability barriers to resolving this case on the merits.

## II. The District Court Should Have Granted Plaintiffs' Motion For Summary Judgment.

### A. Legal Principles Governing The Evaluation Of Each Purported Sensitive Place At Issue Here.

Given the mistaken historical analysis below, it is worth reiterating the core principles governing this Court's Second Amendment analysis. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. The government then "bears the burden to 'justify its regulation,'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (citation omitted), by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17.

#### 1. The Conduct Criminalized By The Carry Bans Is Covered By The Text Of The Second Amendment.

The analysis must start with the Second Amendment's plain text. Just as the conduct at issue in *Bruen*—carrying handguns publicly for self-defense—was protected by the Second Amendment's text, *id.* at 32, so too is the proposed conduct here: carrying handguns for self-defense in three public locations where Texas law

has criminalized carrying. Importantly, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms." *Id.* Thus, the "definition of 'bear' naturally encompasses public carry" for self-defense. *Id.* Every circuit court to consider challenges to sensitive place restrictions has agreed. *See*, *e.g.*, *Wolford v. Lopez*, 116 F.4th 959, 993 (9th Cir. 2024); *Kipke v. Moore*, 165 F.4th 194, 207–08 (4th Cir. 2026); *accord Antonyuk v. James*, 120 F.4th 941, 968, 1004, 1027–39 (2d Cir. 2024) (considering challenges to carry bans at bars and restaurants and sporting events). Indeed, the textually protected right to keep and bear arms for self-defense is not locationally dependent. *See United States v. Allam*, 140 F.4th 289, 296 (5th Cir. 2025) (concluding that possession of a rifle in a car for self-defense was conduct covered by the Second Amendment, despite the defendant's presence in a school zone).[6]

Because "the Second Amendment's plain text covers [appellants' proposed] conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Therefore, the State bears the burden of justifying each of the Carry Bans "by

---

[6] The Supreme Court has already defined the Second Amendment's key terms relevant here. "The people" includes "all Americans"; "Arms" includes "all instruments that constitute bearable arms[,]" including handguns; and, to "bear" simply means to "carry." *Heller*, 554 U.S. at 580–82, 584; *Bruen*, 597 U.S. at 32–33. That interpretation of the text establishes that Plaintiffs' proposed conduct is presumptively protected by the Second Amendment. The Individual Plaintiffs are law-abiding Americans who seek to carry bearable arms (handguns) for self-defense in the three public places at issue here during their daily lives. As in *Bruen*, these undisputed facts end the textual inquiry. *See* 597 U.S. at 31–32.

demonstrating that [each] is consistent with the Nation's historical tradition of firearm regulation." *Id.*

### 2. The Supreme Court Has Explained How To Ascertain The Principles Underlying Our Historical Traditions At The Proper Level Of Generality.

*Bruen* and *Rahimi* explain in detail how the district court was supposed to determine whether *amici* met their historical burden. For starters, given the "general societal problem" of potential firearm violence at locations like bars, restaurants, racetracks, and public sporting events has existed since the Founding, the historical inquiry is "fairly straightforward": "the lack of a distinctly similar historical regulation addressing [the] problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. There are no "unprecedented societal concerns or dramatic technological changes" at play here that would justify a "more nuanced approach" when reviewing the historical record. *Id.* at 27.

Even when various proffered analogues are considered, however, there is no historical tradition that justifies the Carry Bans. Two essential points bear particular emphasis here.

#### a. Establishing A Historical Tradition Requires Identifying A Widely Representative Regulatory Analogue.

*Bruen* held that establishing a historical tradition requires proof of widely representative, relevantly similar analogues. As *Rahimi* explained, such historical

laws must evidence the "principles that underpin our regulatory tradition" and that "underl[ie] the Second Amendment." 602 U.S. at 692. Analogues are representative, therefore, if they are broadly applicable and widely accepted. But a handful of state laws that are unconnected, in principle, to earlier or later enactments is not a "historical tradition" that informs the original public meaning of the right at the Founding. Thus, historical analogues must be "well-established and representative," not "outliers." *Bruen*, 597 U.S. at 30. "[S]poradic regulations, in only a few jurisdictions, likely are insufficient to substantiate a 'regulatory tradition.'" *Allam*, 140 F.4th at 297. In *Bruen*, the Supreme Court rejected a set of three regulations as insufficient "to show a tradition of public-carry regulation." 597 U.S. at 46; *accord Connelly*, 117 F.4th at 281 (observing that three post-Reconstruction laws were "notably few").

Territories or discrete localized jurisdictions have limited utility in the analogical inquiry. *Bruen* explained that territorial laws are afforded "little weight" because they were "localized," "rarely subject to judicial scrutiny," and "short lived." *Bruen*, 597 U.S. at 67–69.

**b. Purported Analogues Must Be Relevantly Similar.**

Analogues must be "relevantly similar" based on "how and why [they] burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. This means that the modern regulation must impose a "comparable burden on the right of

armed self-defense" as the historical regulation, and for a similar reason. *Id.* Analyzing this relevant similarity yields, under *Rahimi*, the sort of "principles" that are applied to assess a modern enactment. 602 U.S. at 692. Accordingly, Founding-Era laws arising in different contexts, or for different reasons, are inapt comparators to a modern law since they are not motivated by the same underlying principles.

Consider the approach in *Rahimi*: when directing courts to consider "the principles that underpin our regulatory tradition," the Court offered direction on determining the right level of generality for extracting those principles. *Id.* On the one hand, courts need not identify a "dead ringer" or "historical twin" to the challenged law. *Id.* But on the other, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id.* at 740 (Barrett, J., concurring).

Thus, the *Rahimi* Court examined surety and going-armed laws and concluded that they stood for the principle that "[w]hen an individual poses a clear threat of physical violence to another" (justification), "the threatening individual may be disarmed" (burden). *Id.* at 698. The "principle," therefore, must satisfy both factors. Any purported principle that disregards the "how" or the "why"—or both—is taken at too high a level of generality. *See id.* at 692 (a law would be incompatible with the Second Amendment if it imposes a more severe burden, even if it shares a "permissible reason").

While the district court recited these standards more or less accurately, it utterly failed to apply them. Instead, the lower court stretched the historical record by seizing on *Bruen*'s statement that analogous regulations need not be a "historical twin." ROA.914-915 (considering bars and restaurants); ROA.921 (discussing sporting events and racetracks). By defining the purported historical tradition at a high level of generality, the district court excused the *absence* of truly analogous regulation to Texas' Carry Bans as detailed below. The district court compounded this error by cherry-picking isolated sources that supported its conclusion, while ignoring the broader regulatory traditions confirming that Texas' modern Carry Bans are historical outliers.

**3. The Second Amendment's Scope Is Anchored To How The Right Was Understood At The Founding, Not Reconstruction.**

The district court defied *Bruen* and binding Fifth Circuit precedent by relying too heavily on supposed analogues from the 19th century that conflicted with the regulatory regime at the Founding. It is therefore worth carefully reviewing the rules governing this timing question, since it is dispositive for each Carry Ban here.

The meaning of the Second Amendment was fixed at the time it was adopted. The closer in time both before and after 1791 a historical law is, the more probative it is of that meaning. This is because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554

U.S. at 634–35; *see also Bruen*, 597 U.S. at 37. Even if the text was later incorporated against the states through the Fourteenth Amendment, it is the 1791 understanding that is "applicable to [both] the Federal Government and States." *Reese v. BATFE*, 127 F.4th 583, 600 (5th Cir. 2025).

As this Court has recognized, the Founding is thus "the crucial period of our nation's history" for defining the Second Amendment's scope. *Id.* at 599 (citation omitted). "*Bruen* cautioned that 'when it comes to interpreting the Constitution, not all history is created equal.'" *Id.* at 600 (quoting *Bruen*, 597 U.S. at 34); *accord Connelly*, 117 F.4th at 273–74, 281. Accordingly, "a law may unconstitutionally infringe on the right when it goes 'beyond what was done at the founding,' '[e]ven when [it] regulates arms-bearing for a permissible reason.'" *Reese*, 127 F.4th at 588 (quoting *Rahimi*, 602 U.S. at 692); *accord Connelly*, 117 F.4th at 274; *United States v. Daniels*, 124 F.4th 967, 972 (5th Cir. 2025).[7]

*Bruen* also stressed that courts "must … guard against giving postenactment history more weight than it can rightly bear." 597 U.S. at 35. So while it is

[7] This accords with the prevailing view among the Circuits. *See also, e.g.*, *Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("the constitutional right to keep and bear arms should be understood according to its public meaning in 1791"); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012); *Worth v. Jacobson*, 108 F.4th 677, 692–93 (8th Cir. 2024); *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1115 (11th Cir. 2025) (en banc); *accord Christian v. James*, 176 F.4th 189, 207 (2d Cir. 2026) (Menashi, J., concurring) ("The scope of the right to keep and bear arms is the same as against the federal and state governments. We therefore prioritize the understanding of the right that prevailed in 1791.").

*permissible* for courts to consider post-Founding-Era historical regulations, that review is limited to determining whether such regulations *confirm* a Founding Era tradition. *Id*. at 36–37. Put simply, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*. at 36 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (emphasis in original), and citing *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464 (2020)). While "*Heller* and *Bruen* both considered 19th century sources in their analysis," they did so "to confirm and reinforce earlier historical evidence contemporaneous with the Constitution's ratification." *Reese*, 127 F.4th at 600.

*Bruen* thus reaffirmed the Court's practice of focusing on the Founding Era when analyzing other enumerated rights. *See, e.g.*, *Ramos v. Louisiana*, 590 U.S. 83, 90–91 (2020) (discussing history of unanimous jury right by referencing "backdrop" of Bill of Rights' ratification in 1791); *Timbs v. Indiana*, 586 U.S. 146, 152 (2019) (discussing "colonial-era provisions" and "constitutions of eight States" when analyzing Eighth Amendment excessive fines clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("[w]e look to the statutes and common law of the founding era to determine [Fourth Amendment] norms").

*Espinoza* is instructive in cases, like this one, where proponents of modern restrictions rely mainly on late-19th-century regulations as supporting analogues. In

*Espinoza*, Montana took the position that its tuition-assistance bill, which generally applied to private schools, had to exclude religious schools given the state constitution's prohibition on "aid" to such schools. Montana argued this didn't violate the Religion Clauses because "a tradition ... arose in the second half of the 19th century, as more than 30 States—including Montana—adopted no-aid provisions." 591 U.S. at 482. But the Court rejected the notion that the 19th-century adoption of such laws by even a *majority* of States could "by itself establish an early American tradition." *Id.* The Court stressed that "[i]n the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones." *Id.* at 480. Given that contrary tradition at the Founding, the "no-aid provisions of the 19th-century hardly evince a tradition that should inform our understanding of the Free Exercise Clause." *Id.* at 482.

The district court recited many of these rules but gave itself an escape hatch to assign the very sort of improper weight to 19th century regulations that *Bruen* warned against. After paying lip service to *Bruen*'s familiar rules—and curiously failing to cite *Reese* and *Connelly*—the district court asserted that using "[p]ost-enactment history ensures that courts do not fall into the 'use it or lose it' trap and presume that 'founding-era legislatures maximally exercised their power to regulate' in 1791." ROA.911 (citing *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring)). The district court then added that "[t]he Founders knew that they would not

anticipate all of the modern social conditions to come." ROA.912. So, despite nodding to the rule that "[e]vidence from the Reconstruction era … cannot be inconsistent with Founding era evidence," *id.*, the district court nevertheless relied on inconsistent 19th century evidence, as shown further below.

The district court's gloss on *Bruen*'s historical method ignores that the majority in *Bruen already accounted for* the absence of Founding Era regulation in its formulation of the test: "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, *the lack of a distinctly similar historical regulation* addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26–27 (emphasis added). In that case the historical analysis is "fairly straightforward," *id.*, such that there is no need to look deep into the 19th century or anywhere else for more regulatory evidence.

Indeed, when the regulatory environment changes from no regulation at the Founding to some regulation at Reconstruction, that later regulation, by definition, cannot be "consistent" with the regulatory approach at the Founding. *Bruen* explained how *Heller* demonstrated this:

> *Heller* itself exemplifies this kind of straightforward historical inquiry. One of the District's regulations challenged in *Heller* "totally ban[ned] handgun possession in the home." *Id.* at 628. The District in *Heller* addressed a perceived societal problem—firearm violence in densely populated communities—and it employed a regulation—a flat ban on the possession of handguns in the home—*that the Founders themselves*

> *could have adopted to confront that problem*. Accordingly, after considering "founding-era historical precedent," including "various restrictive laws in the colonial period," and finding that none was analogous to the District's ban, *Heller* concluded that the handgun ban was unconstitutional.

*Bruen*, 597 U.S. at 27 (emphasis added).

Moreover, *Bruen* observed that "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27. As shown below, for example, legislatures at the Founding did have minimal regulation targeting the "mix of firearms and alcohol," and that regulation was vastly different than the Carry Bans' approach of complete disarmament in the relevant locations. Those sporadic regulations (a) targeted misuse of firearms while drinking and (b) banned militia members from consuming alcohol *while training*. *See Connelly*, 117 F.4th at 280. These bear no relation to prophylactically disarming everyone who enters a bar.

The district court rejected all of this in favor of a new "no-use-it-or-lose-it-trap" standard to justify relying on dissimilar Founding Era regulations and late-in-time 19th century regulations. Lower courts have no license to undermine *Bruen* under the guise that regulations first appearing in the 19th century merely "liquidate" the Second Amendment's meaning. ROA.911.

#### 4. The Supreme Court Has Instructed Lower Courts How To Apply These Principles To Carry Bans In Alleged "Sensitive Places."

The Court has also provided guidance on the scope of so-called "sensitive places." *Bruen* identified three "sensitive places" the Court determined were based on the historical record: polling places, courthouses, and legislative assemblies. If governments hope to justify alleged new "sensitive places," they need to analogize the new restrictions to that limited set of regulations. *Bruen*, 597 U.S. at 30. Modern designations of alleged "sensitive places" are not exempt from *Bruen*'s historical analysis.

None of Texas' Carry Bans can be analogized to these historical sensitive places. Most important, each of those historic "sensitive places" shares one important characteristic: where the people were disarmed, the government provided comprehensive security. Legislative assemblies, polling places, and courthouses were all protected by heightened, government-provided security, reducing the public's need for individual weapons. Kopel & Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 203, 290 (2018) ("When armed guards are present, the government takes the responsibility for having armed force at the ready to protect citizens."); McWilliam, *Second Amendment Principles*, 33 WM. & MARY BILL RTS. J. 1127, 1149–51 (2025) (collecting laws and concluding they were typically "confined to locations where a

form of security was present"); Amici Br. of Angus Kirk McClellan, et al. at 9–18, *Wolford v. Lopez*, No. 23-16164 (9th Cir. Nov. 9, 2023), Doc. 48-2 (reviewing historical record confirming presence of comprehensive government security at legislatures, courthouses, and polling places). Texas provides no security at the locations covered by the Carry Bans at issue here.

*Bruen* also confirmed that any firearm regulation—even sensitive places laws—must satisfy its history-and-tradition standard. "*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17 (emphasis added; citation omitted). While the Court "ha[d] no occasion to comprehensively define 'sensitive places'" in *Bruen*, it instructed that courts must still "use analogies to those historical regulations of 'sensitive places'" to justify them. *Id*. at 30.

When determining the regulatory principles in the context of sensitive places, courts must be "mindful of the Supreme Court's caution against construing too broadly the category of 'sensitive places such as schools and government buildings,' as it would 'eviscerate the general right to publicly carry arms for self-defense.'" *Reese*, 127 F.4th at 597 (quoting *Bruen*, 597 U.S. at 30–31).

In all events, the Supreme Court has left no doubt that a place is not sensitive simply because many people congregate there. "[E]xpanding the category of

'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Bruen*, 597 U.S. at 31. The district court indulged this temptation when it extrapolated a too-general principle to justify Texas' bans on carrying in stadiums and racetracks.

### B. The Carry Bans Here Are Inconsistent With The Principles Underlying Our Historical Tradition Of Firearms Regulation.

#### 1. There Is No Historical Tradition That Justifies The Ban On Carrying Firearms In Bars Or Restaurants Serving Alcohol.

The district court upheld Texas' ban on carry in bars and restaurants serving alcohol based on a purported historical tradition of restricting carry in "certain social settings" and an alleged "legal tradition that regulated the mix of firearms and alcohol." ROA.914. The district court's effort to cobble together a historical tradition where none exists fails across the board.

While bars and taverns were ubiquitous at the Founding, there is zero evidence that the Founding Era legislatures restricted, let alone banned, carrying firearms in them. *See, e.g.*, Thompson, RUM PUNCH AND REVOLUTION: TAVERNGOING AND PUBLIC LIFE IN EIGHTEENTH-CENTURY PHILADELPHIA 27 (Penn 1999) (table showing ratio of taverns to Philadelphia's population; estimating 178 taverns in 1769, when Philadelphia's population was roughly 28,000). As this Court has observed, "early Americans, including the Founders, consumed copious amounts of alcohol." *Connelly*, 117 F.4th at 279. George Washington himself participated in one

famous drinking session at a Philadelphia tavern. *See id.* at 279 n.4 (citing *Bill for an Evening of Entertainment for George Washington - 14 September 1787*, Quill Project).

*Amici* could not point to *any* Founding-era regulations restricting carrying firearms in bars and taverns. To be sure, there was a historical tradition of governments regulating taverns, such as imposing licensing restrictions. *See*, *e.g.*, Thompson, *supra*, at 33–41 (summarizing licensing of Philadelphia taverns). Yet that regulation did not include banning the carrying of firearms. This utter lack of outright bans on carrying in bars, despite exactly the same risk of danger associated with "the mix of firearms and alcohol" at the Founding, ROA.914, should have been dispositive. *Bruen*, 597 U.S. at 26–27.[8]

Yet the district court disagreed. To alchemize a historical tradition purportedly justifying the 51% Ban, it extracted broad principles from a narrow set of Founding Era laws and leaned heavily on 19th century regulations that conflicted with the Founders' targeted approach to regulating the combination of alcohol and firearms.

---

[8] That the Founders actually *did* regulate drinking while on militia duty, *see Connelly*, 117 F.4th at 280–81 (discussing such laws), shows that they knew how to regulate to address similar concerns but chose to solve the problem in a more narrowly tailored way than the 51% Ban, *see Bruen*, 597 U.S. at 26–27 (when the Founders addressed a societal problem "through materially different means," it is "evidence that a modern regulation is unconstitutional").

#### a. There Is No Founding Era Tradition To Support The 51% Ban.

The three categories of Founding-Era historical regulation considered below confirm that the 51% Ban is inconsistent with the Nation's tradition of firearm regulation.

***Laws Of Affray Flunk Both The "How" And "Why" Test.*** The district court first pointed to the English Statute of Northampton, which allowed "no man … [to] ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers." 2 Edw. 3, c.3. It then addressed two early American laws that, taking their form from the Statute of Northampton, prohibited going armed "in fairs or markets, or in other places, in terror of the county." An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35; An Act for Punishment of Crimes and Offenses, within the District of Columbia § 40 (1816).

*Bruen* unequivocally stated that "the Statute of Northampton … has little bearing on the Second Amendment adopted in 1791." 597 U.S. at 41. Nevertheless, the district court characterized the Statute of Northampton and its American progeny as relevant "location-based laws." ROA.915. Aside from ignoring *Bruen*, the court mistook the thrust of these laws: Rather than prohibiting firearms in sensitive locations, they were aimed at prohibiting the carrying of arms in a terrifying manner in *any* location. *Allam*, 140 F.4th at 289 ("by the time of American independence[,] ... the old Statute of Northampton ... was only applicable to carrying

for the purpose of terrorizing other people") (citing Kopel & Greenlee, *supra*, at 227). Indeed, despite prohibiting such terror specifically in fairs and markets, these laws also applied "in other places," so they were not truly location dependent. As such, they are better thought of as "manner-based laws."

Thus, while the district court claimed its analysis was comparable to *Rahimi*'s reliance on the law of affray to justify § 922(g)(8)'s ban on those subject to a domestic violence restraining order, this is plainly not so. The *Rahimi* Court noted that "the affray laws traced their origin to the Statute of Northampton," and they "prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land.'" 602 U.S. at 697 (citation omitted). The 51% Ban disarms all who enter without regard to any effort to "terrorize" the people. This comparator flunks *Bruen*'s "why" test because it regulated for a very different purpose than the 51% Ban.

It also flunks the "how" test, since the affray laws operated retrospectively to punish only those who have terrorized the people, whereas the 51% Ban disarms everyone prospectively. In short, there is no relevant principle to be gleaned from the operation of the Statute of Northampton or the affray laws.

***The Virginia And New York Restrictions On Discharge Are Not Relevantly Similar To The 51% Ban.*** The district court next turned to two colonial laws that prohibited shooting firearms during certain limited events or times. ROA.915-916.

First, due to frivolous shots' interference with using shooting as an alarm for Indian attacks, a 1655 Virginia statute barred "shoot[ing] any gunns at drinkeing" events (other than marriages or funerals). Acts of Mar. 10, 1655, Act XII, *reprinted in* 1 William Waller Hening, The Statutes at Large: Being a Collection of all the Laws of Virginia from the First Session of the Legislature, in the Year 1619 at 401–02 (1823). And second, because of the "great Terror" caused by raucous celebrants going "from House to House, with Guns and other Fire Arms and being often intoxicated with liquor," a 1771 New York statute prohibited discharging firearms in the days surrounding New Year's Eve in or around buildings. Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 The Colonial Laws of New York From the Year 1664 to the Revolution 244–46 (1894).

These share neither the "how" nor the "why" of the 51% Ban. Neither of these historical laws has anything to say about carrying firearms. They exclusively regulated *shooting* them. And the New York law applied only three days a year. The historical laws also had very different justifications. The Virginia law was enacted because of the need to ensure effective defense against "the common enemie … Indians." Acts of Mar. 10, 1655, Act XII. Rogue firearm shots risked being mistaken for an attack alarm, and so were prohibited. *Id.* The New York law was concerned by general nuisance and danger of partiers regularly discharging firearms in the

street. Act of Feb. 16, 1771, ch. 1501.[9] This Court made identical observations about these same two statutes in *Connelly* when rejecting the federal government's reliance on them to justify § 922(g)(3)'s prohibition on possession of firearms by a user of controlled substances (marijuana). 117 F.4th at 280.

The district court ignored *Connelly* and dismissed the glaring differences between these statutes and the 51% Ban. It first suggested that "lawmakers believed they had the authority to prevent firearms violence committed by intoxicated individuals by regulating or banning the use of firearms by such individuals or in such settings." ROA.916. But as shown above and in *Connelly*, these laws had very different justifications and so do not stand for this sweeping principle. The court then postulated that "these laws likely disarmed most if not all persons at these events." ROA.916. This is a confusing and wholly unjustified supposition, given that the New York and Virginia laws did not disarm *anyone*—they simply barred them from firing weapons in certain limited circumstances. The district court went far beyond merely extracting a supposed principle at a too-general level; it misstated what the laws actually did.

Finally, the court noted that "such laws need not be ubiquitous to form a tradition for purposes of *Bruen*." ROA.916. But *Bruen* repeatedly rejected purported

---

[9] The two disparate and isolated laws further fail to establish a "representative" historical tradition analogous to the 51% Ban. *See Bruen*, 597 U.S. at 30.

traditions emanating from only "a handful" of jurisdictions. 597 U.S. at 38; *id.* at 65 (one state statute and two state court decisions not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation" (emphasis omitted)). These two odd laws do not comprise an analogous historical tradition to justify the 51% Ban.

***Statutes Restricting Alcohol Sales To On-Duty Militia Members Are Not Proper Analogues For The 51% Ban.*** The district court properly rejected *amici*'s argument that various Founding Era laws restricting the sale of alcohol while on duty were sufficiently analogous to justify the 51% Ban. ROA.918-919 ("The purpose of these laws was to ensure militiamen were fit for military service and not to disarm lay people from carrying firearms for fear of violence ensuing.").

* * *

In sum, the Founding Era revealed the utter "lack of a distinctly similar historical regulation addressing th[e potential] problem" of firearm violence in bars. *Bruen*, 597 U.S. at 26. Rather, the three groups of alleged Founding Era precursors for the 51% Ban reveal a "materially different"—and vastly narrower—"means" of regulating the "mix" of alcohol and firearms compared to the one-size-fits-all 51% Ban. This should have ended the matter.

#### b. The District Court Improperly Relied On 19th Century Regulations That Conflicted With The Regulatory Regime At The Founding.

Disregarding the distinct lack of Founding Era support, the district court reached into the late-19th and early-20th centuries to uphold the Carry Ban based on a mishmash of state, territorial, and municipal laws prohibiting carrying firearms while intoxicated, where alcohol was sold, and in certain social areas. These laws are too late in time, too few, and too heavily drawn from territorial and local jurisdictions to form a historical tradition.

***Bans On Carrying While Intoxicated From Civil War Era (And Later).*** The district court noted that, beginning in 1867, some states started prohibiting carrying firearms while intoxicated. ROA.916 (citing six statutes from 1867 to 1909). These regulations, beginning roughly 80 years after the Founding (and creeping into the 20th century) cannot possibly create a tradition because they were completely inconsistent with the regulatory regime at the Founding. *Bruen*, 597 U.S. at 36–37.

In any event, these laws imposed a lesser burden on the right to bear arms than the 51% Ban, as they disarmed only those who were actively intoxicated, while Texas' law disarms anyone on any premises that serve a certain amount of alcohol, regardless of whether (or how much) they are drinking. *See Connelly*, 117 F.4th at 280–81 (noting that federal prohibition on possession by a person "who is an unlawful user of or addicted to any controlled substance" was "much broader than

historical intoxication laws" because the historical tradition supported only "banning the carry of firearms while actively intoxicated." (emphasis omitted)).

The 51% Ban here faces a similar hurdle: It bans *all* carry by *all* individuals in places where alcohol is served, regardless of whether they are consuming alcohol, let alone intoxicated. Indeed, Texas separately criminalizes carrying while intoxicated (Penal Code § 46.02(a-6)), and that prohibition is not at issue here. This underscores how dissimilar these supposed analogues are to the 51% Ban.

***Late-19th-Century Territorial Laws Banning Possession Where Alcohol Sold.*** The district court next relied on a handful of late-19th-century territorial regulations restricting carry where alcohol was sold. ROA.917 (Oklahoma 1890, New Mexico 1853, Arizona 1889). While the district court rightly acknowledged that "[c]ertainly territorial laws are given less weight than state laws," it tried to spackle over the gaping hole in the historical record by pointing to the Second Circuit's statement that "*Bruen* does not require 'automatic rejection of any territorial laws and statutes from the latter half of the nineteenth century.'" ROA.917 (quoting *Antonyuk*, 120 F.4th at 1029). Notably, the record below does not reveal a single *State* law prohibiting carry at places where liquor was sold. *Amici* cited only these three territorial regulations (along with two municipal laws that the district court was wise not to mention). And while it may be true that *Bruen* does not mandate an "automatic rejection" of these regulations, it doesn't sanction the

unconsidered reliance on them either: laws in the western territories are entitled to less weight because they covered sparse local populations, were rarely tested in court, and typically short lived. *Bruen*, 597 U.S. at 67–69. Beyond acknowledging the mere existence of these three historical regulations, the district court provided no reasoned analysis for departing from *Bruen*'s cautious approach to territorial laws. These historical "outliers" are too few in number and too late in time to constitute "a well-established and representative" tradition of any kind. *See id.* at 30.

***Late-19th-Century Bans On Carrying In Social Settings At State, Territory, And Municipal Levels.*** Finally, the district court leaned on laws banning firearms at social gatherings; these purported analogues have similar "serious flaws." *Bruen*, 597 U.S. at 66. For one, the earliest appears to have been passed in 1853, with other jurisdictions following only well after the Fourteenth Amendment's ratification. Yet the district court primarily emphasized this line of authority, with particular focus on anecdotal accounts from post-Civil War Texas. ROA.917-918.

Taking a step back to look at the actual historical record, the record below identifies a late-19th- and early-20th-century patchwork of territories and frontier states (Texas 1879, New Mexico 1853, Arizona 1889, Oklahoma 1890, Montana 1903) and municipalities (San Antonio 1870, Waco 1891, New Orleans 1879) that

banned firearms in places like balls, fandangos, and social events.[10] Just as in *Bruen*, "the bare existence of these localized restrictions" cannot establish a historical tradition, particularly when they conflict with an established tradition of permitting (and sometimes requiring) carry at public gatherings. 597 U.S. at 67.

These laws are too late, too few, and impermissibly contradictory of Founding Era history. If "more than 30 States" in the late 1800s were not enough to establish a tradition in *Espinoza* because they were inconsistent with the absence of such regulations at the Founding, 591 U.S. at 482–83, a handful of territorial and post-Reconstruction laws banning carry in certain "social gatherings" cannot support an outright ban on carrying firearms in bars and restaurants.

Beyond the handful of regulations identified by the *amici* below, the district court placed significant emphasis on a similar law from Abilene, Kansas, claiming that these local territorial regulations "illustrate the mid-nineteenth century trend in Texas and beyond of regulating firearms in response to a concern about firearms violence, which also could be attributed to the 'infusion of guns and veterans after the Civil War.'" ROA.918 (citation omitted). If this is meant to evoke deference due to "unprecedented societal concerns," *Bruen*, 597 U.S. at 27, the effort is unavailing. These historical regulations "conflict with the Nation's earlier approach to firearm

---

[10] As with other laws of similar vintage, these regulations pose a lesser burden on the right of armed self-defense because they were misdemeanor offenses that carried only modest penalties. *See Rahimi*, 602 U.S. at 699.

regulation," *Bruen*, 597 U.S. at 67, which did not restrict the carry of firearms in places where liquor was sold, including the taverns that were commonplace at the time of the Founding. Accordingly, these laws "are most unlikely to reflect 'the origins and continuing significance of the [Second] Amendment.'" *Id.* (quoting *Heller*, 554 U.S. at 614).

* * *

The district court claimed that there was "a well-established tradition of regulating the carry of firearms by those intoxicated or prone to become intoxicated in settings serving significant amounts of alcohol." ROA.918. But at the Founding and for nearly 80 years thereafter, Americans were not disarmed in bars *anywhere* in the Nation. Given that, and for the many additional reasons set out above, the 51% Ban is inconsistent with the historical scope of the Second Amendment and is therefore unconstitutional.

#### 2. There Is No Historical Tradition Justifying The Ban On Carrying Firearms At Sporting Events.

The district court's examination of the history applicable to sporting and off-campus interscholastic events was plagued by similar issues to those in its analysis of the 51% Ban. It relied on historical laws that are too few and too late. And from a slim collection of laws, it drew impossibly broad principles. In doing so, the court examined the sporting events rule in two buckets: interscholastic events and professional sports stadiums.

**a. The Sporting/Interscholastic Event Carry Ban Is Not Relevantly Similar To Narrow Student Restrictions.**

The district court concluded that Section 46.03(a)(8)'s ban on carrying at sporting and interscholastic events was of a piece with a separate historical tradition limiting carry on college campuses. This fails as a matter of history, and it ignores the scope of the challenge in this case.

Start with the district court's premise: "Schools are sensitive places. By extension, interscholastic events are too." ROA.912. In the district court, Plaintiffs repeatedly affirmed that this lawsuit does not challenge Section 46.03(a)(8) to the extent that it applies to events on school grounds or where property owners have separately restricted carrying. ROA.92; ROA.882.[11] Moreover, the district court's effort to analogize § 46.03(a)(8)'s broad ban on carrying at all sporting events to the laws that narrowly target carry at schools is at odds with *Bruen*. Prohibiting carry at *all* sporting and interscholastic events imposes a far greater burden on the right of armed self-defense than a limited ban that applies *only* on school grounds (and then

[11] Section 46.03(a)(8) bans carry "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place." Texas law, however, separately bans carry on college campuses subject to campus-specific written regulations. Penal Code § 46.03(a)(1); Govt. Code § 411.2031(d-1) & (e). Plaintiffs do not challenge these laws here.

only to students), since it could cause *any* location to spring into sensitive status simply because a school decides to host a sporting event there.[12]

The historical record bears out what logic suggests. The district court first noted that colleges and universities sometimes restricted students' possession and use of firearms. ROA.913. Aside from an 1824 rule imposed by the University of Virginia, these largely arose in the latter half of the 19th century. Kopel & Greenlee, *supra*, at 247–50. Many of these regulations did not actually prohibit students from carrying arms, and when they did, they typically left faculty and other adults free to carry. *Id.* at 250. Indeed, the very law review article that the district court relied on discussing these restrictions concluded that "[n]one of [these] laws provides support for *Heller*'s designation of 'schools' as sensitive places where arms carrying may be banned." *Id.*; ROA.913 (citing Kopel & Greenlee, *supra*, at 247–48).

As this Court has already explained, "these rules were only limited prohibitions, specifically disarming students but not the public at large. And none of these regulations applied off campus." *Allam*, 140 F.4th at 298. Section 46.03(a)(8) "prohibits law-abiding, adult citizens from [possessing firearms at sporting events], whereas the university resolutions simply disarmed students on school grounds." *Reese*, 127 F.4th at 597. "So … even if campus or student safety was 'why' these

[12] This problem seemingly has no bound—if a school hosts a cross-country race through public areas, bystanders who aren't even there for the race risk being affected by Section 46.03(a)(8).

restrictions constrained firearm possession, 'how' they did so is somewhat distinct from [this law's] reach." *Allam*, 140 F.4th at 298. Indeed, the district court acknowledged that "[t]hose restrictions admittedly did not apply to non-students," yet it nevertheless concluded that the laws were analogous to Texas' Carry Ban, reasoning that "a majority of people in those [campus] settings were disarmed entirely" in order "to create a peaceful learning and social environment for the sake of the students." ROA.913; *but cf. Allam*, 140 F.4th at 298 (explaining that these college rules were "only limited prohibitions, specifically disarming students but not the public at large," "[a]nd none of these regulations applied off campus").

The district court's analysis also failed to account for the context of these early on-campus firearms regulations, which disarmed *only students* because their schools exercised *in loco parentis* authority over them. *See Lara*, 125 F.4th at 450–51 (Restrepo, J., dissenting) (evidence "strongly suggest[s] that [authority to bar students from possessing firearms] was not predicated on or justified by the student's presence at a sensitive location, but rather stemmed from the inherent power of the authority standing *in loco parentis*"); *Worth*, 108 F.4th at 695–96 (acknowledging that universities "had many practices that if compelled by the government, would have violated students' constitutional rights"). Schools' historical exercise of *in loco parentis* authority to restrict students' use of arms on campus does not support restricting firearm carry by anyone not subject to that sort of authority. As this Court

recognized in *Reese*, "[a]ctions taken *in loco parentis* say little about the general scope of Constitutional rights and protections." 127 F.4th at 596.[13] Even so, this rationale cuts in favor of permitting carry here: Just as the original students-only disarming occurred in an *in loco parentis* setting, where school officials (and others) are responsible for student safety, the *actual parents* who attend off-campus school events should be permitted to exercise their constitutionally protected right to carry in case of confrontation. And the minor students will still be disarmed under Penal Code § 46.02(a)(2)(A).

The district court next turned to a handful of late-19th and early-20th century state and territorial laws that prohibited carrying firearms into "any school room or other place where persons are assembled for educational, literary, or scientific purposes." ROA.913 (Texas 1870, Missouri 1875, Arizona 1889, Oklahoma 1890, Montana 1903). Putting aside that many of these regulations were territorial and thus entitled to little weight, the laws were passed too late to overcome a century of tradition in which Americans were free to carry arms to educational events.

In short, the historical evidence demonstrates that restrictions on firearms at schools were limited to minors or students, so such school-imposed rules cannot

---

[13] Although colleges and universities were historically understood to possess *in loco parentis* authority over their students, that is no longer the case. *See, e.g.*, *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010). These historical laws accordingly would not justify firearm bans on college students today.

serve as analogues for broad-based gun restrictions on law-abiding adults. And of course, Texas' ban applies to all sporting events that take place in any location, and even where a crowd may be small or dispersed. The Carry Ban contradicts the Nation's Colonial and Founding Era historical tradition, discussed below, permitting (and sometimes requiring) firearms in various public assemblies.

#### b. There Is No Historical Tradition Justifying The Prohibition On Carry At Professional Sporting Events.

Texas cannot justify Section 46.03(a)(8)'s Carry Ban where a "professional sporting event … is taking place," because this restriction has no basis in the Nation's history or tradition. On the contrary, while there were similar large gatherings of citizens in crowded settings at the Founding (including for sports), there was no tradition—widespread or otherwise—of banning carry in such places.

The district court concluded otherwise by finding a historical tradition of restricting carry in "crowded places of social amusement." ROA.919. Through this framing, the court recast *amici*'s assertion that the carry ban was justified by a tradition of "prohibiting firearms where people congregate." *See* ROA.409 (Amici Br. at 28). However phrased, this argument rests on the premise that Texas can ban firearms in crowded places. This runs counter to *Bruen*'s recognition of "the general right to publicly carry arms for self-defense," and ignores its instruction that places are not sensitive "simply because [they are] crowded." 597 U.S. at 31. "[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are

not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Id.*

This theory also flatly contradicts this Nation's tradition, dating to the Colonial and Founding Eras, of permitting carry in all manner of places where people gathered. Public gatherings of all sorts obviously existed at the Founding. The district court did not identify any Founding Era laws that actually addressed carrying in social places. This makes sense, as the Founders often did (and were sometimes required to) go armed to public gatherings.

Indeed, the Founders themselves used such public gatherings to speak to fellow citizens about American Independence. *See, e.g.*, "American Independence," Samuel Adams Speech (Aug. 1, 1776), https://tinyurl.com/3zued27k (delivered on the steps of the Philadelphia State House). Similarly, to protest British rule and gather to discuss the issues of the day, colonists frequently erected "Liberty Poles" around which they gathered. *See, e.g.*, *Monuments of Colonial New York: George III and Liberty Poles*, Gotham Ctr. (Oct. 15, 2020), https://tinyurl.com/bdzkafap. During the revolution, George Washington arranged a massive demonstration in Boston to display the marksmanship talents of the continental army's riflemen. 1 Sawyer, FIREARMS IN AMERICAN HISTORY 78–79 (1910). There is no identifiable historical tradition that firearms were banned at any of the numerous public gatherings at the Founding.

Colonists sometimes arrived armed to political gatherings in which they could potentially clash with British soldiers. At one public gathering, now remembered as the Boston Massacre, British soldiers opened fire on a crowd of colonists in 1770. In defending the soldiers at trial, John Adams conceded that, in this country, "every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence." John Adams, Argument for the Defense (Dec. 1770), Nat'l Archives: Founders Online, https://bit.ly/35FCuRh.

Many jurisdictions even required colonists to carry arms at public assemblies, including at church and court. McWilliam, *Second Amendment Principles*, *supra*, at 1149. Laws dating back to the Colonial Era required firearms in all manner of public meetings. *See, e.g.*, Trumbull, The Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony 95 (Brown & Parsons eds., 1850) (1643 order) (ordering "that one person in every severall howse wherein is any souldear or souldears, shall bring a musket, pystoll or some peece, w[i]th powder and shott to e[a]ch meeting"); 1 Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England 190 (White ed., 1853) (1639 order) (ordering that "all such persons … shall come to the publike assymblyes with their muskets, or other peeces fit for service, furnished w[i]th match, powder & bullets…."). *Heller* cited a 1770 Georgia law requiring men to carry firearms '"to

places of public worship.”’ 554 U.S. at 601. Virginia enacted a similar law in 1755, which persisted until 1878, allowing each county’s chief militia officer to order all enlisted militiamen “to go armed to their respective parish churches.” 6 William Waller Hening, The Statutes at Large, Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619 at 534 (1819); *see also* Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 LIBERTY UNIV. L. REV. 653, 697–99 (2014) (reviewing Colonial and Founding Era historical precedent for requiring firearms at church services).

The district court justified its departure from historical tradition by pointing in two directions. First, it referred back to its previous discussion of English and early American “laws prohibit[ing] the carrying of arms in fairs and markets where people gathered for amusement.” ROA.919. For the many reasons discussed above, the court’s view of this purported historical tradition is flat wrong. This characterization misunderstands these early laws, which were not aimed at stopping carrying *at all* in certain locations, but instead at carrying arms in a terrifying manner in *any* location. They thus imposed a very different burden—one that did not stop individuals from carrying their arms in a peaceful and usual manner.

The district court then made a leap forward, asserting that “[o]ne should not expect to see laws regulating stadiums anyways because modern professional sports did not come anywhere close to their current form until 1869, when the Cincinnati

Red Stockings became the first salaried professional team." ROA.919. The advent of professional sports teams, however, is not needed to establish a relevant analogue or historical principle when, as noted above, the historical record demonstrates that Founding governments did not disarm people simply because they gathered in very large crowds.[14] *See* Kopel & Greenlee, *supra*, at 288.

Taking the district court's point on its merits: It relied heavily on post-1868 state and territorial statutes banning firearms at "any circus, show, or public exhibition of any kind." ROA.920. Once again, these came too late to inform the original public meaning of the Second Amendment. This reasoning also appears to reflect sensitivity stemming from the mere assembly of people—which ignores the Supreme Court's explicit instruction that "there is no historical basis [to declare a location] a 'sensitive place' simply because it is crowded." *Bruen*, 597 U.S. at 31.

In sum, the district court erred by drawing overgeneralized principles from "late-in-time outliers." *Id.* at 70. No historical tradition supports Section 46.03(a)(8)'s ban on carrying firearms at sporting events.

---

[14] Moreover, sports venues existed at the Founding. As discussed further below, the first permanent horseracing track was established in 1665. And in the late 17th and 18th centuries, many cities, taverns, and other venues established permanent "bowling greens" for public recreation. *Bowling green*, National Gallery of Art, https://heald.nga.gov/mediawiki/index.php/Bowling_green. In none of these were firearm possession banned.

### 3. There Is No Historical Tradition That Justifies The Ban On Carrying Firearms At Racetracks.

There is no historical tradition justifying Section 46.03(a)(4)'s Carry Ban "on the premises of a racetrack." As with its analysis of sporting events, the district court asserted that the ban is justified by a historical tradition of restricting carry at "crowded places of amusement." ROA.920-921. This argument falls short of meeting *Bruen*'s test for many reasons.

To reiterate, *Bruen* forecloses banning firearms based merely on the presence of "large crowds"—locations are not sensitive "simply because [they are] crowded." *Bruen*, 597 U.S. at 31.

As the district court acknowledged, "American horseracing has existed since the 1600s," ROA.921, and yet there are precisely zero relevant historical regulations prohibiting carry at racetracks. This bare historical record is telling given that, as horseracing became more and more popular throughout the country, jurisdictions took steps to regulate it. *See* Howland, *Let's Not "Spit the Bit" in Defense of "The Law of the Horse": The Historical and Legal Development of American Thoroughbred Racing*, 14 MARQ. SPORTS L. REV. 473, 483–88 (2004). These included locational restrictions on racing, prohibitions on gambling, and limitations on who could participate in races. *Id.* Notably, in spite of the large crowds that often gathered as spectators, none regulated firearms possession at racetracks.

The district court excused this lack of regulation as a product of the "unorganized" and "spontaneous" nature of horseracing in the Colonial Era. ROA.921. But this undersells the racing institutions that developed in that time. Following the construction of America's first official racetrack on Long Island in 1665, "several other colonies, including Maryland and Virginia, followed suit by providing public funding for similar courses." *Id.* at 484. "[T]he number of tracks and events proliferated" and in the decades leading up to the Revolution, a number of jockey clubs were established to standardize racing rules. *Id.* at 485–86. George Washington attended races, with one diary entry noting that he "had lost one pound, six shillings as a result of wagers placed at Annapolis." *Id.* at 487. Following the Revolution, horseracing had its detractors, but nonetheless "was generally accepted and flourished during the first sixty years of the nineteenth century." *Id.* at 489. Controversy arose surrounding gambling at races, but no one thought to disrupt this country's tradition of arms bearing by excluding firearms from racetracks.

Ducking this inconvenient truth, the district court relied instead on one 1868 Tennessee law barring the carrying of pistols at a race course. ROA.921. This "late-in-time" outlier cannot justify Texas' law prohibiting arms possession at racetracks. The district court pointed to a purported "concern that gambling and horseracing would heighten tensions and potentially escalate violence" to justify this lonely regulation. ROA.921-922. So even setting aside the problem of trying to spin up a

historical tradition based on a single law, this effort fails on *Bruen*'s own terms: To the extent that there was a "societal problem" that mixing gambling and horseracing might lead to violence, the fact that Tennessee in 1868 was the only State that went through the trouble of banning carry is "evidence that the challenged regulation is inconsistent with the Second Amendment." 597 U.S. at 26.

* * *

In sum, the Carry Bans impermissibly burden conduct covered by the Second Amendment. The district court should therefore be reversed.

## III. The District Court Abused Its Discretion In Denying Plaintiffs' Motion For Leave to Amend.

As discussed above (at 10), Plaintiffs moved to amend their complaint to address purported jurisdictional issues Texas raised for the first time during merits briefing after agreeing with the Court and the Plaintiffs that the case was well suited to proceed directly to summary judgment briefing. Specifically, although the State agreed the Carry Bans were unconstitutional, it claimed Plaintiffs lacked standing because local jurisdictions had concurrent (or "primary") enforcement authority.

Against that backdrop, Plaintiffs proposed amending their complaint to add sheriffs and district attorneys in five counties in and around the Dallas/Fort Worth area where Plaintiffs live and travel, as well as the executive director of the Texas Alcoholic Beverage Commission. This proposed amendment was intended to remove any argument as to justiciability by joining these additional jurisdictions that

share concurrent enforcement authority over the Carry Bans with DPS.[15] Aside from naming the new jurisdictions, the core theory of recovery against all defendants remained unchanged: The proposed amended complaint asserted precisely the same Second Amendment challenge to the exact same Carry Bans that Plaintiffs asserted in their original complaint.

The district court denied this request, claiming that it would "disrupt" the litigation and that it was "too late to make such a sweeping change to this lawsuit" because the parties had exchanged summary judgment briefs. ROA.362.

This was an abuse of discretion. Under Federal Rule of Civil Procedure 15(a), once the time for amending a pleading as a matter of course expires, an amendment may only be made "with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15(a) "*requires* courts 'freely give leave [to amend] when justice so requires.'" *Carver v. Atwood*, 18 F.4th 494, 498 (5th Cir. 2021). While "leave is not automatic," Rule 15 does "'evince[ ] a bias in favor of granting leave to amend.'" *In re Southmark Corp.*, 88 F.3d 311, 314 (5th Cir. 1996) (citation omitted). When "exercising its discretion [to permit amendment], a court may consider undue delay, bad faith, dilatory motive, prejudice to the other party, and the

[15] Given DPS' claims about how the Carry Bans are enforced, Plaintiffs' proposed amendment also sought to address any concerns about the scope of injunctive relief in the case. *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985); *see* Fed. R. Civ. Proc. 65(d).

futility of the proposed amendment." *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996). A district court also considers "any prejudice that might arise from denial of leave to amend," along with "judicial economy and whether the amendments would lead to expeditious disposition of the merits of the litigation." *Chitimacha Tribe of La. v. Harry L. L. Co.*, 690 F.2d 1157, 1163 (5th Cir. 1982). On balance, "the discretion of the district court is not broad enough to permit denial," unless the court has a "substantial reason to deny leave to amend." *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 872 (5th Cir. 2000).

The district court exceeded the bounds of appropriate discretion.

First off, Plaintiffs moved to amend early in the case: Less than eight months after filing suit, seven weeks after the court appointed *amici* to defend the Carry Bans in response to Texas' position on summary judgment, and nearly three months before the *amici* were due to file their opposition brief. Most critically, Plaintiffs promptly proposed amending their complaint once the need arose: DPS, after all, didn't file a Rule 12 motion and agreed to proceed directly to summary judgment on this "purely legal" challenge, only to raise purported justiciability issues in its summary judgment briefing. Moreover, "[i]n reviewing the timeliness of a motion to amend, delay alone is insufficient: 'The delay must be *undue*, i.e., it must prejudice the nonmoving party or impose unwarranted burdens on the court.'" *N.*

*Cypress Med. Ctr. Operating Co. v. Aetna Life Ins. Co.*, 898 F.3d 461, 478 (5th Cir. 2018) (citation omitted).

On that score, there could have been no prejudice to DPS by permitting amendment. The proposed amendment did not involve new claims or legal theories and would not have "fundamentally alter[ed] the nature of the case." *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004). The district court's assertion that allowing amendment would "add new statutes and arguments" and somehow "alter the case" is simply wrong. The case would have remained fundamentally the same. The amendment would have merely ensured Plaintiffs could obtain relief from the constitutional injury inflicted by the Carry Bans. The case would have proceeded apace with an identical legal question hanging in the balance.

Finally, permitting amendment would not have been disruptive simply because the parties had exchanged summary judgment briefs. A motion for summary judgment does not "extinguish[] a plaintiff's right to amend a complaint." *Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984); *see Aforigho v. Tape Prods. Co.*, 334 F.R.D. 86, 91 (S.D. Tex. 2020) (collecting cases permitting plaintiffs to amend in the face of a pending summary judgment motion).

This was not a situation where one side sought to alter their factual theories in response to the other side's showing in a summary judgment motion. The district

court could (and should) have considered the dispositive motions as they were because the proposed amendment would not have affected the parties' arguments *vis-à-vis* each other. *See, e.g.*, *Callan v. Deutsche Bank Tr. Co. Americas*, 11 F. Supp. 3d 761, 766 (S.D. Tex. 2014) (permitting plaintiff to file an amended complaint that did "not raise new facts or theories" and then addressing cross-motions for summary judgment); *Clark v. America's Favorite Chicken Co.*, 896 F. Supp. 611, 616 (E.D. La. 1995) (construing summary judgment against proposed amended complaint where "[p]laintiffs [were] not adding a new theory but simply adding defendants under an already existing theory").

On remand, the Plaintiffs should be allowed to amend to name the additional parties and obtain injunctive relief from them consistent with this Court's judgment on the merits as to the Department of Public Safety.

## CONCLUSION

For all these reasons, the Court should reverse and remand the case to the district court with instructions to permit Plaintiffs' proposed amendment and enter summary judgment in favor of the Plaintiffs.

Respectfully submitted,

s/ Bradley A. Benbrook

R. Brent Cooper
COOPER & SCULLY PC

Bradley A. Benbrook
*Counsel of Record*
Stephen M. Duvernay
Jamie G. McWilliam
BENBROOK LAW GROUP, P.C.

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on June 15, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

s/Bradley A. Benbrook_
Bradley A. Benbrook

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the length limits permitted by Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,795 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3. Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Avast Security virus detector and is free of viruses.

Dated: June 15, 2026

s/Bradley A. Benbrook_
Bradley A. Benbrook