No. 26-10302

## In the United States Court of Appeals for the Fifth Circuit

CHARLES ZIEGENFUSS; DAVID MONTGOMERY; BRIAN ROBINSON;
FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation,

*Plaintiffs-Appellants*,

v.

FREEMAN MARTIN, in his official capacity as Director and Colonel of the Texas
Department of Public Safety,

*Defendant-Appellee*

On Appeal from
United States District Court for the Northern District of Texas, 4:24-cv-1049

## RECORD EXCERPTS

R. Brent Cooper
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9500
brent.cooper@cooperscully.com

Bradley A. Benbrook
 *Counsel of Record*
Stephen M. Duvernay
Jamie G. McWilliam
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

*Counsel for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

**Tab**

Docket Entries, No. 4:24-cv-1049 (N.D. Tex.),

   ROA.1-ROA.11 ................................................................... Tab 1

District Court Order Denying Motion to Amend (July 24, 2025),

   ROA.362 .............................................................................. Tab 2

District Court Opinion (March 24, 2026),

   ROA.902-ROA.923 ............................................................. Tab 3

District Court Judgment (March 24, 2026),

   ROA.924 .............................................................................. Tab 4

Notice of Appeal (March 24, 2026),

   ROA.925-ROA.926 ............................................................. Tab 5

CERTIFICATE OF SERVICE

# TAB 1

# U.S. District Court
# Northern District of Texas (Fort Worth)
# CIVIL DOCKET FOR CASE #: 4:24-cv-01049-P

| | |
|---|---|
| Ziegenfuss et al v. Martin | Date Filed: 10/28/2024 |
| Assigned to: Judge Mark Pittman | Date Terminated: 03/24/2026 |
| Cause: 42:1983 Civil Rights Act | Jury Demand: None |
| | Nature of Suit: 950 Other Statutes: |
| | Constitutionality of State Statutes |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Charles Ziegenfuss**                represented by   **R Brent Cooper**
Cooper & Scully PC
900 Jackson Street, Suite 100
Dallas, TX 75202
214-712-9501
Fax: 214-712-9540
Email: brent.cooper@cooperscully.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bradley Alan Benbrook**
Benbrook Law Group PC
701 University Avenue
Suite 106
Sacramento, CA 95825
916-447-4900
Fax: 916-447-4904
Email: brad@benbrooklawgroup.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Samuel Hunter Walton**
Cooper & Scully
900 Jackson Street
Suite 100
Dallas, TX 75202
214-712-9532
Email: hunter.walton@cooperscully.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Stephen Michael Duvernay**
Benbrook Law Group
701 University Ave
Suite 106

Sacramento, CA 95825
916-447-4900
Email: steve@benbrooklawgroup.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Plaintiff**

**David Montgomery**                    represented by **R Brent Cooper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bradley Alan Benbrook**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Samuel Hunter Walton**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Stephen Michael Duvernay**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Plaintiff**

**Brian Robinson**                    represented by **R Brent Cooper**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bradley Alan Benbrook**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Samuel Hunter Walton**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Stephen Michael Duvernay**
(See above for address)
*PRO HAC VICE*

ATTORNEY TO BE NOTICED
Bar Status: Not Admitted

**Plaintiff**

| | | |
|---|---|---|
| **Firearmes Policy Coalition, Inc.** | represented by | **R Brent Cooper** |

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Bradley Alan Benbrook**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Samuel Hunter Walton**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Stephen Michael Duvernay**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

V.

**Defendant**

| | | |
|---|---|---|
| **Steven C McCraw** | represented by | **Zachary Louis Rhines** |

*in his official capacity as Director and Colonel of the Texas Department of Public Safety*
*TERMINATED: 04/22/2025*

Texas Attorney General's Office
PO Box 12548
Mc-017
Austin, TX 78711-2548
512-696-8186
Email: Zachary.Rhines@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Kyle Tebo**
Office of the Attorney General of Texas
PO Box 12548, Capitol Station
Austin, TX 78701
512-463-2100
Email: kyle.tebo@oag.texas.gov
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Ryan Daniel Walters**
Texas Higher Education Coordinating Board

<span style="color:red">**26-10302.3**</span>

Office of the Ombudsman
PO Box 12788
1801 Congress Avenue
Suite 12.200
Austin, TX 78711-2788
512-427-6336
Email: Ryan.Walters@studentsfirst.texas.gov
*TERMINATED: 01/31/2025*
*Bar Status: Admitted/In Good Standing*

**Defendant**

| | | |
|---|---|---|
| **Freeman Martin** | represented by | **Zachary Louis Rhines** |
| *in his official capacity as Director and* | | (See above for address) |
| *Colonel of the Texas Department of Public* | | *LEAD ATTORNEY* |
| *Safety* | | *ATTORNEY TO BE NOTICED* |
| | | *Bar Status: Not Admitted* |

**Kyle Tebo**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Amicus**

| | | |
|---|---|---|
| **Amicus Curiae** | represented by | **Eric Ruben** |
| *Appointed per [34] Order* | | 3315 Daniel Ave |

SMU Dedman School of Law
Dallas, TX 75205
214-768-2581
Email: eruben@smu.edu
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

**Gregg Costa**
Gibson Dunn & Crutcher
811 Main Street, Suite 3000
Houston, TX 77002
346-718-6649
Email: gcosta@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alexa Nicole Acquista**
Gibson Dunn & Crutcher
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
214-698-3231
Email: aacquista@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**26-10302.4**

*Bar Status: Admitted/In Good Standing*

**Andrew Reid Mitchell**
Gibson Dunn & Crutcher LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
214-698-3209
Email: amitchell@gibsondunn.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Arjun Pushkar Ogale**
Gibson Dunn & Crutcher LLP
2001 Ross Avenue
Suite 2100
Dallas, TX 75201
214-698-3322
Email: aogale@gibsondunn.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Kylie Calabrese**
Gibson Dunn & Crutcher
811 Main Street
Suite 3000
Houston, TX 77002
346-718-6717
Email: kcalabrese@gibsondunn.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/28/2024 | 1 (p.12) | COMPLAINT against Steven C McCraw filed by Firearmes Policy Coalition, Inc., Charles Ziegenfuss, Brian Robinson, David Montgomery. (Filing fee $405; Receipt number ATXNDC-15022542) Plaintiff will submit summons(es) for issuance. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 (p.12) Cover Sheet, # 2 (p.27) Cover Sheet Supplement) (Cooper, R) (Entered: 10/28/2024) |
| 10/28/2024 | 2 (p.27) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Charles Ziegenfuss, David Montgomery, Brian Robinson, Firearmes Policy Coalition, Inc.. (Clerk QC note: No affiliate entered in ECF). (Cooper, R) (Entered: 10/28/2024) |
| 10/28/2024 | 3 (p.29) | |

26-10302.5

| | | |
|---|---|---|
| | | New Case Notes: A filing fee has been paid. File to: Judge Pittman. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. Attorneys are further reminded that, if necessary, they must comply with Local Rule 83.10(a) within 14 days or risk the possible dismissal of this case without prejudice or without further notice. (sre) (Entered: 10/30/2024) |
| 10/30/2024 | 4 (p.31) | Request for Clerk to issue Summons filed by Charles Ziegenfuss. (Walton, Samuel) (Entered: 10/30/2024) |
| 10/30/2024 | 5 (p.33) | Summons Issued as to Steven C McCraw. (sre) (Entered: 10/30/2024) |
| 11/07/2024 | 6 (p.35) | SUMMONS Returned Executed as to Steven C McCraw ; served on 10/31/2024. (Walton, Samuel) (Entered: 11/07/2024) |
| 11/20/2024 | 7 (p.38) | NOTICE of Attorney Appearance by Kyle Tebo on behalf of Steven C McCraw. (Filer confirms contact info in ECF is current.) (Tebo, Kyle) (Entered: 11/20/2024) |
| 11/20/2024 | 8 (p.40) | NOTICE of Attorney Appearance by Zachary Louis Rhines on behalf of Steven C McCraw. (Filer confirms contact info in ECF is current.) (Rhines, Zachary) (Entered: 11/20/2024) |
| 11/20/2024 | 9 (p.42) | Unopposed MOTION to Extend Time Unopposed, FRCP 6(b) filed by Steven C McCraw (Attachments: # 1 (p.12) Proposed Order) (Rhines, Zachary) (Entered: 11/20/2024) |
| 11/21/2024 | 10 (p.46) | ORDER: Before the Court is Defendant's Unopposed Motion for Extension of Time to Respond to Plaintiff's Complaint. ECF No. 9 (p.42) . Having considered the Motion and applicable law, the Court hereby GRANTS the Motion. Therefore, the Court ORDERS that Defendant must answer or otherwise respond to Plaintiffs Complaint on or before December 21, 2024. (Ordered by Judge Mark Pittman on 11/21/2024) (sre) (Entered: 11/21/2024) |
| 11/21/2024 | 11 (p.47) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-15080559) filed by Charles Ziegenfuss, David Montgomery, Brian Robinson, Firearmes Policy Coalition, Inc. (Attachments: # 1 (p.12) Exhibit(s) Certificate of Good Standing, # 2 (p.27) Proposed Order) (Benbrook, Bradley) (Entered: 11/21/2024) |
| 11/21/2024 | 12 | ELECTRONIC ORDER granting 11 (p.47) Application for Admission Pro Hac Vice of Bradley A. Benbrook. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 11/21/2024) (wra) (Entered: 11/21/2024) |
| 11/21/2024 | 13 (p.53) | Application for Admission Pro Hac Vice with Certificate of Good Standing (Filing fee $100; Receipt number ATXNDC-15080716) filed by Charles Ziegenfuss, David Montgomery, Brian Robinson, Firearmes Policy Coalition, Inc. (Attachments: # 1 (p.12) Exhibit(s) Certificate of Good Standing, # 2 (p.27) Proposed Order) (Duvernay, Stephen) (Entered: 11/21/2024) |
| 11/21/2024 | 14 | ELECTRONIC ORDER granting 13 (p.53) Application for Admission Pro Hac Vice of Stephen M. Duvernay. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 11/21/2024) (wra) (Entered: 11/21/2024) |

| | | |
|---|---|---|
| 11/22/2024 | 15 (p.59) | NOTICE of Attorney Appearance by Ryan Daniel Walters on behalf of Steven C McCraw. (Filer confirms contact info in ECF is current.) (Walters, Ryan) (Entered: 11/22/2024) |
| 12/19/2024 | 16 (p.61) | Unopposed MOTION to Extend Time Time to File Answer filed by Steven C McCraw (Attachments: # 1 (p.12) Proposed Order) (Tebo, Kyle) (Entered: 12/19/2024) |
| 12/19/2024 | 17 (p.65) | ORDER: Before the Court is the Defendant's Unopposed Motion for Extension of Time to Respond to Plaintiff's Complaint. ECF No. 16 (p.61) . The Court hereby GRANTS the Motion. The Court ORDERS that Defendant respond to Plaintiff's Complaint on or before February 4, 2025. (Ordered by Judge Mark Pittman on 12/19/2024) (saw) (Entered: 12/19/2024) |
| 01/31/2025 | 18 (p.66) | Unopposed MOTION to Withdraw as Attorney *Ryan D. Walters* filed by Steven C McCraw (Attachments: # 1 (p.12) Proposed Order) (Rhines, Zachary) (Entered: 01/31/2025) |
| 01/31/2025 | 19 (p.69) | ORDER: Before the Court is Defendant's Unopposed Motion to Withdraw Ryan Walters as Counsel. ECF No. 18 (p.66) . Having considered the Motion and applicable law, the Court finds the Motion should be and hereby is GRANTED. Accordingly, the Court ORDERS that Ryan Walters be withdrawn as counsel of record for Defendant, Steven McCraw. (Ordered by Judge Mark Pittman on 1/31/2025) (sre) (Entered: 01/31/2025) |
| 02/04/2025 | 20 (p.70) | ANSWER to 1 (p.12) Complaint,,,,, filed by Steven C McCraw. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. Attorneys are further reminded that, if necessary, they must comply with Local Rule 83.10(a) within 14 days or risk the possible dismissal of this case without prejudice or without further notice. (Rhines, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | 21 (p.76) | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Steven C McCraw. (Clerk QC note: No affiliate entered in ECF). (Rhines, Zachary) (Entered: 02/04/2025) |
| 02/04/2025 | 22 (p.78) | ORDER: The Court ORDERS that the Parties meet and confer regarding this proposal and submit any objections to immediately transitioning to summary judgment by February 11, 2025. If there are no objections, the Court further ORDERS the Parties to include a joint proposal for a briefing schedule by February 11, 2025. (Ordered by Judge Mark Pittman on 2/4/2025) (sre) (Entered: 02/04/2025) |
| 02/11/2025 | 23 (p.79) | Joint STATUS REPORT *Regarding Summary Judgment Briefing* filed by Steven C McCraw, Charles Ziegenfuss, David Montgomery, Brian Robinson, Firearmes Policy Coalition, Inc. (Tebo, Kyle) Modified filers on 2/12/2025 (jnp). (Entered: 02/11/2025) |
| 02/12/2025 | 24 (p.83) | ORDER: The Court ORDERS that Plaintiffs file their Motion for Summary Judgment and Defendant file his Cross-Motion for Summary Judgment on or before April 16, 2025. The Court further ORDERS that the Parties file a combined Opposition and Reply, as a single brief not to exceed 50 pages, on or before May 14, 2025. (Ordered by Judge Mark Pittman on 2/12/2025) (jnp) (Entered: 02/12/2025) |
| 04/16/2025 | 25 (p.84) | MOTION for Summary Judgment filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss (Benbrook, Bradley) (Entered: |

| | | |
|---|---|---|
| | | 04/16/2025) |
| 04/16/2025 | 26 (p.87) | Brief/Memorandum in Support filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re 25 (p.84) MOTION for Summary Judgment (Benbrook, Bradley) (Entered: 04/16/2025) |
| 04/16/2025 | 27 (p.111) | Appendix in Support filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re 25 (p.84) MOTION for Summary Judgment (Benbrook, Bradley) (Entered: 04/16/2025) |
| 04/16/2025 | 28 (p.129) | ADDITIONAL ATTACHMENTS to 25 (p.84) Motion for Summary Judgment by Plaintiffs Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss. (Benbrook, Bradley) (Entered: 04/16/2025) |
| 04/16/2025 | 29 (p.132) | Cross MOTION for Summary Judgment filed by Steven C McCraw with Brief/Memorandum in Support. (Rhines, Zachary) (Entered: 04/16/2025) |
| 04/16/2025 | 30 (p.135) | Brief/Memorandum in Support filed by Steven C McCraw re 29 (p.132) Cross MOTION for Summary Judgment (Rhines, Zachary) (Entered: 04/16/2025) |
| 04/16/2025 | 31 (p.170) | Appendix in Support filed by Steven C McCraw re 29 (p.132) Cross MOTION for Summary Judgment (Rhines, Zachary) (Entered: 04/16/2025) |
| 04/22/2025 | 32 (p.176) | ORDER: The Court ORDERS that the Parties file replies, separate from the opposition briefs due on May 14, 2025. The reply briefs shall be filed on or before May 28, 2025. The Court finds it necessary to appoint an amicus curiae to defend the merits of the Texas Penal Code sections at issue. The Court will allow the Parties to file objections to the Court appointing an amicus curiae by April 29, 2025. Freeman Martin added. Steven C McCraw (in his official capacity as Director and Colonel of the Texas Department of Public Safety) terminated. (Ordered by Judge Mark Pittman on 4/22/2025) (jnp) (Entered: 04/22/2025) |
| 04/29/2025 | 33 (p.178) | RESPONSE filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re: 32 (p.176) Order Setting Deadline/Hearing,,, Add and Terminate Parties,, (Benbrook, Bradley) (Entered: 04/29/2025) |
| 05/08/2025 | 34 (p.181) | ORDER: The Court APPOINTS the following two attorneys as amici curiae in this case: Eric Ruben and Gregg Costa. The Court also ORDERS that Plaintiffs file any objections to the Court's appointment on or before May 15, 2025. Brief of amici curiae is due 9/12/2025. Plaintiffs' response brief is due 10/10/25. (Ordered by Judge Mark Pittman on 5/8/2025) (hcc) (Entered: 05/08/2025) |
| 05/08/2025 | | ***Clerk's Notice of delivery: (see NEF for details) Docket No:34. Thu May 8 16:28:20 CDT 2025 (crt) (Entered: 05/08/2025) |
| 05/14/2025 | 35 (p.183) | RESPONSE filed by Freeman Martin, Steven C McCraw re: 25 (p.84) MOTION for Summary Judgment (Tebo, Kyle) (Entered: 05/14/2025) |
| 05/14/2025 | 36 (p.195) | RESPONSE filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re: 29 (p.132) Cross MOTION for Summary Judgment (Benbrook, Bradley) (Entered: 05/14/2025) |
| 05/15/2025 | 37 (p.223) | RESPONSE filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re: 34 (p.181) Order Setting Deadline/Hearing,, Add and Terminate Parties, (Benbrook, Bradley) (Entered: 05/15/2025) |
| 05/28/2025 | | |

| | | |
|---|---|---|
| | 38 (p.226) | NOTICE of Attorney Appearance by Gregg Costa on behalf of Amicus Curiae. (Filer confirms contact info in ECF is current.) (Costa, Gregg) (Entered: 05/28/2025) |
| 05/28/2025 | 39 (p.229) | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Eric Ruben (Filing fee $100; Receipt number ATXNDC-15532552) filed by Amicus Curiae (Attachments: # 1 (p.12) Proposed Order Proposed Order for Admission Pro Hac Vice, # 2 (p.27) Exhibit(s) Certificate of Good Standing) (Costa, Gregg) (Entered: 05/28/2025) |
| 05/28/2025 | 40 | ELECTRONIC ORDER granting 39 (p.229) Application for Admission Pro Hac Vice of Eric Ruben. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Mark Pittman on 5/28/2025) (chmb) (Entered: 05/28/2025) |
| 05/28/2025 | 41 (p.235) | REPLY filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re: 25 (p.84) MOTION for Summary Judgment (Benbrook, Bradley) (Entered: 05/28/2025) |
| 05/28/2025 | 42 (p.249) | REPLY filed by Freeman Martin re: 25 (p.84) MOTION for Summary Judgment (Rhines, Zachary) (Entered: 05/28/2025) |
| 06/26/2025 | 43 (p.264) | MOTION for Leave to File First Amended Complaint filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss (Benbrook, Bradley) (Entered: 06/26/2025) |
| 06/26/2025 | 44 (p.267) | Brief/Memorandum in Support filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re 1 (p.12) Complaint,,,,, (Attachments: # 1 (p.12) Proposed Amendment Proposed Amended Complaint, # 2 (p.27) Exhibit(s) Redline Amended Complaint, # 3 (p.29) Proposed Order) (Benbrook, Bradley) (Entered: 06/26/2025) |
| 06/26/2025 | 45 (p.320) | ORDER: Before the Court is Plaintiffs' 43 (p.264) Motion for Leave to File First Amended Complaint (Motion). The Court hereby SETS the Motion for a hearing at 1:30 p.m. on July 24, 2025, in the Fourth Floor Courtroom of the Eldon B. Mahon United States Court, 501 W 10th St., Fort Worth, Texas, 76102. All counsel are ORDERED to attend. (Ordered by Judge Mark Pittman on 6/26/2025) (hcc) (Entered: 06/26/2025) |
| 07/17/2025 | 46 (p.321) | MOTION Leave to File Notice of Supplemental Authority re 25 (p.84) MOTION for Summary Judgment filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss with Brief/Memorandum in Support. (Attachments: # 1 (p.12) Exhibit(s) Proposed Notice of Supplemental Authority, # 2 (p.27) Proposed Order) (Benbrook, Bradley) (Entered: 07/17/2025) |
| 07/17/2025 | 47 (p.331) | RESPONSE AND OBJECTION filed by Freeman Martin re: 43 (p.264) MOTION for Leave to File First Amended Complaint (Tebo, Kyle) (Entered: 07/17/2025) |
| 07/17/2025 | 48 (p.341) | ORDER: Having considered the Motion, all responses, and applicable law, the Court GRANTS the 46 (p.321) Motion. Plaintiffs' Notice of Supplemental Authority shall be deemed filed. (Ordered by Judge Mark Pittman on 7/17/2025) (hcc) (Entered: 07/17/2025) |
| 07/17/2025 | 49 (p.342) | NOTICE of Supplemental Authority filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss (hcc) (Entered: 07/18/2025) |

| | | |
|---|---|---|
| 07/22/2025 | 50 (p.346) | REPLY filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re: 43 (p.264) MOTION for Leave to File First Amended Complaint (Benbrook, Bradley) (Entered: 07/22/2025) |
| 07/23/2025 | 51 (p.359) | NOTICE of Attorney Appearance by Alexa Acquista on behalf of Amicus Curiae. (Filer confirms contact info in ECF is current.) (Acquista, Alexa) (Entered: 07/23/2025) |
| 07/24/2025 | 52 | ELECTRONIC Minute Entry for proceedings held before Judge Mark Pittman: Motion Hearing held on 7/24/2025 re: 43 (p.264) MOTION for Leave to File First Amended Complaint. Attorney Appearances: Plaintiff - Bradley Benbrook, Stephen Duvernay; Defense - Zachary Rhines, Kyle Tebo, Alexa Acquista. (Court Reporter: Monica Guzman) (No exhibits) Time in Court - :47. (chmb) (Entered: 07/24/2025) |
| 07/24/2025 | 53 (p.362) | ORDER: For these reasons and all others stated on the record at the hearing, the Court DENIES the 43 (p.264) Motion. (Ordered by Judge Mark Pittman on 7/24/2025) (hcc) (Entered: 07/24/2025) |
| 09/03/2025 | 54 (p.363) | NOTICE of Attorney Appearance by Arjun Pushkar Ogale on behalf of Amicus Curiae. (Filer confirms contact info in ECF is current.) (Ogale, Arjun) (Entered: 09/03/2025) |
| 09/05/2025 | 55 (p.366) | NOTICE of Attorney Appearance by Andrew Reid Mitchell on behalf of Amicus Curiae. (Filer confirms contact info in ECF is current.) (Mitchell, Andrew) (Entered: 09/05/2025) |
| 09/05/2025 | 56 (p.369) | NOTICE of Attorney Appearance by Kylie Calabrese on behalf of Amicus Curiae. (Filer confirms contact info in ECF is current.) (Calabrese, Kylie) (Entered: 09/05/2025) |
| 09/12/2025 | 57 (p.372) | Brief/Memorandum in Support filed by Amicus Curiae re 34 (p.181) Order Setting Deadline/Hearing,, Add and Terminate Parties, *Brief of Appointed Amici Curiae Eric Ruben and Gregg Costa to Defend the Merits of Texas Penal Code § 46.03(a)(4), 46.03(a)(7), and 46.03(a)(8)* (Costa, Gregg) (Entered: 09/12/2025) |
| 09/12/2025 | 58 (p.419) | Appendix in Support filed by Amicus Curiae re 57 (p.372) Brief/Memorandum in Support of Motion, (Costa, Gregg) (Entered: 09/12/2025) |
| 10/10/2025 | 59 (p.856) | REPLY filed by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss re: 57 (p.372) Brief/Memorandum in Support of Motion, (Benbrook, Bradley) (Entered: 10/10/2025) |
| 10/28/2025 | 60 (p.893) | ORDER: Before the Court are the Motion for Summary Judgment and the Cross Motion for Summary Judgment. ECF Nos. 25 (p.84) , 29 (p.132) . The Court sets the Motions and all related filings for a hearing on Thursday, November 20, 2025, at 2:00 p.m. The hearing will take place in Judge Pittman's courtroom on the fourth floor of the Eldon B. Mahon Courthouse. (Ordered by Judge Mark Pittman on 10/28/2025) (hcc) (Entered: 10/28/2025) |
| 11/06/2025 | 61 (p.894) | Unopposed MOTION to Continue *Hearing Date* filed by Amicus Curiae (Attachments: # 1 (p.12) Proposed Order) (Costa, Gregg) (Entered: 11/06/2025) |
| 11/07/2025 | 62 (p.900) | ORDER: Before the Court is the Unopposed Motion for Continuance of Hearing Date. ECF No. 61 (p.894) . The Motion is hereby GRANTED. The Court sets the Motions and all related filings for a hearing on Thursday, December 11, 2025, at 2:00 p.m. The hearing will take place in Judge Pittman's courtroom on the fourth floor of |

| | | |
|---|---|---|
| | | the Eldon B. Mahon Courthouse. The Courthouse's address is 501 W. 10th Street, Fort Worth, TX 76102. (Ordered by Judge Mark Pittman on 11/7/2025) (hcc) (Entered: 11/07/2025) |
| 12/09/2025 | 63 (p.901) | ORDER: The Court previously set a hearing in this case for Thursday, December 11, 2025, at 2:00 p.m. ECF No. 62 (p.900) . The Court hereby ORDERS that the hearing be changed to 1:30 p.m. on Thursday, December 11, 2025, instead of 2:00 p.m. (Ordered by Judge Mark Pittman on 12/9/2025) (hcc) (Entered: 12/09/2025) |
| 12/11/2025 | 64 | ELECTRONIC Minute Entry for proceedings held before Judge Mark Pittman: Motion Hearing held on 12/11/2025 re 25 (p.84) and 29 (p.132) Motions for Summary Judgment. Attorney Appearances: Plaintiff - R Brent Cooper, Bradley Benbrook; Defense - Zachary Rhines, Kyle Tebo; Amicus Curiae- Eric Ruben, Gregg Costa. (Court Reporter: Monica Guzman) (No exhibits) Time in Court - 1:18. (chmb) Modified docket text on 1/2/2026 (chmb). (Entered: 12/19/2025) |
| 01/02/2026 | 65 (p.927) | Notice of Filing of Official Electronic Transcript of Summary Judgment Motions Proceedings held on December 11, 2025 before Judge Mark T. Pittman. Court Reporter/Transcriber Monica Guzman, Telephone number 817-850-6681 or mguzman.csr@yahoo.com. Parties are notified of their duty to review the transcript. A copy may be purchased from the court reporter or viewed at the clerk's office. If the transcript contains personal identifiers that must be redacted under MO 61, Fed.R.Civ.P. 5.2 or Fed.R.Crim.P. 49.1, or if the transcript contains the name of a minor child victim or a minor child witness that must be redacted under 18 U.S.C. § 3509, file a Redaction Request - Transcript within 21 days. If no action is taken, the entire transcript will be made available through PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed. (68 pages) Redaction Request due 1/23/2026. Redacted Transcript Deadline set for 2/2/2026. Release of Transcript Restriction set for 4/2/2026. (mwg) (Entered: 01/02/2026) |
| 03/24/2026 | 66 (p.902) | OPINION & ORDER: Based on the foregoing, it is ORDERED that Texas's Motion 29 (p.132) is GRANTED and Plaintiffs' Motion 25 (p.84) is DENIED. (Ordered by Judge Mark Pittman on 3/24/2026) (hcc) (Entered: 03/24/2026) |
| 03/24/2026 | 67 (p.924) | FINAL JUDGMENT: This final judgment is issued pursuant to Federal Rule of Civil Procedure 58(a). In accordance with the Parties' Joint Stipulation, this case is DISMISSED with prejudice. The Clerk of the Court shall transmit a true copy of this judgment to the parties. (Ordered by Judge Mark Pittman on 3/24/2026) (hcc) (Main Document 67 replaced on 3/31/2026) (bdb). (Entered: 03/24/2026) |
| 03/24/2026 | 68 (p.925) | NOTICE OF APPEAL to the Fifth Circuit by Firearmes Policy Coalition, Inc., David Montgomery, Brian Robinson, Charles Ziegenfuss. Filing fee $605, receipt number ATXNDC-16301765. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Benbrook, Bradley) (Entered: 03/24/2026) |

TAB 2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**CHARLES ZIEGENFUSS, ET AL.,**

    Plaintiffs,

v.

                                                   **No. 4:24-cv-01049-P**

**FREEMAN MARTIN,**

    Defendant.

## ORDER

Plaintiffs initiated the above-captioned case nearly nine months ago. ECF No. 1. Now before the Court is Plaintiffs' Motion for Leave to File First Amended Complaint. ECF No. 43. Even though cross-motions for summary judgment are already fully briefed by the Parties, Plaintiffs seek to file an amended complaint. Because of this potentially drastic change, the Court held a hearing on July 24, 2025. *See* ECF No. 45.

At the hearing, the Court heard arguments from the Parties and voiced its various concerns with the Motion. *First*, on February 11, 2025, all Parties agreed to proceed with summary judgment briefing because the issues presented were purely legal. ECF No. 23. The addition of new parties and briefing would disrupt that agreement that has guided this case until now. *Second*, the Motion proposes to add new statutes and arguments that would further alter the case. And *third*, it is too late to make such a sweeping change to this lawsuit. Granting leave to file an amended complaint would likely delay the disposition of the fully briefed motions for summary judgment, and such a delay would prejudice the State. For these reasons and all others stated on the record at the hearing, the Court **DENIES** the Motion.

    **SO ORDERED** on this **24th day of July 2025.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

# TAB 3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**CHARLES ZIEGENFUSS, ET AL.,**

   Plaintiffs,

v.                                                                  **No. 4:24-cv-01049-P**

**FREEMAN MARTIN,**

   Defendant.

## OPINION & ORDER

Before the Court are two motions. The first is a Motion for Summary Judgment filed by Plaintiffs. ECF No. 25. The Second is a Cross Motion for Summary Judgment filed by the State of Texas. ECF No. 29. Having considered the Motions, briefs, and applicable law, the Court finds the statutory provisions at issue in the Motions constitutional. Accordingly, the Court **GRANTS** Texas's Motion and **DENIES** Plaintiffs' Motion.

## BACKGROUND

Texas law makes it a crime to carry firearms in a number of public spaces. Texas law prohibits "intentionally, knowingly, or recklessly possess[ing] or go[ing] with a firearm, location-restricted knife, club, or prohibited weapon" on the "premises" of three types of spaces. TEX. PENAL CODE § 46.03. First, this provision applies to "racetracks." *Id.* § 46.03(a)(4). Second, this provision applies to "premises" "of a business that has a permit or license issued under [the Texas Alcoholic Beverage Code], if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption." *Id.* § 46.03(a)(7). Third, the prohibition applies to "premises" "where a high school, collegiate, or professional sporting event or interscholastic event is taking place." *Id.* § 46.03(a)(8). Texas has enjoyed the protection of these laws passed by their elected representatives for decades. Section 46.03 dates back to 1973 and codified prior longstanding firearm prohibitions. *See* TEX. PENAL CODE §§ 46.02, 46.04 (1974). One of the latest pertinent amendments to these provisions was passed as far back

as 1995, when Texas banned citizens possessing a concealed-carry license from carrying handguns on the premises of businesses primarily profiting from alcohol, at interscholastic events, and at sporting events of nearly all levels. *See* An Act Relating to the Issuance of a License to Carry a Concealed Handgun, 74th R.S., ch. 229, § 4, 1995 Tex. Gen. Laws 1998, Tex. Penal Code § 46.035 (1995). And some of the other relevant provisions were enacted even earlier than that amendment, which was passed 31 years ago.

Here, Plaintiffs sue Defendant Freeman Martin, director of the Texas Department of Public Safety ("DPS") (the successor of previous Defendant, Steven C. McGraw) pursuant to 42 U.S.C. § 1983, seeking a declaratory injunction, permanent injunction, and reasonable attorneys' fees under 42 U.S.C. § 1988. ECF No. 1 at 13. Plaintiffs include Charles Ziegenfuss, David Montgomery, Brian Robinson, and Firearms Policy Coalition, Inc. ("FPC"). FPC is an organization based out of Sacramento, California, not Texas. The claims rest on a facial challenge asserting that the Firearms Prohibitions violate the Second and Fourteenth Amendments. Plaintiffs assert that the Second Amendment grants them the right to "carry[] loaded, operable handguns in case of confrontation for immediate self-defense in public places." Compl. at 8.

Texas initially argued in its Cross Motion for Summary Judgment for the case to be dismissed on justiciability grounds and chose to "not contest the underlying merits." ECF No. 29 at 1. Because the Attorney General of Texas declined to defend the merits of the Legislature's duly-enacted laws, the Court needed to look elsewhere for a defense of the relevant statutory provisions. *See generally Duties and Responsibilities of the Office of the Attorney General*, TEX. ATT'Y GEN., https://tinyurl.com/yf95ptet (duties include "defend[ing] the laws and the Constitution of the State of Texas"); *accord* Speaker Sam Rayburn, *quoted in* D.B. HARDEMAN & DONALD C. BACON, RAYBURN: A BIOGRAPHY 429 (1987) ("A man who is not willing to get out and defend what he has done will ultimately find himself in poor shape politically."). As a result, the Court appointed attorneys Professor Eric Ruben and Judge Gregg Costa as amici curiae to defend the underlying merits. ECF No. 34. Amici accordingly filed its brief. ECF No. 57.

The Motion and Cross Motion for Summary Judgment are now ripe for review. ECF Nos. 25, 29.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact" and "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if the evidence presented would allow a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242–43 (1986). And a fact is "material" when it might affect the outcome of a case. *Hobby Distillers Ass'n v. Alcohol and Tobacco Tax and Trade Bureau*, 740 F. Supp. 3d 509, 517 (N.D. Tex. 2024). When determining whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmovant. *First Am. Title Ins. Co. v. Cont'l Cas. Co.*, 709 F.3d 1170, 1173 (5th Cir. 2013). In conducting its evaluation, the Court may rely on any admissible evidence of record but need only consider materials cited by the parties. FED. R. CIV. P. 56(c)(1)–(3).

Considering that there are no factual issues, the determinative inquiry is which Party is entitled to judgment as a matter of law. Because Plaintiffs bring a facial challenge to the Firearms Prohibitions,[1] they must "'establish that no set of circumstances exists under which the [challenged law] would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). The Parties' motions are a vehicle for presenting to the Court a question of law: Are the Texas Firearms Prohibitions constitutional?

## ANALYSIS

To successfully challenge a firearms regulation under the Second Amendment, Plaintiffs must satisfy a two-step test. *First*, a Plaintiff

---

[1] Plaintiffs also seek a universal permanent injunction "enjoining enforcement of [Texas's sensitive-places laws] with respect to places open to the public." Compl. at 13; *but see Trump v. CASA, Inc.*, 606 U.S. 656, 145 S. Ct. 2530, 2554 (2025) (noting that "[b]ecause the universal injunction lacks a historical pedigree, it falls outside the bounds of a federal court's equitable authority").

must show that the plain text of the Second Amendment covers the proscribed conduct. If the Second Amendment covers the conduct, it follows that "the Constitution presumptively protects [it]." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). In that case, the burden shifts to the government, and the inquiry continues to step two. To defend the challenged regulation at the *second* step, the government must show that the regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

To make that showing, the government must provide evidence of analogous regulations from around the Founding era, when the Second Amendment was ratified. The Founding era example need not be a "dead ringer" for, or a "historical twin" of, the challenged regulation, but it must be "relevantly similar" using "commonplace" analogical legal reasoning. *Rahimi*, 602 U.S. at 692, "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692. "Historical regulations reveal a principle, not a mold." *Id.* at 740 (Barrett, J., concurring). Modern regulations need not "precisely match [their] historical precursors." *Id.* at 692. Whether a similarity is relevant depends on the answers to two questions—*why* the regulation was enacted and *how* the regulation operates. The first question asks what social ills the government seeks to lessen by placing a burden on the natural right to armed self-defense. *Id.* And the second considers whether the law burdens the Second Amendment right "to an extent beyond what was done at the Founding" and how similar those burdens are. *Id.*

Here, the Court finds that the Firearms Prohibitions regulate conduct that falls within the plain text of the Second Amendment. Further, Amici have demonstrated that Texas's law is sufficiently analogous to historical laws prohibiting the carry of firearms in sensitive places to justify Texas's Firearms Prohibitions.

4

**A. Standing and Sovereign Immunity Pose No Barriers to Plaintiffs' Lawsuit.**

Plaintiffs have standing to litigate their claim that the Firearms Prohibition violate the Second Amendment.[2] To demonstrate standing, a Plaintiff must show: (1) an actual or imminent "injury-in-fact"; (2) that is caused by and fairly traceable to the challenged action of the Defendant; and (3) that is likely redressable by a favorable judicial decision. *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiff, FPC, enjoys associational standing as representative of the three named Plaintiffs, who are members of FPC. An "association" has standing to sue on behalf of its members' interests when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Assoc. of Am. Physicians & Surgeons, Inc. v.*

---

[2] Although Plaintiffs' standing to bring this case is easy to determine, this is not always true under current precedent. Indeed, standing jurisprudence has been aptly described as a "morass of imprecision." *N.H. Rt. to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 12 (1st Cir. 1996). Recent decisions from the Supreme Court on this issue are notoriously difficult to reconcile. *See, e.g., Haaland v. Brackeen*, 599 U.S. 255, 277 (2023) (holding that a state lacks standing to challenge federal law preempting state laws on foster child placement, despite the fact that "Congress's Article I powers rarely touch state family law"); *contra Massachusetts v. EPA*, 549 U.S. 497, 519 (2007) (holding that a state had standing to challenge the EPA's decision not to regulate emissions of greenhouse gases because that power was preempted and greenhouse gases affected "the earth and air within [their] domain"); *contra United States v. Texas*, 599 U.S. 670, 671 (2023) (holding that states near an international border lacked standing to challenge the federal government's immigration enforcement policies because the state's financial injury was not "legally cognizable"); *but see Biden v. Nebraska*, 143 S. Ct. 2355, 2358 (2023) (holding that Missouri established standing by showing that it "suffered . . . a concrete injury to a legally protected interest, like property or money"); *contra Dept. of Ed. v. Brown*, 600 U.S. 551, 568 (2023) (holding that individual loan borrowers lacked standing to allege the federal government unlawfully excluded them from a one-time direct benefit program purportedly designed to address harm caused by an indiscriminate global pandemic).

*Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (citing *Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Here, at issue is whether a favorable court decision would redress the alleged injuries suffered by the named Plaintiffs and thus confer associational standing on FPC. Texas claims that redressability is an issue. It argues DPS is not primarily responsible for enforcing these laws and that local law enforcement performs most of the relevant enforcement actions. Texas's reasoning is misguided.

For starters, the redressability prong need not be met with a perfect remedy; a "partial remedy" suffices. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (cleaned up) (holding that when "establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitely demonstrate that a victory would completely remedy the harm"). So, all that is needed for standing here is that DPS at least partially enforces the Firearms Prohibitions; the fact that local law enforcement may not be subject to an injunction does not undermine that analysis. Indeed, the State even concedes "DPS has authority to enforce every portion of the State's criminal law," and implies at minimum that they have some responsibility for enforcing these laws, even if not the "primary responsibility." Def.'s Br. at 1, 3. Because all that is needed is a "scintilla of enforcement by the relevant state official," Plaintiffs have standing against DPS. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 786 (5th Cir. 2024) (cleaned up).

As for the sovereign immunity argument, Texas's assertion fails on that front as well. Texas contends that Director Martin of DPS is not subject to the *Ex parte Young* exception to sovereign immunity. It argues that he is too far afield from enforcement of the Firearms Prohibitions to be properly subject to *Ex parte Young*. *See* 209 U.S. 123 (1908). "*Ex parte Young* permits plaintiffs to sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law," *Texas Alliance for Retired Americans v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022), as long as the officer has "some connection with the enforcement of the [challenged] act." *Ex parte Young*, 209 U.S. at 157. For the reasons

6

mentioned in the standing analysis, Director Martin, as head of DPS, is adequately connected to enforcement of these laws. Indeed, Director Martin's job description even says that he himself "leads the agency of over 11,000 commissioned and non-commissioned personnel charged with ensuring the safety and security of Texas." Texas Dep't of Pub. Safety, Press Release, *Freeman F. Martin Assumes Command of DPS* (Dec. 2, 2024). And those include the Texas Rangers and Texas Highway Patrol troopers. Texas Dept' of Pub. Safety, Organization Chart, https://perma.cc/JNC4-TYTR. Those officers have jurisdiction to make arrests for violations of these laws throughout all of Texas. Texas Gov't Code §§ 411.022, .032. Director Martin is, therefore, lawfully within the scope of the *Ex parte Young* exception to be subject to a suit for prospective injunctive relief.

## B. The Second Amendment's Plain Text Covers Conduct Restricted by the Firearms Prohibitions, Even in Sensitive Places.

The first step requires an analysis of the latter portion of the Second Amendment text: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The first clause of the Amendment is prefatory: "A well-regulated Militia, being necessary to the security of a free State . . . ." *Id.* The prefatory clause does not expand or diminish the scope of the right protected by the second clause: " . . . the right of the people to keep and bear Arms, shall not be infringed." *Id.*; *District of Columbia v. Heller*, 554 US. 570, 578 (2008). Instead, it announces the purpose for codifying the right to bear arms in the following part of the sentence. *Id.* at 599. Therefore, the Court looks to the main clause—"the right of the people to keep and bear Arms, shall not be infringed." That clause determines whether the conduct forbidden by the challenged laws is "presumptively protect[ed]." *Bruen*, 597 U.S. at 24; *see Elite Precision Customs LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 805 F. Supp. 3d 711 (N.D. Tex 2025) (Pittman, J.) (finding that conditions requiring firearms purchased out of state to be first transported to federally licensed dealers fell outside the ambit of the Second Amendment).

*First*, the Court has no trouble finding that the Firearms Prohibitions apply to "the people," *cf. Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740 (N.D. Tex. 2022) (Pittman, J.), even in "sensitive places." *See United States v. Diaz*, 116 F.4th 458, 466 (5th Cir. 2024). Amici incorrectly argue that sensitive place restrictions fall outside the ambit of the Second Amendment's coverage at step one of the *Bruen* text. It is clear that laws restricting the carry of firearms in "sensitive places" are presumptively constitutional. *Heller*, 554 U.S. at 626–27 n.26; *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring). As the Supreme Court has made abundantly clear, its precedents should not be taken to "cast doubt on longstanding prohibitions . . . forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626.

But, there is no carve out for sensitive places from the *Bruen* test. "[C]ourts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 597 U.S. at 30; *McRorey v. Garland*, 99. F.4th 831, 838 (5th Cir. 2024) ("[S]ensitive-place laws are likely captured by the plain text of the Second Amendment—they directly impact the right to bear arms. Therefore, they are likely subject to *Bruen*'s historical analysis."). Nevertheless, the Fifth Circuit had said "how [sensitive places] mesh[] with *Bruen*'s framework is an open question." *United States v. Allam*, 140 F.4th 289, 295, n.7 (5th Cir. 2025).

## C. The *Bruen* Test Centers on Founding Era Evidence with Guidance from Reconstruction Era Evidence.

Here, as in other constitutional contexts, the Second Amendment ought to be interpreted based mainly on how the Founders understood the scope of the right in 1791, rather than its interpretation around 1868. Evidence from the 19th century can then help guide the analysis. The Supreme Court has explicitly declined to opine on whether 1791 or 1868 should be the focal point of a historical analysis of the Second Amendment as applied to the States. *Bruen*, 597 U.S. at 38 ("We need not address this issue today."). And "there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing

understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Id.* at 37. While guidance from the Supreme Court would be helpful, this Court must use the tools it has and confront the issue on its own. This inquiry is critical because "when it comes to interpreting the Constitution, not all history is created equal." *Id.* at 34.

*Bruen* "gave a strong hint" that 1791 is the correct timeframe. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 439 (3d. Cir. 2025). So the burden is on Amici to demonstrate that 1868 would be the dispositive timeframe. *Id.* at 439–40 (putting the burden on the Government to "establish that the Second Amendment—whether applied against a state or federal regulation—is best construed according to its public meaning at the time of the Fourteenth Amendment's ratification as opposed to the public meaning of the right when the Second Amendment was ratified"). Indeed, in *Bruen*, the Supreme Court said "we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37. And as *Bruen* mentioned, this has been the approach in the First Amendment, Fourth Amendment, and Sixth Amendment contexts. *Id.* Plus, the Supreme Court has at minimum indicated that 1791 has some bearing on the scope of the right as against the states. *Id.* at 41.

To be sure, some circuits have put a greater or equal emphasis on Reconstruction era evidence. *See Antonyuk v. James*, 120 F.4th 941, 973–74 (2d Cir. 2024) ("We therefore agree with the decisions of our sister circuits—emphasizing the understanding that prevailed when the States adopted with the Fourteenth Amendment—is, along with the understanding of that right held by the founders in 1791, a relevant consideration.") (cleaned up); *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024) ("[W]e look to the understanding of the right to bear arms both at the time of the ratification of the Second Amendment in 1791 and at the time of the ratification of the Fourteenth Amendment in 1868.") (emphasis in original); *Kipke v. Moore*, 165 F.4th 194, 207 (4th Cir. 2026) ("[W]e look beyond the Founding Era to determine whether our national tradition of firearm regulation supports a government's

9

restriction today."). Yet other circuits see otherwise. *See United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023) (saying "[a] tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later" when analyzing a federal statute), *cert. granted, judgment vacated*, No. 23-376, 144 S. Ct. 2707 (2024); *Lara*, 125 F.4th at 441 (3d Cir. 2025) ("[T]he constitutional right to keep and bear arms should be understood according to its public meaning in 1791."); *Worth v. Jacobsen*, 108 F.4th 677, 692 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history."). The Court agrees with the latter circuits.

But, with that said, 1791 is not the exclusive point of historical analysis because the period closer to 1868 still plays an important role in the analysis. Reconstruction era evidence can help to liquidate a meaning and settle indeterminacies. *See Chiafalo v. Washington*, 591 U.S. 578, 593 (2020) (quoting Letter to S. Roane (Sept. 2, 1819), in 8 *Writings of James Madison* 450 (G. Hunt ed. 1908)) ("As James Madison wrote, 'a regular course of practice' can 'liquidate & settle the meaning of' disputed indeterminate 'terms & phrases.'"). So a proper Second Amendment analysis involves "pre-ratification and post-ratification history." *Rahimi*, 602 U.S. at 714 (Kavanaugh, J., concurring). How the Second Amendment was understood "from immediately after its ratification through the end of the 19th century" is a "critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605; *see also Rahimi*, 602 U.S. at 738 (Barrett, J., concurring) ("[P]ost enactment history can be an important tool."). The Framers "intended" that post-ratification history would be used to "interpret[] vague constitutional text and determin[e] exceptions to individual constitutional rights." *Rahimi*, 602 U.S. at 723, 725 (Kavanaugh, J., concurring). That is why "[r]eliance on post-ratification history 'has shaped scores of Court cases spanning all domains of constitutional law.'" *Id.* at 728 (quoting Sherif Girgis, *Living Traditionalism*, 98 N.Y.U. L. REV. 1477, 1480 (2023), and collecting cases).

Post-enactment history ensures that courts do not fall into the "use it or lose it" trap and presume that "founding-era legislatures maximally exercised their power to regulate" in 1791. *Id.* at 739–40 (Barrett, J.,

concurring); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (encouraging consideration of "common practice in 1868"). The Founders knew that they would not anticipate all of the modern social conditions to come. Most circuits have held that "evidence stretching into the nineteenth century is useful to a *Bruen* inquiry," particularly when that evidence is consistent with 1791-era history. *Schoenthal v. Raoul*, 150 F.4th 889, 913 (7th Cir. 2025); *see also NRA v. Bondi*, 133 F.4th 1108, 1121 (11th Cir. 2025) (en banc) (W. Pryor, C.J.) (relying on [m]id-to-late nineteenth-century laws"); *Antonyuk*, 120 F.4th at 973 (same); *Wolford*, 116 F.4th at 280 (same); *Koons v. Att'y Gen. N.J.*, 156 F.4th 210 (3d Cir. 2025) (same).

Evidence from the Reconstruction era, however, cannot be inconsistent with Founding era evidence. "[W]e must . . . guard against giving postenactment history more weight that it can rightly bear." *Bruen*, 597 U.S. at 35–36. That is to say, it cannot contradict Founding era practice: "[W]e recognize that where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision." *Id.* (cleaned up). 1868-era evidence is "secondary" and must be "mere confirmation of what the Court thought had already been established." *Id.* at 37. "[E]vidence of 'tradition' unmoored from original meaning is not binding law." *Rahimi*, at 738 (Barrett, J., concurring).

## D. Locations Hosting Interscholastic Events are Sensitive Places Where Prohibiting Firearms is Constitutionally Permissible.

Schools are sensitive places. By extension, interscholastic events are too. *Heller*, 554 U.S. at 626. A place is sensitive because of the "people found there" or the "activities that take place there." *See United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019). For instance, certain (but not all) government buildings were likely deemed sensitive because "the activities taking places" "were central government functions involving weighty matters of public concern which might be influenced or disturbed by the presence of firearms." *Firearms Pol'y Coal. Inc. v. Bondi*, 805 F. Supp. 3d 721, 731 (N.D. Tex. 2025). "[S]chools" and

11

"analogous[ly]" "school grounds" have historically also been categorized as sensitive to "protect children and to preserve a peaceful learning environment." *Kipke*, 165 F.4th at 212.

In and around the Founding era—as Plaintiffs note—there were "prominent" "restrictions" on "students' possession and use of firearms" at "colleges and universities at the time of the Founding." Pl.'s Resp. at 21–22; Kopel & Greenlee, *The "Sensitive Places" Doctrine*, 13 CHARLESTON L. REV. 203, 247–48 (2018). Those restrictions admittedly did not apply to non-students. But, the relevant point is that a majority of people in those settings were disarmed entirely. And the purpose— the "why"—of that regulation was to create a peaceful learning and social environment for the sake of the students.

The 1868 evidence further clarifies this tradition of protecting students through firearms regulations. For instance, Texas's 1870 sensitive places law prohibited specified knives and all firearms in certain public spaces including: "[a]ny church ore religious assembly, any school room or other place where persons are assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering . . . or any other public assembly." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st C.S., ch. 46, § 1, 1870 Tex. Gen. Laws 63. And there are a number of other late 19th century state laws throughout the nation that prohibited people from carrying firearms where persons gathered for educational, literary or scientific purposes. *See, e.g.*, 1875 Mo. Laws 50, § 1; TEX. PENAL CODE, tit. 9, ch. 4, art. 320 (1879); 1889 Ariz. Terr. Sess. Laws 17, § 3; 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7; 1903 Mont. Gen. Laws 49, ch. 35, § 3.

The same "how" and "why" applies to the contemporary Texas law's provision regarding interscholastic events; it prohibits carry for the sake of students' peaceful learning and social environment. Interscholastic events at all levels are meant to educate and socialize students, "purposes furthered by prohibitions on bringing firearms into those locations." *Md. Shall Issue v. Montgomery County, Md.*, 680 F. Supp. 3d 567, 584 (D. Md. 2023). They "are meant to protect the same or similar vulnerable populations." *Id.* And "*Bruen* did not distinguish between

12

public schools and private schools or limit the term 'schools' based on the age of the students." *Id.* at 583. Courts have made similar analogies before. *Wolford*, 116 F.4th at 985 ("[Y]outh centers . . . are akin to schools."); *Kipke*, 695 F. Supp. 3d at 660 ("School grounds are plainly analogous to school buildings, and therefore the grounds may also be designated as sensitive places."); *Md. Shall Issue*, 680 F. Supp. 3d at 584 (analogizing childcare facilities to schools); *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 64–65 (N.D.N.Y. 2024) (upholding firearm restrictions at summer camps and analogizing them to schools). Ultimately, the Firearms Prohibitions at interscholastic events are constitutional.

## E. Bars and Restaurants are Sensitive Places Where Prohibiting Firearms is Constitutionally Permissible.

Bars, restaurants, and other settings that predominantly serve alcohol have also historically been deemed sensitive places warranting restrictions on firearms. *See Wolford*, 116 F.4th at 986 ("[B]ars and restaurants that sell alcohol are among the Nation's 'sensitive places' where firearms may be prohibited."). Places are not sensitive "simply because [they are] crowded," even though "people sometimes congregate in 'sensitive places.'" *Bruen*, 597 U.S. at 31. Otherwise, the general right to publicly carry arms "would eviscerate." *Id*. But, here, although not yet explicitly labeled by the Court as "sensitive places," the historical record shows that in practice these settings were treated as sensitive places where laws forbade the carrying of firearms. So, likewise contemporary businesses that predominantly profit from alcohol sales, such as bars, are also sensitive places.

The American legal tradition includes two notable themes that predate and continue from the Founding through the nineteenth century. *First*, the Americans inherited and continued a legal tradition consisting of location-based prohibitions on carrying firearms in certain social settings. *Second*, the Founders also inherited and enforced a legal tradition that regulated the mix of firearms and alcohol. These legal traditions together provide precedent for the Texas statutes and are further confirmed by 19th century state laws prohibiting and restricting firearms in social settings centered around alcohol. While these may not perfectly resemble the Texas statutes, the Court need not identify a

13

"historical twin." Indeed, in *Rahimi*, there was no twin for the federal statute prohibiting those with a domestic violence restraining order from possessing a firearm. Yet, surety laws and going-armed laws led the Court to conclude that the ban on "the possession of firearms by those found by a court to present a threat to others fit[] neatly within that tradition." *Rahimi*, 602 U.S. at 694, 698.

Amici identify laws that prohibited the carrying of firearms starting with English society's quintessential social settings. A 1328 English statute prohibited going "armed by night []or by day, in fairs, markets, nor in the presence of the [King's] justices or other ministers." Statute of Northampton 1328, 2 Edw. 3, c.3. A 1402 law include a prohibition on firearms to Welshmen in "merchant towns," "churches," "congregations in the same," and "highways." 1402, 4 Hen. 4, c.29. Other location-based laws include prohibitions on a "town, church, fair, market or other congregation" in Wales. 1534, 26 Hen. 8, c.6 § 4. A similar statute existed in Scotland. 1715, 1 Geo., c.54, §§ 1, 6–10.

American society continued this tradition of location-based laws. Virginia passed a similar law prohibiting going or riding armed "in fairs" or "markets." *See* An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35. That tradition continued into the early stages of the United States. In 1816, Congress prohibited arms at fairs in Washington, D.C. *See* An Act for Punishment of Crimes and Offences, within the District of Columbia § 40 (1816), available at https://rb.gy/7q0cv.

Lawmakers at the Founding also understood "the need to disarm intoxicated individuals who could not be trusted with weapons" and could cause violence, particularly in "crowded space[s]." *Antonyuk*, 120 F.4th at 1031. "[I]n a long line of regulations dating back to the colonial era, colonies, states, and cities have regulated in ways reflecting their understanding that firearms and intoxication are a dangerous mix." *Wolford*, 116 F.4th at 985. In 1656, Virginia prohibited "shoot[ing] any gunns at drinkeing [events]," regardless of intoxication. Acts of Mar. 10, 1655, Act XII, *reprinted in* 1 William Waller Hening, THE STATUTES AT LARGE: BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA FROM THE FIRST SESSION OF THE LEGISLATURE, IN THE YEAR 1619 at 401–02 (1823), available at https://tinyurl.com/4sr6xfv3. In 1771, New York prohibited

14

shooting around New Year's Eve for similarly motivated reasons. Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 THE COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 244–46 (1894).

Plaintiffs counter that these laws are distinct because they did not necessarily burden the gun rights of those not drinking in these settings and did not apply to all places selling alcohol. They say also that the same problem posed by intoxicated individuals now existed then— without any significant technological changes in the interim. First, the fact that the Legislature could have made these laws applicable in a wider range of settings does not undermine the fundamental import of these laws. The lawmakers believed they had the authority to prevent firearms violence committed by intoxicated individuals by regulating or banning the use of firearms by such individuals or in such settings. There is no evidence that their lawfulness was ever in question. Second, these laws likely assumed that practically everyone was drinking in these settings, and the Virginia law specifically prohibits shooting by anyone at drinking events. So these laws likely disarmed most if not all persons at these events. Plus such laws need not be ubiquitous to form a tradition for purposes of *Bruen*. So they are relevantly similar for purposes of the Court's analysis, even if they are not "twins," and even if the contemporary law operates in a more prophylactic manner than previous laws.

Additionally, nineteenth century state and territorial laws further confirm and cement these traditions through the similar prohibitions on carrying firearms in social settings that revolved around alcohol consumption and in the prohibitions on carrying firearms while intoxicated. Many states prohibited the carrying of firearms while intoxicated in the nineteenth century. *See* 1867 Kan. Sess. Laws 25, ch. 12, § 1; MO. REV. STAT. § 1274 (1879); 1883 Wis. Laws 290, ch. 329 § 3; Wis. Stat. § 4397b(3) (1878); 1909 Idaho Sess. Laws 7, § 1; *see also* 1878 Miss. Laws 175, ch. 46, § 2 ("That it shall not be lawful for any person to sell to . . . any person intoxicated, knowing him to be . . . in a state of intoxication, any dangerous weapons."). There was no dispute about the constitutionality of those laws. *See Wolford*, 116 F.4th at 985.

15

Likewise, many laws prohibited firearms in settings where alcohol was sold. Western territories, for instance, banned firearms in many venues selling alcohol. In 1890, Oklahoma banned firearms at "any place where intoxicating liquors are sold." 1890 Okla. Terr. Stats. 496, ch. 25, art. 47 § 7. In 1853, New Mexico prohibited firearms at a "Ball or Fandango" and any "room adjoining said ball where Liquors are sold." 1853 N.M. Terr. Laws 67, § 3. In 1889, the territory of Arizona required "drinking saloon[s]" to "keep posted up in a conspicuous place in his bar room . . . a plain notice to travelers to divest themselves of their weapons." 1889 Ariz. Terr. Sess. Laws 17, § 7. Certainly territorial laws are given less weight than state laws, but *Bruen* does not require "automatic rejection of any territorial laws and statutes from the latter half of the nineteenth century." *Antonyuk*, 120 F.4th at 1029.

Next, states and territories prohibited firearms in ballrooms and other social gatherings revolving around alcohol (including a Texas law passed close in time to the enactment of the Fourteenth Amendment). *See* TEX. PENAL CODE, tit. 9, ch. 3, art. 320 (1879); 1853 N.M. Terr. Laws 67, § 3; 1889 Ariz. Terr. Sess. Laws 17, § 3; 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7; 1875 Mo. Laws 50 § 1. For example, a Texas sensitive places law from 1870 prohibited specified knives and all firearms in certain public spaces, including "[a]ny church or religious assembly, any school room or other place where persons are assembled for educational, literary, or scientific purposes, or into a ball room, social party, or other social gathering . . . or any other public assembly." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st C.S., ch. 46, § 1, 1870 Tex. Gen. Laws 63. This tradition extended to localities throughout Texas and throughout the nation, for instance, in the thriving cowtown of Abilene, Kansas—a town where Texas cowboys travelled to and had a reputation for wielding firearms and drinking alcohol. JOSEPH G. ROSA, THEY CALLED HIM WILD BILL: THE LIFE AND ADVENTURES OF JAMES BUTLER HICKOK 120–121 (Univ. Okla. Press 1964). As the cattle trade prospered and the city experienced an influx of "gunmen" and thriving cowboys eager to socialize, the city became "alarmed" by the possibility of confrontations. *Id.* The city, therefore, "banned [firearms]

within the city limits", and those laws were rigorously enforced by the town's toughest "Southern boys." *Id.* at 122.

The actions taken by Abilene illustrate the mid-nineteenth century trend in Texas and beyond of regulating firearms in response to a concern about firearms violence, which also could be attributed to the "infusion of guns and veterans after the Civil War." BENJAMIN HEBER JOHNSON, TEXAS: AN AMERICAN HISTORY 165 (2025). So the West is no stranger to these kinds of firearms regulations even given its reputation for protecting Second Amendment liberties. *See* Matt Jancer, *Gun Control is as Old as the Old West*, SMITHSONIAN MAG. (Feb. 5, 2018), https://tinyurl.com/54a4cp93 ("Contrary to the popular imagination, bearings arms on the frontier was a heavily regulated business."); An Act Relating to the Issuance of a License to Carry a Concealed Handgun, R.S., ch. 229, 1995 Tex. Gen. Laws 1998 (the concealed-carry licensing law signed by then-Governor Bush); Firearm Carry Act of 2021, 87th R.S., ch. 809 Tex. Gen. Laws 1960 (legalizing permitless carry for handguns in public). Those laws were passed at the municipal level more often than at other levels. *Id.*; *see* San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly Weapons, § 1 (Dec. 14, 1870).

The prohibitions on firearms in ballrooms are especially probative because ballrooms "often served" alcohol "and drinking (sometimes copiously) was a favorite ballroom activity." Kellen Heniford & Kari Still, *Panic! At the Ballroom: The 1804 New Orleans Ballroom Weapons ban in a Post-*Bruen *Context*, 73 BUFF. L. REV. 679, 703 (2025). Balls "united wine, whiskey, [and] honor-conscious men often heavily armed," and "[v]iolence [was] commonplace." *Id.* at 708 (cleaned up). Thus many jurisdictions legislated ballrooms and similar social gatherings accordingly.

These laws together form a well-established tradition of regulating the carry of firearms by those intoxicated or prone to become intoxicated in settings serving significant amounts of alcohol.

Amici also marshal laws that prohibit the sale of alcohol to militia members on duty. *See Wolford*, 116 F.4th at 985; *see, e.g.*, An Act for

17

Better Settling and Regulating the Militia of this Colony of New Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions, May 8, 1746, *reprinted in* 3 LAWS OF THE ROYAL COLONY OF NEW JERSEY 1746-1760 at 5–11 (1980) (prohibiting the sale of liquor to militiamen on duty); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania, ch. 167, 1780 Pa. Laws 368 (prohibiting militiamen from meeting at taverns and from appearing for military service carrying firearms while intoxicated). The Court declines to accept those laws as support for the tradition of prohibiting firearms in places selling alcohol. The purpose of those laws was to ensure militiamen were fit for military service and not to disarm lay people from carrying firearms for fear of violence ensuing.

### F. Professional Sports Stadiums and Racetracks are Sensitive Places Where Prohibiting Firearms is Constitutionally Permissible.

While professional sports stadiums and racetracks are not sensitive places just because they are crowded, the American legal tradition has long-maintained laws regulating Second Amendment liberties in crowded places of social amusement. And the historical evidence shows that social places of amusement were treated as sensitive places. Because of the similarities between those settings and professional sports stadiums and racetracks, the Texas statutes lawfully treat them as sensitive places as they do interscholastic events, bars, and restaurants.

As described before, many English laws prohibited the carrying of arms in fairs and markets where people gathered for amusement, and this tradition extended into the early stages of the United States. *See supra* Section E. One should not expect to see laws regulating stadiums anyways because modern professional sports did not come anywhere close to their current form until 1869, when the Cincinnati Red Stockings became the first salaried professional team. Steven A Riess, SPORTS IN AMERICA FROM COLONIAL TIMES TO THE TWENTY-FIRST CENTURY 15–17 (2015) ("[A] real boom in sports took place after the Civil War" due to urbanization and industrialism.). But, like sports stadiums and racetracks, these regulations strived to preserve a peaceful social

environment for entertainment where large crowds gather by means of disarmament.

The 1868 evidence confirms this tradition. Once again, Texas was a leader in this regard. Texas banned firearms at "any circus, show, or public exhibition of any kind." TEX. PENAL CODE, tit. 9, ch. 4, art. 320 (1879); *see* Tenn. Acts 23, ch. 22, § 2; 1889 Ariz. Terr. Sess. Laws 17 § 3. The Texas Supreme Court then interpreted this law to be constitutional. Therein, the Texas Supreme Court addressed Section 3 of the above statute, which was the sensitive places restriction, and said that it was almost "ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as for instance, into a church, a lecture room, a ball room, or any other place where ladies and gentleman are congregated." *English v. State*, 35 Tex. 473 (1872); *see also Antonyuk*, 120 F.4th at 1036, 1038 (upholding statute "regulat[ing] firearms in discrete, densely crowded physical spaces wherein people assemble for amusement"). Although *Bruen* has called *English* an "outlier[]," that interpretation was only in regards to the public-carry restriction provision in the statute, not the sensitive-place restriction. *Bruen*, 597 U.S. at 64–65 (taking issue with § 1 of the Texas statute, which forbade anyone from "carrying . . . unless he has reasonable grounds for fearing an unlawful attack"). Other state courts likewise agreed that laws banning firearms at public gatherings for amusement were constitutional. *See Wolford*, 116 F.4th at 987–88 (collecting cases); *Hill v.* State, 53 Ga. 472, 476 (1874) ("[T]he bearing [at a concert] of arms of any sort, is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners."); *Andrews v. State*, 50 Tenn. 165, 182 (1871) ("[A] man may well be prohibited from carrying his arms to . . . [a] public assemblage."). Thus, professional sporting events are analogous to places of amusement where firearms were restricted "[b]oth before and shortly following the ratification of the Fourteenth Amendment [in] cities, states, and territories." *Wolford*, 116 F.4th 987.

The same analysis applies to the provision covering racetracks: They are relevantly similar to the historical regulations governing crowded

19

places of amusement. Racetracks arguably present different considerations because American horseracing has existed since the 1600s. 1 JOHN HERVEY, RACING IN AMERICA: 1665–1865, at 29 (1944). But, ultimately, the same analysis applies as it does to professional sports because of its evolution. In the colonial era, horseracing was not formalized but instead "unorganized" and "spontaneous," taking place in streets at times, and only one racecourse existed. *Id.* Americans even led an "Anti-Racing Crusade" as part of "[a] natural reaction against things English." *Id.* at 131. So a historical twin would be impossible to find for horseracing just as it would be for professional sports stadiums.

Because racing took place in the streets and was dangerous, there was a movement to ban it or at least severely restrict it. *Id.* at 43, 16. States passed laws to prevent it, and if it was permitted, there were no grandstands. *Id.* at 31–33. Or they banned gambling altogether. Joshua Hochman, *The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation*, 133 YALE L.J. 1676, 1721 (2024) ("[M]any colonies and states throughout the eighteenth and nineteenth centuries banned gambling.").

But, after the Civil War, racing started to expand as did "trackside betting" to develop revenue. Gary A. O'Dell, *Under Siege: Kentucky and the Transformation of American Thoroughbred Racing, 1865–1936*, 118 REG. KY. HIST. SOC'Y 389, 402 (2020). That led to bookmaking and pari-mutuels and "transformed" horseracing into a "national industry." *Id.* at 402–05. Accordingly, in 1868, Tennessee made it unlawful for "any person attending any . . . race course . . . to carry about his person, concealed or otherwise, any pistol." 1869 Tenn. Acts 23, ch. 22 § 2. The rise in gambling at racetracks raised concerns about a heightened risk of firearms violence, serving as an impetus for these restrictions. Regardless, horseracing events qualify as social places of amusement in the same way professional sports events do. Therefore, similar evidence supporting a ban at sports stadiums supports a ban at racetracks.

In short, the laws are similar in that they intend to "protect individuals engaged in these recreational and social activities from confrontations and encounters involving firearms." *Md. Shall Issue*, 680 F. Supp. 3d at 587, 588. Coupled with the concern that gambling and

20

horseracing would heighten tensions and potentially escalate violence, these regulations are relevantly similar in both the burdens they impose and in the purposes behind their enactments.

## CONCLUSION

In coming to its holding, the Court is mindful of the important, but restrained role, the federal judiciary must serve in American democracy. Courts indeed serve a critical role in protecting constitutional liberties, particularly those liberties that may easily be trampled on by the tyranny of the majority. But the Court is also mindful that it is ultimately the people that govern our nation and the people that pass legislation through their duly-enacted representatives—the same American people who treasure constitutional liberties. This is not an act of "judicial abdication." Rather, the Court's role is not to impose its view of the merits of these policies on the people, but instead to uphold the law and Constitution independent of its or anyone else's political preferences.[3] "For [the Founding Fathers], the question involved in judicial restraint was not—as it is not—will we have liberal or conservative courts?" Ronald Reagan Presidential Library, *President Reagan's Remarks at Swearing in of Chief Justice William Rehnquist and Associate Justice Antonin Scalia. East Room, on September 26, 1986*, YOUTUBE (August 8, 2017), https://tinyurl.com/ku2kzwt6. "The question was and is, will we have government by the people?" *Id.*

And it is especially incumbent on a district judge to maintain his independence because unlike appellate judges, he operates unilaterally. "There's a reason why there are jokes about God wishing that he was a federal *district* judge." Hon. James C. Ho, *Not Enough Respect for the Judiciary—Or Too Much? Arrogance and the Myth of Judicial Supremacy*, 24 HARV. J. L. PUB. POL'Y: PER CURIAM, 6 (2026). "So it's vital

---

[3] "One single object... [will merit] the endless gratitude of the society: that of restraining the judges from usurping legislation." Letter from Thomas Jefferson to Edward Livingston (Mar. 25, 1825), *in* 16 THE WRITINGS OF THOMAS JEFFERSON 112, 113 (Andrew A. Lipscomb & Albert Ellery Bergh eds., 1904).

that district judges exercise their powers carefully and with integrity." *Id.*

Here, Texans—arguably among the most prominent protectors of our Second Amendment liberties—made a decision to balance their rights to firearms with other special factors concerning sensitive places. In such a situation, the Court must proceed with great care at the risk of trampling on the will of the people. *See United States v. Butler*, 297 U.S. 1, 78–79 (1936) (Stone, J., dissenting) ("[W]hile unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies, not to the courts but to the ballot and to the process of democratic government."). Indeed, lest it be forgotten, Texans can renege on the Firearms Prohibitions if they so choose through their elected representatives. *See* Speaker Sam Rayburn, *quoted in* ALFRED STEINBERG, SAM RAYBURN: A BIOGRAPHY 351 (1975) ("The American people, when properly appealed to, respond."). As President Lyndon B. Johnson, a native Texan, advised Congress: "Come now, let us reason together." JOHN BARTLETT, FAMILIAR QUOTATIONS 872 (15th ed. 1980).

The Court, therefore, holds that the Texas Firearms Prohibitions do not violate the Constitution. Based on the foregoing, it is **ORDERED** that Texas's Motion is **GRANTED** and Plaintiffs' Motion is **DENIED.**

**SO ORDERED** this **24th day of March 2026.**

_____
Mark T. Pittman
UNITED STATES DISTRICT JUDGE

22

TAB 4

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**CHARLES ZIEGENFUSS, ET AL.,**

Plaintiffs,

v.

No. **4:24-cv-01049-P**

**FREEMAN MARTIN,**

Defendant.

## FINAL JUDGMENT

This final judgment is issued pursuant to Federal Rule of Civil Procedure 58(a). In accordance with the Parties' Joint Stipulation, this case is **DISMISSED with prejudice**. The Clerk of the Court shall transmit a true copy of this judgment to the parties.

**SO ORDERED** on this **24th day of March 2026.**

Mark T. Pittman
UNITED STATES DISTRICT JUDGE

# TAB 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

<table>
<tr><td>

CHARLES ZIEGENFUSS, DAVID MONTGOMERY, BRIAN ROBINSON, and FIREARMS POLICY COALITION, INC.,

*Plaintiffs,*

v.

FREEMAN MARTIN, in his official capacity as Director and Colonel of the Texas Department of Public Safety,

*Defendants.*

</td><td>

CIVIL ACTION NO. 4:24-cv-01049-P

</td></tr>
</table>

**<u>NOTICE OF APPEAL</u>**

PLEASE TAKE NOTICE that Plaintiffs Charles Ziegenfuss, David Montgomery, Brian Robinson, and Firearms Policy Coalition, Inc. hereby appeal to the United States Court of Appeals for the Fifth Circuit from the Court's Final Judgment (ECF No. 67) and all prior orders intertwined with that judgment including, but not limited to, the Court's Opinion & Order on the Parties' Cross-Motions for Summary Judgment (ECF No. 66) and the Court's Order denying Plaintiffs' Motion for Leave to File First Amended Complaint (ECF No. 53).

Dated: March 24, 2026

|  | Respectfully submitted, |
|---|---|
| /s/ Bradley A. Benbrook | R. Brent Cooper (TX Bar No. 04783250) |
| Bradley A. Benbrook* (TX Bar No. 24142064) | COOPER & SCULLY, P.C. |
| Stephen M. Duvernay* (TX Bar No. 24139565) | 900 Jackson Street, Suite 100 |
| BENBROOK LAW GROUP, P.C. | Dallas, Texas 75202 |
| 701 University Avenue, Suite 106 | Telephone: (214) 712-9500 |
| Sacramento, California 95825 | brent.cooper@cooperscully.com |
| Telephone: (916) 447-4900 | |
| brad@benbrooklawgroup.com | |
| steve@benbrooklawgroup.com | *Admitted *pro hac vice* |
| | *Attorneys for Plaintiffs* |

1

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 24, 2026, a true and correct copy of the foregoing document and all supporting documents filed concurrently therewith were served via the Court's CM/ECF system to all counsel of record.

/s/ Bradley A. Benbrook
Bradley A. Benbrook

# CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that on June 15, 2026, I electronically filed the foregoing record excerpts with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Avast Security virus detector and is free of viruses

s/Bradley A. Benbrook
Bradley A. Benbrook