No. 26-10302

**In the United States Court of Appeals
for the Fifth Circuit**

CHARLES ZIEGENFUSS; DAVID MONTGOMERY; BRIAN ROBINSON;
FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation,

*Plaintiffs-Appellants*,

v.

FREEMAN MARTIN, in his official capacity as Director and Colonel of the Texas
Department of Public Safety,

*Defendant-Appellee*

On Appeal from
United States District Court for the Northern District of Texas, 4:24-cv-1049

**PLAINTIFFS-APPELLANTS' SUPPLEMENTAL BRIEF**

R. Brent Cooper
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9500
brent.cooper@cooperscully.com

Bradley A. Benbrook
*Counsel of Record*
Stephen M. Duvernay
Jamie G. McWilliam
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

*Counsel for Plaintiffs-Appellants*

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................ 1

I.     *Wolford* And *Hemani* Confirm That The District Court's Purported
       Analogues Cannot Justify The Carry Bans ..................................................... 2

II.    The Court Emphasized In *Wolford* That It Meant What It Said In *Bruen*: The
       Public Has A "General Right To Carry" In Ordinary Places ......................... 6

III.   Guns, Drugs, Alcohol, And Prophylactic Bans .............................................. 9

CONCLUSION............................................................................................ 11

CERTIFICATE OF SERVICE ..................................................................... 12

CERTIFICATE OF COMPLIANCE............................................................ 13

i

# TABLE OF AUTHORITIES

**Cases**

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. 1 (2022) .................................................................................. 2, 7

*United States v. Hemani*,
  146 S. Ct. 1677 (2026) ......................................................................... passim

*United States v. Rahimi*,
  602 U.S. 680 (2024) .................................................................................. 2

*Wolford v. Lopez*,
  116 F.4th 959 (9th Cir. 2024)................................................................. 10

*Wolford v. Lopez*,
  No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026) .............................. passim

**Statutes**

18 U.S.C. §922(g)(3) ..................................................................................... 1

Texas Penal Code § 46.02(a-6).................................................................. 11

Texas Penal Code § 46.03(a)(7) ................................................................. 9

Texas Penal Code § 46.03(a)(8) ................................................................. 9

## INTRODUCTION

The Supreme Court's decisions in *United States v. Hemani*, 146 S. Ct. 1677 (2026), and *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723 (U.S. June 25, 2026), confirm that Texas' Carry Bans violate the Second Amendment. In *Hemani*, a unanimous Court held the government cannot strip an individual of their Second Amendment protected rights simply for being an "unlawful user" of marijuana under 18 U.S.C. §922(g)(3). And in *Wolford*, the Court invalidated Hawaii's law presumptively banning the carry of firearms on private property open to the public. The Court's analysis in each case strongly supports Plaintiffs and reaffirms that the district court's judgment must be reversed.

First, both opinions' application of *Bruen*'s historical analysis—mirroring what Plaintiffs articulated below—undermines the district court's decision. *Wolford* instructs that analogues must be "widespread, well-known, and widely accepted." 2026 WL 1825723, at *14. And *Hemani* teaches that even analogues meeting that threshold must still be "relevantly similar" based on two "central" question—"why" and "how". 146 S. Ct. at 1686 (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 28–30 (2022); citing *United States v. Rahimi*, 602 U.S. 680, 692 (2024)). The district court's analysis fails on all these measures.

Second, *Wolford*'s discussion of Hawaii's two-part "regime"—"ban[s] on the possession of a firearm in significant categories of places," *Wolford*, 2026 WL

1825723, at *4, and the default-flipping law—applies equally to the Texas bans. Both States have "hobble[d] what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives." *Id*. at *4.

Third, *Hemani* leaves no room for a blanket prophylactic rule that renders anyone carrying a firearm into a bar a felon, regardless of how much they drink or whether they drink at all, based on the *potential* danger of mixing alcohol and guns. Texas separately criminalizes carrying while intoxicated; that law is not at issue.

## I. *Wolford* And *Hemani* Confirm That The District Court's Purported Analogues Cannot Justify The Carry Bans.

*Wolford* and *Hemani* reiterated and clarified the analogical burden the State must satisfy under *Bruen*'s historical inquiry. When considering a government's proffered historical analogues, courts must first look at "the number of jurisdictions in which they were adopted" and "the extent to which they were well-accepted." *Wolford*, 2026 WL 1825723, at *6. And because the Second Amendment analysis "seek[s] the general understanding of that codified right," it follows that "[a]n outlier legal rule adopted in a few locales is not enough." *Id.* at *11.

A historical analogue must be "widespread, well-known, and widely accepted," *id.* at *14, but even then, it must also be sufficiently tailored to the modern conduct the government seeks to regulate: The analogue must be "relevantly similar" to a modern law based on "how" and "why" they restrict Second Amendment

protected conduct. *Id.* at *6. *Hemani* provides a case in point. The Court found that "the government's analogy fails" because "the historical laws on which it relies targeted different kinds of people, did so for different reasons, and operated in different ways." 146 S. Ct. at 1694.

The Supreme Court's work in *Wolford* and *Hemani* cements the conclusion that Texas' Carry Bans are unconstitutional.

***51% Ban.*** *Wolford* followed *Bruen*'s lead in stressing that modern laws targeting problems that existed at the Founding require a tighter fit with historical analogues than when regulation "addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted." 2026 WL 1825723, at *6. That guiding principle is instructive: Neither Texas nor *amici* have provided a single example of the Founders (or anyone) being disarmed at taverns (or elsewhere) for regular drinking, let alone anything resembling the 51% Ban, which disarms even non-drinkers while on the covered premises.

In holding that a periodic drug user could not be disarmed consistent with the Second Amendment, *Hemani*'s examination of the "'culture of copious drinking' in early America" should be dispositive here. 146 S. Ct. at 1688–89. While certain Founding Era laws targeted habitual drunkards, they did so "not merely because they regularly used intoxicants, or even sometimes used them to excess … [but] because

their drinking rendered them practically incapacitated and incapable of managing their affairs." *Id.* at 1689. The analogues proffered here are similarly remote.

As for the affray laws the district court relied on, *Wolford* underscores how such regulations are not relevantly similar to the 51% Ban. Take *Wolford*'s distillation of the test: "Because it was accepted that" those who carried in a terrifying manner could be disarmed "consistent with the Second Amendment right, can we infer that it is also consistent with that right to ban a person who is lawfully carrying a concealed handgun for self-defense from entering" a bar or restaurant deriving enough income from alcohol? 2026 WL 1825723, at *6. Just as in *Wolford*, "[t]he question answers itself" because "[t]he gap between" the affray laws and the 51% Ban "is just too wide." *Id.* at *13.

*Hemani* and *Wolford* also doom the district court's reliance on Virginia's and New York's prohibitions on shooting firearms during certain limited events or times. Compared to a blanket ban on all who enter a bar, these laws "targeted different kinds of people" (those shooting during events or around New Year's), "did so for different reasons" (to ensure the efficacy of attack alarms and to avoid nuisance), and "operated in different ways" (banned only discharging firearms). *Hemani*, 146 S. Ct. at 1694. And these unusual outlier laws were also not "widespread, well-known, [or] widely accepted." *Wolford*, 2026 WL 1825723, at *14.

So too with the district court's reliance on a smattering of late-19th- and early-20th-century regulations prohibiting carry while intoxicated, a few territorial laws barring possession where alcohol was sold, and territorial and municipal bans on carrying in social settings. These sparse statutes, "neither widespread nor widely accepted," *id.* at *14, "adopted nearly a century after the adoption of the Second Amendment and [largely] after the adoption of the Fourteenth Amendment shed[] little if any light on the meaning of the Second Amendment right," *id.* at *13.

***Ban At Sporting And Interscholastic Events.*** The district court's analysis with respect to Texas' ban on carrying at sporting events and racetracks suffer from the same flaws. In particular, the affray laws "operated in different ways" (for the reasons discussed above) and the student bans "targeted different kinds of people" (students, rather than adults, whose rights are at issue here). *Hemani*, 146 S. Ct. at 1687. On top of that, most of the laws—including the university rules disarming students and prohibitions on carrying at miscellaneous social events—were either lone or sparse statutes and were passed long after the adoption of the Second Amendment. Because they were late-in-time and "neither widespread nor widely accepted," they "carr[y] no weight." *Wolford*, 2026 WL 1825723, at *14.

***Racetrack Ban.*** The record reveals only one 1868 Tennessee law prohibiting arms possession at racetracks. The absence of a historical pedigree is dispositive. Setting aside that it was "adopted nearly a century after the adoption of the Second

Amendment," *id.* at \*13, *Wolford* reiterated *Bruen*'s admonition that the Court "'will not stake [its] interpretation … upon a law in effect in a single State, or a single city.'" *Id.* at \*6 (citation omitted).

**II.     The Court Emphasized In *Wolford* That It Meant What It Said In *Bruen*: The Public Has A "General Right To Carry" In Ordinary Places.**

The district court below cited the Ninth Circuit's *Wolford* decision nine times in its 22-page opinion, relying on that case in blessing each of Texas's three carry bans. Op. at 13 (51% Ban and interscholastic events ban); *id*. at 18 (sporting events and racetracks). The Ninth Circuit's opinion was a thin reed on which to lean *before* it was reversed, but that reed has now snapped.

The Supreme Court emphasized in *Wolford* that States may not undermine the Second Amendment by making it difficult for ordinary individuals to carry a firearm in the spaces of daily life. Just as the Court affirmed a "general right to publicly carry arms," in *Bruen*, 597 U.S. at 31, 33, *Wolford* reiterated that "the Second Amendment protects … the right of Americans to carry arms for self-defense as they go about their daily lives," 2026 WL 1825723, at \*4.

In *Wolford*, the Court stressed that Hawaii's bans on the carrying of a firearm in various public and private places covered all manner of locations that people visit every day:

> Hawaii imposes two additional restrictions on carrying firearms. The first bans the possession of a firearm in significant categories of

places: … [including] any "restaurant serving alcohol"; any "stadium, movie theater, or concert hall"; … any "beach, playground," or park; …; any "amusement park, aquarium, carnival, circus, fair, museum, water park, or zoo"; and any "public gathering, public assembly, or special event conducted on property open to the public." [Haw. Rev. Stat.] § 134–9.1(a). Some of these places are owned by the State, but many of the categories include privately owned property. So even if the owner of such a place wanted to admit individuals who are carrying guns for self-defense, the owner could not do so.

*Id.* at *8.

Although the Court did not directly address the constitutionality of Hawaii's "sensitive places" bans directly, as those issues were not before it, the Court went out of its way to treat Hawaii's bans on "the possession of a firearm in significant categories of places"—including "privately owned property"—with extreme skepticism. *Id*. Indeed, it stressed at the outset that Hawaii's "regime," which included *both* the private property default rule and the "sensitive places" bans, "hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives." *Id*. at *4. And the Court declared more broadly that "Hawaii's prohibitions on public carry represent a distinct outlier" in the historical tradition of permitting public carry. *Id.* at *11.

The Court's reasoning demonstrates why the carry bans at issue here violate the Second Amendment. To demonstrate the impediments to armed self-defense posed by the private property default carry ban, the Court used an example: "[a] hypothetical young woman, [who] after clearing all the hurdles needed to get a []

7

carry permit, leaves her home on a weekday morning and carries a handgun on her person or in a purse." *Id.* at *9. The Court cataloged typical stops at various places that an ordinary person might visit throughout the day, including a gas station, a fast-food restaurant, a drug store, the dry cleaners, and the grocery store. *Id.* at *9–*10. "[B]y the end of an ordinary day," the Court concluded, "our hypothetical young woman could be a criminal at least six times over." *Id.* For this reason, the Court held, the challenged restriction "severely hampers the ability of a law-abiding citizen to exercise the right *Bruen* recognized." *Id.* at *10.

If the Court's hypothetical woman were in Texas and wished to end her workday by visiting a bar or restaurant serving alcohol—or attending her son's high school cross-country meet at a local park—she too would be a criminal if she left her gun in her purse. Texas Penal Code § 46.03(a)(7) (51% Ban; third-degree felony, punishable by 2-10 years' imprisonment and fine up to $10,000); § 46.03(a)(8) (high school sporting event or interscholastic event carry ban; misdemeanor, punishable by fine up to $4,000 and up to a year in jail, or both).

Like Hawaii's now-unconstitutional restrictions on the everyday exercise of the Second Amendment protected right, the restrictions on carrying at specific locations here "severely hamper[] the ability of a law-abiding citizen to exercise the right *Bruen* recognized." *Wolford*, 2026 WL 1825723, at *10. Indeed, when it comes to private property open to the public like bars and restaurants, mis-designating such

8

ordinary places as "sensitive places" is more restrictive to Second Amendment protected rights than flipping the default rule to require the owner's consent to carry. In Texas, bar and restaurant owners would be criminally liable if they purported to allow carrying in their locations.

## III.  Guns, Drugs, Alcohol, And Prophylactic Bans.

The 51% Ban is a prophylactic ban. As the district court put it, relying once again on the Ninth Circuit, "firearms and intoxication are a dangerous mix." Op. 14 (citing *Wolford v. Lopez*, 116 F.4th 959, 985 (9th Cir. 2024)). To address the potential danger associated with this mix, Texas and a few other States make it a crime to possess a gun in a bar, regardless of whether the defendant is intoxicated. Here, the Individual Plaintiffs affirm that they do not intend to drink while carrying in a 51% location.

*Hemani* undermines, if not destroys, any argument that this sort of blanket prophylactic ban is permissible. The Court stressed repeatedly that the prosecution under 18 U.S.C. § 922(g)(3) was based on the theory that simply because a person is a "user" of marijuana, they could be disarmed. *E.g.*, 146 S. Ct. at 1684 ("that [Hemani was a user] alone, the government says, means he is automatically disarmed"); 1685 ("[f]or that alone, the government claimed," Hemani was charged, "[n]o matter that it did not contend his drug use had ever led him to pose a danger to himself or others"); 1686 (§ 922(g)(3) "automatically bans an individual from

9

possessing a gun from the moment he becomes an unlawful user," and it "doesn't matter … in what amounts he does so, or whether his drug use has ever made him a danger to himself or others"). In short, under this blanket rule, "[i]t makes no difference either if he … never misuses a gun while intoxicated, and never poses a danger to himself or others as a result of his marijuana use." *Id*. at 1693–94.

The 51% Ban applies its blanket rule even more broadly: It criminalizes possession for simply walking into a bar, without regard to whether the person carrying has a drop of alcohol (a legal substance), let alone drinks to the point of becoming a danger. And on that point, the Court leaves zero doubt that the historical record shows a rich tradition drinking "copious" amounts of alcohol, *id*. at 1688, yet there is no history of Founding Era bans on carrying or being armed where that drinking was occurring, *id*. at 1688.

Here, Texas has done exactly that while **separately** criminalizing possession of firearms ***while intoxicated***, Texas Penal Code § 46.02(a-6). While *Hemani* leaves open the question how much drinking is enough to justify a prosecution under that statute, it leaves no doubt that the 51% Ban cannot disarm Texans for the simple fact of walking into a bar.

**CONCLUSION**

The district court's judgment should be reversed.

Respectfully submitted,
 /s/ Bradley A. Benbrook
Bradley A. Benbrook

R. Brent Cooper            *Counsel of Record*
COOPER & SCULLY PC    Stephen M. Duvernay
Jamie G. McWilliam
BENBROOK LAW GROUP, P.C.

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on July 13, 2026, I electronically filed the above brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

 /s/ Bradley A. Benbrook
Bradley A. Benbrook

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the type-volume limitations of this Court's order because this brief contains 2,457 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)

2.     This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

3.     Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Avast Security virus detector and is free of viruses.

Dated: July 13, 2026

/s/ Bradley A. Benbrook<br>Bradley A. Benbrook