No. 26-10302

# In the United States Court of Appeals for the Fifth Circuit

---

CHARLES ZIEGENFUSS; DAVID MONTGOMERY; BRIAN ROBINSON; FIREARMS POLICY COALITION, INC.,

*Plaintiffs – Appellants*,

v.

FREEMAN MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR AND COLONEL OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendant – Appellee*.

---

On Appeal from the U.S. District Court
for the Northern District of Texas, Fort Worth Division,
Case No. 4:24-cv-1049

---

**BRIEF OF COURT-APPOINTED *AMICI CURIAE* ERIC RUBEN AND GREGG COSTA IN SUPPORT OF THE JUDGMENT BELOW**

---


Eric Ruben
SMU DEDMAN SCHOOL OF LAW
3315 Daniel Avenue
Dallas, Texas 75205
Telephone: (214) 768-2581
*eruben@smu.edu*

Andrew Mitchell
Arjun Ogale
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
*amitchell@gibsondunn.com*
*aogale@gibsondunn.com*

Gregg Costa
Kylie Calabrese
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, Texas 77002
Telephone: (346) 718-6600
*gcosta@gibsondunn.com*
*kcalabrese@gibsondunn.com*

Blake J. Ellison
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
*bellison@gibsondunn.com*

COUNSEL FOR COURT-APPOINTED AMICI CURIAE

## CERTIFICATE OF INTERESTED PERSONS

No. 26-10302,
*Charles Ziegenfuss; David Montgomery; Brian Robinson; Firearms Policy Coalition, Inc. v. Freeman Martin, in his official capacity as Director and Colonel of the Texas Department of Public Safety*

The undersigned counsel of record certifies that the following listed persons or entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| **Plaintiffs-Appellants** | **Counsel for Appellants** |
|---|---|
| Charles Ziegenfuss; David Montgomery; Brian Robinson; Firearms Policy Coalition, Inc. | R. Brent Cooper<br>Samuel Hunter Walton<br>COOPER & SCULLY PC<br>900 Jackson Street, Suite 100<br>Dallas, Texas 75202<br><br>Bradley Alan Benbrook<br>Stephen Michael Duvernay<br>Jamie McWilliam<br>BENBROOK LAW GROUP PC<br>701 University Avenue, Suite 106<br>Sacramento, California 95825 |
| **Defendant-Appellee** | **Counsel for Appellee** |
| Freeman Martin, in his official capacity as Director and Colonel of the Texas Department of Public Safety | Matthew Micah Hilderbrand<br>Zachary Louis Rhines (withdrew)<br>Kyle Tebo<br>OFFICE OF THE ATTORNEY GENERAL OF TEXAS<br>PO Box 12548<br>Austin, Texas 78711 |

## CERTIFICATE OF INTERESTED PERSONS
(continued)

| Court-Appointed Amici Curiae | Counsel for Court-Appointed Amici Curiae |
|---|---|
| Gregg Costa; Eric Ruben | Gregg Costa<br>Kylie Calabrese<br>GIBSON, DUNN & CRUTCHER LLP<br>811 Main Street, Suite 3000<br>Houston, Texas 77002<br><br>Eric Ruben<br>SMU DEDMAN SCHOOL OF LAW<br>3315 Daniel Avenue<br>Dallas, Texas 75205<br><br>Andrew Mitchell<br>Arjun Ogale<br>Alexa Acquista *(withdrawn)*<br>GIBSON, DUNN & CRUTCHER LLP<br>2001 Ross Avenue, Suite 2100<br>Dallas, Texas 75201<br><br>Blake J. Ellison<br>GIBSON, DUNN & CRUTCHER LLP<br>1700 M Street N.W.<br>Washington, D.C. 20036 |

Respectfully submitted,

*/s/ Gregg Costa*
Gregg Costa

*Counsel of Record for Court-Appointed Amici Curiae*

## Statement Regarding Oral Argument

This case asks the Court to decide the constitutionality of Texas laws. Oral argument will aid the Court in conducting the historical analysis required to make that decision. To the extent the Court's order appointing *amici* did not also grant them leave to do so, *amici* respectfully request that they be allowed to present oral argument. *See* Fed. R. App. P. 29(a)(8); *cf.* Order at 1, *In re Hall*, No. 19-10345 (5th Cir. Mar. 18, 2020), Dkt. 41-1 (inviting court-appointed *amicus* "to brief and argue" an issue).

## TABLE OF CONTENTS

Page


Certificate of Interested Persons .......... ii

Statement Regarding Oral Argument .......... iv

Table of Authorities .......... vii

Introduction .......... 1

Statement of the Case .......... 4

I. Texas's sensitive-places laws date back to at least 1870. .......... 5

A. Texas enacted sensitive-places laws to address a staggering rise in violence in the mid-nineteenth century. .......... 5

B. Sensitive-places laws have endured despite Texas's loosening of other firearm regulations. .......... 10

II. Plaintiffs challenge the longstanding sensitive-places laws. .......... 13

III. The district court upholds the sensitive-places laws. .......... 15

Argument .......... 18

I. Plaintiffs' facial challenge, which disregards historical practices consistent with the Founding era, fails at the outset. .......... 19

A. Plaintiffs concededly haven't shown that the laws are unconstitutional in all applications. .......... 19

B. The historical traditions from the Founding and onward are relevant—and consistent. .......... 23

II. Each of the three sensitive-places laws is consistent with the Nation's tradition of firearm regulation. .......... 28

A. Restricting firearms at businesses that derive most of their revenue from alcohol (section 46.03(a)(7)) is consistent with the tradition of regulating firearms and alcohol. .......... 32

**TABLE OF CONTENTS**
(continued)

Page

1. Section 46.03(a)(7) is consistent with the tradition of regulating the dangerous mix of firearms and alcohol. .... 33
2. Section 46.03(a)(7) is consistent with the tradition of prohibiting firearms where alcohol is sold. .... 36
3. Section 46.03(a)(7) is consistent with the tradition of prohibiting the carrying of firearms at ballrooms and social gatherings. .... 37

B. Restricting firearms at interscholastic and sporting events (section 46.03(a)(8)) is consistent with the tradition of prohibiting firearms at schools and crowded places of amusement. .... 46

1. Section 46.03(a)(8) is consistent with the tradition of prohibiting firearms at schools and places where people gather for literary or educational purposes. .... 47
2. Section 46.03(a)(8) is consistent with the tradition of prohibiting firearms in crowded places of amusement. .... 51

C. Restricting firearms at racetracks (section 46.03(a)(4)) is consistent with the historical tradition of prohibiting firearms at crowded places of amusement. .... 58

Conclusion .... 64
Certificate of Service .... 66
Certificate of Compliance .... 67

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. State*,
11 S.W. 628 (Tex. Ct. App. 1889) .......... 10

*Andrews v. State*,
50 Tenn. 165 (1871) .......... 55

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024) .......... *passim*

*Chiafalo v. Washington*,
591 U.S. 578 (2020) .......... 16

*Christian v. James*,
176 F.4th 189 (2d Cir. 2026) .......... 20, 27, 51

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... *passim*

*English v. State*,
35 Tex. 473 (1871) .......... 9, 28

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) .......... 28

*Hill v. State*,
53 Ga. 472 (1874) .......... 55

*Kipke v. Moore*,
165 F.4th 194 (4th Cir. 2026) .......... 31, 50, 51

*LaFave v. County of Fairfax*,
149 F.4th 476 (4th Cir. 2025) .......... 20, 21

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
594 U.S. 180 (2021) .......... 24

*Maupin v. State*,
17 S.W. 1038 (Tenn. 1890) .......... 56

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .......... 47

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) .......... 24

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Md. Shall Issue, Inc. v. Montgomery County*,
680 F. Supp. 3d 567 (D. Md. 2023) .................................. 31, 49, 50, 52

*Mintz v. Chiumento*,
724 F. Supp. 3d 40 (N.D.N.Y. 2024) .................................................. 50

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ......................................................................... 19

*Mugler v. Kansas*,
123 U.S. 623 (1887) ......................................................................... 46

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) ...................................................................... *passim*

*NRA v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) ........................................................ 27

*Punch v. Bridenstine*,
945 F.3d 322 (5th Cir. 2019) ............................................................. 31

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ........................................................................... 27

*Schoenthal v. Raoul*,
150 F.4th 889 (7th Cir. 2025) ...................................................... *passim*

*Snell v. State*,
4 Tex. Ct. App. 171 (1878) ................................................................ 10

*State v. Pigg*,
85 Mo. App. 399 (1900) .................................................................... 56

*State v. Shelby*,
2 S.W. 468 (Mo. 1886) ................................................................ 35, 55

*Summerlin v. State*,
3 Tex. Ct. App. 444 (1878) ................................................................ 10

*Timbs v. Indiana*,
586 U.S. 146 (2019) ......................................................................... 27

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ......................................................................... 15

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*United States v. Allam*,
140 F.4th 289 (5th Cir. 2025) .......... 30

*United States v. Connelly*,
117 F.4th 269 (5th Cir. 2024) .......... 22, 43

*United States v. Hemani*,
608 U.S. ---, 146 S. Ct. 1677 (2026) .......... 23, 40, 43, 44

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... *passim*

*United States v. Salerno*,
481 U.S. 739 (1987) .......... 20

*United States v. Wilson*,
174 F.4th 474 (5th Cir. 2026) .......... 19, 21

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) .......... *passim*

*Wolford v. Lopez*,
609 U.S. ---, 146 S. Ct. 2032 (2026) .......... *passim*

*Wynne v. State*,
51 S.E. 636 (Ga. 1905) .......... 55

**Statutes, Rules, and Constitutional Provisions**

1715, 1 Geo., c.54 .......... 30, 53

1402, 4 Hen. 4, c.29 .......... 30, 53

1534, 26 Hen. 8, c.6 .......... 30, 53

1889 Ariz. Terr. Sess. Laws 17, § 3 .......... 53

1889 Ariz. Terr. Sess. Laws 17, § 7 .......... 37, 38, 48

1870 Ga. Laws 421, tit. 16, no. 285, § 1 .......... 54

1909 Idaho Sess. Laws 6, § 1 .......... 34

1867 Kan. Sess. Laws 25, ch. 12, § 1 .......... 34

1878 Miss. Laws 175, ch. 46, § 2 .......... 34

1875 Mo. Laws 50, § 1 .......... 38, 48, 54

**TABLE OF AUTHORITIES**
(continued)

Page(s)


1903 Mont. Laws 49, ch. 35, § 3 ........ 38, 48, 53

1853 N.M. Terr. Laws 67, § 3 ........ 36, 38

1890 Okla. Terr. Stats. 496, ch. 25, art. 47 ........ 36, 38, 48, 53

1869 Tenn. Acts 23, ch. 22, § 2 ........ 53, 54, 62

1883 Wis. Laws 290, ch. 329, § 3 ........ 34

Abilene, Kan., Ordinance Relating to the Carrying of Firearms and Other Deadly Weapons (May 12, 1870) ........ 38

Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 The Colonial Laws of New York from the Year 1664 to the Revolution (1894) ........ 33

Acts of Mar. 10, 1655-6, Act XII, *reprinted in* 1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619 (1823) ........ 33

An Act for the Punishment of Certain Crimes and Offences, within the District of Columbia § 40 (1816) ........ 54

An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 ........ 30, 54

An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st C.S., ch. 46, § 1, 1870 Tex. Gen. Laws 63 ........ 8, 38

An Act Relating to the Carrying of Certain Knives, 85th Leg., R.S., ch. 1049, § 5, 2017 Tex. Gen. Laws 4106 ........ 13

An Act Relating to the Creation of the Offense of Going on the Premises of a Racetrack With a Firearm, Explosive Weapon, or Illegal Knife, 71st Leg., R.S., ch. 749, § 2, 1989 Tex. Gen. Laws 3332 ........ 11, 62

An Act Relating to the Issuance of a License to Carry a Concealed Handgun, 74th Leg., R.S., ch. 229, 1995 Tex. Gen. Laws 1998 ........ 12

**TABLE OF AUTHORITIES**
(continued)

Page(s)

An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg., R.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25 .......... 8

Blackwell, Okla., Town Ordinance No. 21, § 3 (Aug. 7, 1894) .......... 35

Brookfield, Mo., Gen. Ordinances 116, § 32 (1900) .......... 35, 49

Chi., Ill., Ordinances, ch. 16, § 6 (July 23, 1851) .......... 35

Columbia, Mo., Gen. Ordinances, ch. 17 (1890) .......... 34

Del. Const. art. 28 (1776) .......... 30

DeSoto, Mo., Rev. Ordinances, art. 6, § 224 (1888) .......... 34, 48

Firearm Carry Act of 2021, 87th Leg., R.S., ch. 809, Tex. Gen. Laws 1960 .......... 13

Greenfield, Mo., Ordinance No. 39, § 1 (Jan. 4, 1886) .......... 35

Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons § 1 (July 17, 1894) .......... 34, 48, 55

Jerome, Ariz., Town Ordinance No. 2, § 21 (Mar. 21, 1899) .......... 35, 48

La. Rev. Stat. § 14:95.5 .......... 15

Leonard, Mo., Ordinance No. 23, § 1 (July 6, 1891) .......... 48

Lyons, Kan., Ordinance No. 179, § 1 (Sept. 7, 1891) .......... 35

Marceline, Mo., Ordinance No. 9, § 8 (Mar. 12, 1892) .......... 48

Miss. Code § 45-9-101 .......... 15

Mo. Rev. Stat. § 1274 (1879) .......... 34

New Orleans, La., An Ordinance Respecting Public Balls, art. 1 (Oct. 27, 1817) .......... 38

New Orleans, La., General Ordinances, tit. 1, ch. 1, art. 1 (May 1879) .......... 36

San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly Weapons, § 1 (Dec. 14, 1870) .......... 9, 36, 48

St. Paul, Minn., An Ordinance to Regulate the Sale of Gunpowder, ch. 21, § 4 (June 29, 1858) .......... 35

Page(s)

Statute of Northampton 1328, 2 Edw. 3, c.3 .......... 30, 53
Stockton, Kan., Ordinance No. 76, § 1 (July 1, 1887) .......... 48, 54
Tex. Occ. Code § 2021.001 .......... 62
Tex. Penal Code art. 483 (1925) .......... 10
Tex. Penal Code art. 485 (1925) .......... 10
Tex. Penal Code § 46.02 (1974) .......... 11
Tex. Penal Code § 46.03 .......... *passim*
Tex. Penal Code § 46.03 (1997) .......... 12
Tex. Penal Code § 46.04 (1984) .......... 11
Tex. Penal Code § 46.035 (1995) .......... 12
Tex. Penal Code § 47.02 .......... 62
Tex. Penal Code § 47.09 .......... 62
Tex. Penal Code, tit. 9, ch. 4, art. 320 (1879) .......... 38, 48, 53
Tex. Penal Code, tit. 13, ch. 4 (1856) .......... 62
Texas Racing Act, 69th Leg., 2d C.S., ch. 19, 1986 Tex. Gen. Laws 48 .......... 11
Waco, Tex., An Ordinance (July 9, 1891) .......... 38, 48, 54
Wallace, Kan., Ordinance, § 3 (Dec. 22, 1887) .......... 35
Warrensburg, Mo., Concealed or Deadly Weapons, § 1 (June 5, 1890) .......... 48
Wis. Stat. § 4397b(3) (1889) .......... 34

**Treatises & Other Authorities**

1 John Hervey, Racing in America: 1665-1865 (1944) .......... 59, 60
Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction (1998) .......... 25
Benjamin Heber Johnson, Texas: An American History (2025) .......... 5, 6
Benjamin Rush, An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind (8th ed., Boston, James Loring 1823) .......... 32

**TABLE OF AUTHORITIES**
(continued)

Page(s)


Brennan Gardner Rivas, *The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930* (May 2019) (Ph.D. dissertation, Texas Christian University) ........ 6

Emerson Clarridge, *Authorities Release Names of Two Suspects in Thwarted Everman Homecoming Game Violence*, Fort Worth Star-Telegram (Sept. 19, 2022) ........ 23

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ........ 24

Dictionary of American Regional English (1991) ........ 36

François-Xavier Martin, A Collection of the Statutes of England Now in Force in the State of North Carolina (1792) ........ 30

*Gang Land*, Tex. Monthly (July 2015) ........ 22

Gary A. O'Dell, *Under Siege: Kentucky and the Transformation of American Thoroughbred Racing, 1865-1936*, 118 Reg. Ky. Hist. Soc'y 389 (2020) ........ 61

H.J. of Tex., 11th Leg., R.S. 199 (1866) ........ 7

John Gravois, *Against All Odds: The Evolution and Ups and Downs of Legalized Gambling Efforts in Texas*, Dallas Morning News (Jan. 30, 2023) ........ 11

Joseph Blocher & Patrick J. Charles, *The History and Tradition of Firearm Localism*, Texas L. Rev. (forthcoming) ........ 34

Joseph G. Rosa, *They Called Him Wild Bill: The Life and Adventures of James Butler Hickok* (Univ. Okla. Press 1964) ........ 38

Kellen Heniford & Kari Still, *Panic! At the Ballroom: The 1804 New Orleans Ballroom Weapons Ban in a Post-*Bruen *Context*, 73 Buffalo L. Rev. 679 (2025) ........ 37

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) ........ 25

Page(s)

Laura M. Maruschak et al., Bureau of Just. Stat., *Alcohol and Drug Use and Treatment Reported by Prisoners: Survey of Prison Inmates, 2016* (2021) .......... 45

Louis DeLuca, *Career in a Year Photos 1991: President George H.W. Bush Reacts to His Errant Toss*, Dallas Morning News (Apr. 8, 2015) .......... 22

1 Marcel Giraud, A History of French Louisiana (2d prtg. 1990) (Joseph C. Lambert trans., 1974) .......... 37

Randolph Roth, *Why Guns Are and Aren't the Problem: The Relationship Between Guns and Homicide in American History*, *in* A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment 113 (Jennifer Tucker et al. eds., 2019) .......... 41

S.J. of Tex., 12th Leg., 1st C.S. 15 (1870) .......... 7

Scott Friedman & Eva Parks, *DHS Warns of 'Extremely High' Threat Level Around FIFA, as DFW Prepares to Host*, NBC DFW (May 7, 2026) .......... 23

*Senate Passes Permitless Carry Bill*, Tex. Senate News (May 5, 2021) .......... 13

Steven A. Riess, *Sports in America From Colonial Times to the Twenty-First Century* (2015) .......... 51

Texas Constitutional Convention (1868-1869), Journal of the Reconstruction Convention: Which Met at Austin, Texas, June 1, A.D. 1868 (1870) .......... 6

Will Baude, *Originalism and Dual-Track Incorporation*, Reason.com (Apr. 24, 2020) .......... 24

William H.P. Robertson, The History of Thoroughbred Racing in America (1964) .......... 59, 60, 61

William Rawle, View of the Constitution of the United States of America (1825) .......... 64

## INTRODUCTION

This case arises from a choice by the People of Texas to preserve longstanding limits on where firearms may be carried. For more than a century and a half, Texans have regulated firearms in sensitive locations, including schools, polling places, and certain social gatherings. These laws protect the community in spaces where children learn, democracy happens, and the impassioned and intoxicated congregate. Texas's sensitive-places restrictions are no anomaly. Historical analogues existed before ratification of the Bill of Rights and in the years that soon followed.

Texas has preserved sensitive-places restrictions without compromising its role as a leader in protecting Second Amendment rights. Even as Texas has embraced permitless carry, it has maintained restrictions on carrying weapons into—among other places—bars where alcohol is consumed; sporting events where passions run high; and racetracks where alcohol collides with crowds, cash, and chance. *See* Tex. Penal Code § 46.03(a)(4), (a)(7), (a)(8). These choices reflect a deep-rooted democratic consensus: Texans want the freedom to keep and bear arms

alongside common-sense safeguards in the sensitive places where the risk of violence is most acute.

Plaintiffs seek to override the will of the People of Texas, not just for themselves, but for every Texan and in every situation. Despite a long tradition of sensitive-places restrictions, plaintiffs mount a facial challenge that would strip the People of their ability to keep those areas free of firearms no matter the circumstances.

The district court correctly rejected plaintiffs' facial challenge. The Second Amendment protects the right to keep and bear arms, but like other constitutional freedoms, that right is not absolute. *See District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). When modern gun laws have a "well-established and representative historical analogue," those laws are constitutional. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022).

The sensitive-places laws that plaintiffs challenge pass *Bruen*'s constitutional test. As the Supreme Court has recognized, laws restricting the carry of firearms in "sensitive places" are presumptively constitutional. *Heller*, 554 U.S. at 626–27 & n.26; *United States v. Rahimi*, 602 U.S. 680, 735 (2024) (Kavanaugh, J., concurring).

History confirms that presumption. Texas's laws prohibiting firearms on the premises (1) "of a business . . . [that] derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption," Tex. Penal Code § 46.03(a)(7); (2) "where a high school, collegiate, or professional sporting event or interscholastic event is taking place," *id.* § 46.03(a)(8); and (3) "of a racetrack," *id.* § 46.03(a)(4), have historical analogues firmly rooted in this Nation's tradition of firearms regulation. At minimum, the historical evidence demonstrates that the laws are without doubt constitutional in some—if not all—applications. Plaintiffs' facial challenge—the "most difficult challenge to mount successfully," *Rahimi*, 602 U.S. at 693 (citation omitted)—thus cannot succeed.

The challenged laws reflect the balance Texans have struck between liberty and security. That balance is a constitutional one firmly grounded in historical practice—which is why courts across the Nation have rejected challenges to similar laws. *Amici* urge this Court to affirm the district court's judgment and respect the People of Texas's

longstanding choice to restrict the carrying of firearms in places where they pose special danger.[1]

## STATEMENT OF THE CASE

The challenged provisions of the Texas Penal Code prohibit "intentionally, knowingly, or recklessly possess[ing] or go[ing] with a firearm, location-restricted knife, club, or prohibited weapon" on the "premises":

- "of a racetrack," Tex. Penal Code § 46.03(a)(4);
- "of a business that has a permit or license issued under [the Texas Alcoholic Beverage Code], if the business derives 51 percent or more of its income from the sale or service of alcoholic beverages for on-premises consumption," *id.* § 46.03(a)(7); and
- "where a high school, collegiate, or professional sporting event or interscholastic event is taking place," *id.* § 46.03(a)(8).

[1] **Identity of *Amici Curiae*.** The district court appointed Eric Ruben and Gregg Costa as *amici curiae* to defend the merits after the Attorney General of Texas declined to do so. ROA.176–77, 181–82. Because the State continues to dispute only the justiciability of plaintiffs' challenge, this Court appointed *amici* to file a brief to defend the laws' merits again on appeal. Dkt. 38-2.

No party's counsel authored this brief in whole or in part. Nor did any party, party's counsel, or any other person other than *amici curiae* contribute money that was intended to fund preparing or submitting the brief. Fed. R. App. P. 29(a)(4)(E).

Such sensitive-places laws are not of recent vintage. For more than 150 years, the People of Texas have repeatedly chosen to limit Texans from carrying firearms in places posing a special risk of gun violence.

## I. Texas's sensitive-places laws date back to at least 1870.

Texas began constraining the carrying of firearms into certain sensitive places in 1870, just 25 years after it was admitted to the Union. In the wake of astonishing levels of violence, Texas enacted laws to restrict carrying in certain public spaces. Ever since, laws have prohibited Texans from carrying firearms in sensitive places where heightened emotions or impaired judgment elevate public-safety risks. And despite forswearing other restrictions to make Texas the gold standard for protecting the Second Amendment, Texans have kept sensitive-places laws on the books.

### A. Texas enacted sensitive-places laws to address a staggering rise in violence in the mid-nineteenth century.

Mid-nineteenth century Texas, like other parts of the South, was an exceedingly violent place. "[A]ssaults, murders, and fights over all sorts of disputes were commonplace." Benjamin Heber Johnson, Texas: An American History 164 (2025). That violence was fueled by the

"infusion of guns and veterans after the Civil War, the continued influx of new residents, and the poor functioning of the criminal justice system." *Id.* at 165.

Racial strife augmented the violence. Given Texas's resistance to Reconstruction, this violence was frequently directed against Blacks and Unionists. *See* Texas Constitutional Convention (1868–1869), Journal of the Reconstruction Convention: Which Met at Austin, Texas, June 1, A.D. 1868, 194–96, 501–03 (1870) (ROA.425–35). This campaign of violence turned "the years 1867 and 1868 into some of the bloodiest in Texas history." Brennan Gardner Rivas, *The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836–1930* at 60 (May 2019) (Ph.D. dissertation, Texas Christian University), at https://tinyurl.com/59jdjznf.

To address the violence, Governors worked to regulate where guns could be carried. *See* Rivas, *supra* pp.47–50. Governor Throckmorton, elected by Confederate sympathizers and Democrats, *id.* at 46–47, unsuccessfully tried in 1866 to pass a tax on weapons carried on the person because he didn't believe "the Constitution to convey the idea that men and boys, vagabonds and vagrants, were to be licensed to have arms

about their persons on all occasions," H.J. of Tex., 11th Leg., R.S. 199 (1866) (address of Gov. James Throckmorton) (ROA.436–55). After an election for the state government created by the 1868 Constitutional Convention, Republicans and Unionists took "control[] [of] the statehouse." Johnson, *supra* p.170. Governor Davis echoed his predecessor in harboring "no doubt that to the universal habit of carrying arms is largely to be attributed the frequency of homicides in this State," and he called for the regulation of public carry. S.J. of Tex., 12th Leg., 1st C.S. 15 (1870) (address of Gov. Edmund Davis) (ROA.456–74). The Legislature—which now included Republicans and Unionists—obliged.

Texas's first sensitive-places law thus emerged in 1870, the same year Texas ratified the Fourteenth Amendment. It prohibited specified knives and all firearms in select public spaces. The law provided, in relevant part:

> That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and

> shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same[.]

An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st C.S., ch. 46, § 1, 1870 Tex. Gen. Laws 63 (ROA.475–78).

The Legislature reenacted the sensitive-places law the following year, adding prohibitions on firearms at additional places, including assemblies for "amusement" and "any circus, show, or public exhibition of any kind." An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg., R.S., ch. 34, § 3, 1871 Tex. Gen. Laws 25–27 (ROA.479–84).[2] Sensitive-places laws were also enacted at the local level. For example, the San Antonio City Council prohibited carrying weapons at any "assembly or gathering for amusement or instruction," including

---

[2] The Legislature also enacted a general prohibition on a person publicly carrying a "deadly weapon[]," defined to include concealable weapons like any "pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense," without "reasonable grounds for fearing an unlawful attack on his person." *Id.* § 1. That provision carried a lesser penalty—a "fine of not less than twenty-five nor more than one hundred dollars"—than the sensitive-places law. *Id.*

any "bar-room" or "drinking saloon." San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly Weapons, § 1 (Dec. 14, 1870) (ROA.485–86).

Texas's firearm laws soon made their way to the Supreme Court of Texas. The first case involved three defendants, two of whom had been convicted under section 1 of the 1871 law (the broad public-carry restriction) and one of whom had been convicted under section 3 (the location restriction). *See English v. State*, 35 Tex. 473 (1871). The defendants challenged the 1871 Act, arguing that it was "repugnant to the second article of the amendments to the constitution of the United States." *Id.* at 474. The court rejected the challenge. *Id.* On the sensitive-places challenge, the court was emphatic, decrying as "little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[3] *Id.* at 478–79. Throughout the late 1870s and

[3] *Bruen* referred to *English* as an "outlier[]," 597 U.S. at 65, but the Court focused on *English*'s holding as to section 1 of the 1871 law—the

[*footnote continued on next page*]

1880s, Texas courts consistently applied the sensitive-places laws without doubting their constitutionality. *See*, *e.g.*, *Summerlin v. State*, 3 Tex. Ct. App. 444 (1878); *Snell v. State*, 4 Tex. Ct. App. 171 (1878); *Alexander v. State*, 11 S.W. 628 (Tex. Ct. App. 1889).

### B. Sensitive-places laws have endured despite Texas's loosening of other firearm regulations.

The 1871 sensitive-places law endured well into the twentieth century. *See*, *e.g.*, Tex. Penal Code arts. 483, 485 (1925) (ROA.487–92); Tex. Penal Code arts. 483, 485 (1936) (ROA.493–507); Tex. Penal Code arts. 483, 485 (1948) (ROA.508–22).

Over a century after enactment of the original sensitive-places law, in 1973, Texas revised its criminal laws in a new Penal Code. Sensitive-places laws survived that reorganization in a patchwork fashion. Along with general public-carry restrictions, Texas punished as a third-degree felony the carrying of a "handgun, illegal knife, or club" on "any premises licensed or issued a permit . . . for the sale or service of alcoholic

---

public-carry restriction. The Court didn't address *English*'s treatment of section 3's sensitive-places restrictions. As explained below, the sensitive-places restrictions were no outlier and appeared in the codes of other jurisdictions.

beverages." Tex. Penal Code § 46.02(c) (1974) (ROA.523–38). It also punished as a Class A misdemeanor going onto "the premises of a school or an educational institution" or "the premises of a polling place" on election day with any "firearm." *Id.* § 46.04. Courts and government offices were soon added as places where firearms were prohibited. Tex. Penal Code § 46.04 (1984) (ROA.539–50). And in 1989, when horse race gambling returned to the State,[4] Texas amended section 46.04 to add racetracks to the list. *See* An Act Relating to the Creation of the Offense of Going on the Premises of a Racetrack With a Firearm, Explosive Weapon, or Illegal Knife, 71st Leg., R.S., ch. 749, § 2, 1989 Tex. Gen. Laws 3332 (ROA.551–52).

In recent years, Texas has loosened gun restrictions to become the gold standard for protecting the right to keep and bear arms. All the while, the State has maintained sensitive-places restrictions.

---

[4] In 1986, the Legislature passed the Texas Racing Act, and in 1987, Texans voted to amend the state constitution to legalize gambling on horse races after the practice had been outlawed for most of the twentieth century. *See* Texas Racing Act, 69th Leg., 2d C.S., ch. 19, 1986 Tex. Gen. Laws 48; John Gravois, *Against All Odds: The Evolution and Ups and Downs of Legalized Gambling Efforts in Texas*, Dallas Morning News (Jan. 30, 2023), available at https://tinyurl.com/mr42r2jc.

In 1995, for instance, then-Governor Bush signed into law a concealed-carry licensing regime. *See* An Act Relating to the Issuance of a License to Carry a Concealed Handgun, 74th Leg., R.S., ch. 229, 1995 Tex. Gen. Laws 1998.

At the same time, Texas added new sensitive-places restrictions, including prohibitions on concealed-carry licensees bringing handguns "on the premises of a business that . . . derives 51 percent or more of its income from the sale or service of alcoholic beverages" or "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place." *Id.* § 4; Tex. Penal Code § 46.035 (1995). And the restrictions on carrying any firearm at locations like schools, polling places, racetracks, and government offices remained in force and were made third-degree felonies. Tex. Penal Code § 46.03(a), (f), (g) (1997). Later, in 2017, Texas added provisions to section 46.03 specific to "location-restricted kni[ves]," in which it prohibited "intentionally, knowingly, or recklessly possess[ing]" a location-restricted knife on various premises, including at a "51%" business and "where a high school, collegiate, or professional sporting event or interscholastic

event is taking place." An Act Relating to the Carrying of Certain Knives, 85th Leg., R.S., ch. 1049, § 5, 2017 Tex. Gen. Laws 4106.

In 2021, Texas passed permitless carry, no longer requiring a license for carrying a handgun in public. *See* Firearm Carry Act of 2021, 87th Leg., R.S., ch. 809, Tex. Gen. Laws 1960. But the Legislature intentionally preserved the longstanding laws on where Texans can carry guns. *See Senate Passes Permitless Carry Bill*, Tex. Senate News (May 5, 2021), https://senate.texas.gov/news.php?id=20210505a (comments of bill sponsor). The Legislature consolidated its patchwork of location restrictions that previously distinguished between the types of weapons at issue (for example, knives and firearms) and whether the person carrying held a license. *See* Tex. Penal Code § 46.03(a). Relevant here, carrying a firearm on a "racetrack" or "51%" business is a third-degree felony, *id.* § 46.03(g), while carrying "on the premises where a high school, collegiate, or professional sporting event or interscholastic event is taking place" is a Class A misdemeanor. *Id.* § 46.03(g-2).

## II. Plaintiffs challenge the longstanding sensitive-places laws.

Despite the historical pedigree of Texas's sensitive-places laws, plaintiffs challenge sections 46.03(a)(7), (a)(8), and (a)(4) of the Penal

Code. Plaintiffs say that they "prefer[] to carry a firearm for personal self-defense at all times and in all locations"—including while "attend[ing] sporting events" and going to "51%" businesses—but that Texas's sensitive-places laws prevent them from doing so. *See*, *e.g.*, ROA.17–19. In their view, the Second Amendment entitles them to "carry[] loaded, operable handguns in case of confrontation for immediate self-defense in [all] public places." ROA.19.

Attempting to cast their position in a reasonable light, plaintiffs contrive situations in which Texas's laws would prevent them from carrying a firearm—like patronizing a bar but not drinking, *see* Plaintiffs' Br. 34, or attending a cross-country race at a public area or park, *see id.* at 40 n.12; Plaintiffs' Suppl. Br. 8. But plaintiffs don't challenge the laws only as they apply in those circumstances or even to plaintiffs themselves.

Instead, they allege that the sensitive-places laws are "facially unconstitutional under the Second Amendment." ROA.23. And disregarding recent precedent, they seek a universal permanent injunction "enjoining enforcement of [Texas's sensitive-places laws] with

respect to places open to the public." ROA.24. *But see Trump v. CASA, Inc.*, 606 U.S. 831, 847 (2025).[5]

## III. The district court upholds the sensitive-places laws.

The district court rejected plaintiffs' challenge and declared the challenged sensitive-places laws constitutional. ROA.923. No matter the district court's "view of the merits of these policies," ROA.922, it explained that "Texas's law is sufficiently analogous to historical laws prohibiting the carry of firearms in sensitive places to justify" the restrictions it imposes. ROA.905.

The district court exhaustively surveyed evidence of "the Nation's historical tradition of firearm regulation." ROA.905. It focused on Founding-era evidence of the Second Amendment's meaning. ROA.909. It also considered nineteenth-century evidence—so long as it was not

[5] The possible impact of Plaintiffs' facial challenge doesn't stop at Texas's borders. Plaintiffs' rigid view of the Second Amendment—paired with their facial challenge to Texas's laws—threatens to undo the considered judgments of three legislatures in a single stroke. *See* La. Rev. Stat. § 14:95.5 (prohibiting firearm possession at "any commercial establishment in which alcoholic beverages . . . are sold in individual servings for consumption on the premises"); Miss. Code § 45-9-101(13) (barring licensed concealed carriers from "any portion of" establishments "primarily devoted to dispensing alcoholic beverages" and from "any school, college or professional athletic event not related to firearms").

inconsistent with the Founding-era evidence—because post-enactment history "can help to liquidate a meaning and settle indeterminacies." ROA.911 (citing *Chiafalo v. Washington*, 591 U.S. 578, 593 (2020)).

The district court first assessed the interscholastic-events prohibition, beginning from the settled premise that "[s]chools are sensitive places" and that, "[b]y extension, interscholastic events are too." ROA.912 (citing *Heller*, 554 U.S. at 626). Digging into the history, the court found that colleges and universities in the Founding era imposed "prominent restrictions" on students' possession of firearms "to create a peaceful learning and social environment." ROA.913. Later laws continued this tradition of protecting educational environments through firearm restrictions. ROA.913. In the district court's view, the same "how" and "why" of those laws applies to Texas's interscholastic-events ban: it prohibits carry to ensure a peaceful learning environment. ROA.913.

Next, the district court held Texas could constitutionally prohibit the carrying of firearms at establishments that predominantly serve alcohol. ROA.914. It identified two themes that predated the Founding and continued through the nineteenth century: a tradition of "location-

based prohibitions on carrying firearms in certain social settings," and a tradition of "regulat[ing] the mix of firearms and alcohol." ROA.914. The location-based tradition was evident from, among other things, a 1328 English statute, a 1786 Virginia law, and an 1816 Act of Congress regulating the District of Columbia all prohibiting the carrying of arms in fairs and markets. ROA.915. Likewise, the firearms-and-alcohol tradition appeared in colonial measures such as Virginia's 1656 restriction on shooting firearms at drinking events and New York's 1771 restriction on celebratory shooting. ROA.915–16. Nineteenth-century state and territorial laws carried on these traditions by prohibiting the carrying of firearms both while intoxicated and in social settings where alcohol was consumed. ROA.916–18. The district court concluded that Texas's ban on firearms where alcohol is sold is part of "a well-established tradition of regulating the carry of firearms by those intoxicated or prone to become intoxicated in settings serving significant amounts of alcohol." ROA.918.

The district court then upheld Texas's ban on carrying firearms at professional sports stadiums and racetracks. ROA.919. Although professional sports did not exist at the Founding, the court explained that

crowded places of social amusement—such as fairs and markets—have long been sensitive places where the carrying of firearms could be restricted. ROA.919–20. That tradition continued past the Second Amendment's ratification and included an 1879 Texas law prohibiting firearms at "any circus, show, or public exhibition of any kind." ROA.920. Because Texas's stadium and racetrack restrictions were like earlier laws seeking to protect individuals in crowded social and recreational environments, the district court held them constitutional. ROA.919–22.

## Argument

From Blackstone through present, courts and commentators have explained that the right to keep and bear arms is "not an 'unlimited' right 'to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Wolford v. Lopez*, 609 U.S. ---, 146 S. Ct. 2032, 2042 (2026) (quoting *Heller*, 554 U.S. at 592, 626). And the Supreme Court has long emphasized that its decisions should not "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* (quoting

*Heller*, 554 U.S. at 626). Texas's venerable laws fall well within that sensitive-places tradition.

## I. Plaintiffs' facial challenge, which disregards historical practices consistent with the Founding era, fails at the outset.

As an initial matter, plaintiffs' Second Amendment challenge suffers from two methodological flaws. First, plaintiffs chose to bring a facial challenge, but they have not demonstrated that the laws are unconstitutional in all their applications. Second, plaintiffs insist (at 19–24) that only history from the Founding era is relevant because later history is supposedly inconsistent with Founding-era silence. Both moves fail.

### A. Plaintiffs concededly haven't shown that the laws are unconstitutional in all applications.

Plaintiffs chose to allege that the laws are "facially unconstitutional under the Second Amendment." ROA.23. "[T]hat choice 'comes at a cost.'" *United States v. Wilson*, 174 F.4th 474, 476 (5th Cir. 2026) (Willett, J., respecting the denial of rehearing en banc) (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)). A facial challenge is the "most difficult challenge to mount successfully," because it requires its proponent to "establish that no set of circumstances exists under which

the [challenged law] would be valid." *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Plaintiffs have not met that burden. They hardly seem to have tried: plaintiffs don't use the word "facial" even once. Instead, plaintiffs "flip the facial challenge standard on its head." *Christian v. James*, 176 F.4th 189, 203 (2d Cir. 2026). "Rather than consider the circumstances in which" the Texas sensitive-places laws are "most likely to be constitutional," plaintiffs "focus[] on hypothetical scenarios where [the laws] might raise constitutional concerns." *Rahimi*, 602 U.S. at 701. They repeatedly frame their objection to the Texas sensitive-places laws as one of over-inclusiveness: the laws are unconstitutional because they apply off school campuses, Plaintiffs' Br. 4; "where a crowd may be small or dispersed," *id.* at 43; and to nondrinkers at a bar, *id.* at 34. *Cf. LaFave v. County of Fairfax*, 149 F.4th 476, 484 (4th Cir. 2025) (chiding plaintiffs for "suggest[ing] that the sheer breadth of [a gun] ordinance lowers their burden on a facial challenge"), *cert. denied sub nom. LaFave v. Fairfax County*, 146 S. Ct. 1799 (2026).

Plaintiffs' framing betrays a concession that the challenged laws are constitutional in most applications. They disclaim (at 39) any

challenge to section 46.03(a)(8) (the sporting-and-interscholastic-events provision) "to the extent that it applies to events on school grounds," suggesting they agree that the provision is constitutional in a significant portion of the situations it covers. *See Bruen*, 597 U.S. at 30 (describing schools as a sensitive place). They also assert that they will not drink while armed when they visit bars, ROA.18–19, emphasizing that they do not challenge the constitutionality of disarming those who do. Plaintiffs' Br. 34–35. By plaintiffs' logic, then, the Second Amendment requires facial invalidation of challenged statutes even when they are valid in most applications. That flips the inquiry and neuters the high burden of a facial challenge.

By pursuing a facial challenge, plaintiffs have "doom[ed] their effort." *LaFave*, 149 F.4th at 483. Their tacit concessions alone are enough for this Court to affirm. *See id.* at 483–84 (concession that firearms may be banned in schools defeated facial challenge to firearm restriction at parks because several schools were on park property). And setting those concessions aside, the challenged sensitive-places laws survive plaintiffs' challenge if they validly proscribe just *some* conduct. *See Wilson*, 174 F.4th at 476–77 (Willett, J., respecting the denial of

rehearing en banc) (explaining that the facial challenge standard was "likely a fatal one" when considering a federal machinegun ban because, "[i]f even one such weapon falls outside the Second Amendment's protection . . . [the] facial challenge fails"); *United States v. Connelly*, 117 F.4th 269, 282 (5th Cir. 2024) (rejecting a facial challenge to statute banning firearm possession by unlawful users of controlled substances because there were "some sets of circumstances" where the statute "would be valid, such as banning presently intoxicated persons from carrying weapons").

Texas's sensitive-places laws easily clear that bar. Consider the following scenarios the laws cover:

- a Major League Baseball game where the President is throwing out the first pitch[6];
- a Waco bar and restaurant with a history of biker gang violence[7];

[6] *See* Louis DeLuca, *Career in a Year Photos 1991: President George H.W. Bush Reacts to His Errant Toss*, Dallas Morning News (Apr. 8, 2015), https://www.dallasnews.com/photos/2015/04/09/career-in-a-year-photos-1991-president-george-h-w-bush-reacts-to-his-errant-toss/.

[7] *See* Skip Hollandsworth, *Gang Land*, Tex. Monthly (July 2015), https://www.texasmonthly.com/culture/gang-land/.

- bars, restaurants, and stadiums hosting events related to a major international sporting competition that presents a target for terrorism[8];
- a stadium that is the subject of a credible tip warning of a mass shooting.[9]

As established below, this Nation's history and tradition of firearm regulation permit more but at least that much.

### B. The historical traditions from the Founding and onward are relevant—and consistent.

The Supreme Court has not answered "'whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791." *United States v. Hemani*, 608 U.S. ---, 146 S. Ct. 1677, 1687 n.3 (2026) (quoting *Bruen*, 597 U.S. at 37–38).

---

[8] *See* Scott Friedman & Eva Parks, *DHS Warns of 'Extremely High' Threat Level Around FIFA, as DFW Prepares to Host*, NBC DFW (May 7, 2026), https://www.nbcdfw.com/news/local/dhs-warns-extremely-high-threat-level-world-cup-dfw-host-matches/4021660/.

[9] *See* Emerson Clarridge, *Authorities Release Names of Two Suspects in Thwarted Everman Homecoming Game Violence*, Fort Worth Star-Telegram (Sept. 19, 2022), https://www.star-telegram.com/news/local/crime/article266043036.html (suspects "arrested on suspicion of unlawful carrying of a weapon in a prohibited place" after sheriff acting on a tip stopped them at a high school football stadium).

But because the Second Amendment did not bind Texas until the Fourteenth Amendment's ratification in 1868, Reconstruction-era evidence best illuminates the scope of the right to bear arms incorporated against the State. *See Bruen*, 597 U.S. at 34 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." (quoting *Heller*, 554 U.S. at 634–35)).

In the context of other constitutional guarantees applied to the states, like free speech, Justices Thomas and Scalia have emphasized the understanding of ordinary citizens in 1868—and the same should be true here. *See Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 212–13 (2021) (Thomas, J., dissenting) (examining how ordinary citizens in 1868 understood the scope of free-speech rights incorporated against the States); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (urging consideration of "common practice in 1868"). Respecting 1868 understandings is "ascendant among originalists." Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022); *see also* Will Baude, *Originalism and Dual-Track Incorporation*, Reason.com (Apr. 24, 2020) (centering "1867/8

understanding" for States "is plausible, and even intuitive")[10]; Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022) ("When the people adopted the Fourteenth Amendment, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings."); Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 223 (1998) (similar).

Setting aside whether history from the Second or Fourteenth Amendment's ratifications should carry *more* weight, a proper Second Amendment analysis still involves *both* "pre-ratification and post-ratification history," *Rahimi*, 602 U.S. at 714 (Kavanaugh, J., concurring); *see also id.* at 738 (Barrett, J., concurring) ("[P]ostenactment history can be an important tool."). "[E]vidence of 'how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century' represent[s] a 'critical tool of constitutional interpretation.'" *Bruen*, 597 U.S. at 35 (quoting *Heller*, 554 U.S. at 605). That kind of evidence—"sometimes referred to as tradition,"

[10] https://reason.com/volokh/2020/04/24/originalism-and-dual-track-incorporation/.

*Rahimi*, 602 U.S. at 723 (Kavanaugh, J., concurring)—"shed[s] light on the meaning of vague constitutional text." *See id.* at 725.

Plaintiffs concede that a court may look for guidance to historical regulations beyond the Founding era so long as the regulation was not inconsistent with the Founding-era understanding of the right. Plaintiffs' Br. 20–21. That much would be hard to deny. *See*, *e.g.*, *Bruen*, 597 U.S. at 35–37, 50–70 (describing the value and limitations of post-enactment evidence while acknowledging that *Heller* relied on it, then evaluating at length evidence from after 1791); *Schoenthal v. Raoul*, 150 F.4th 889, 913 (7th Cir. 2025) (collecting circuit cases finding that "evidence stretching into the nineteenth century is useful to a *Bruen* inquiry").

Despite that acknowledgment, plaintiffs insist (at 23) that the Reconstruction-era laws highlighted below deviate from regulatory silence "at the Founding" and so are somehow inconsistent with the regulatory approach at the Founding. But that argument, which ignores that Founding-era legislators may not have "maximally exercised their power to regulate" and could not foresee all future problems, would force courts into the "use it or lose it" trap. *Rahimi*, 602 U.S. at 739–40

(Barrett, J., concurring); *Christian*, 176 F.4th at 206 (explaining that "the lack of Founding-era history is an especially *weak* indicator of constitutionality") (emphasis added). Other circuits have thus unsurprisingly considered historical evidence stretching deep into the nineteenth century. *Schoenthal*, 150 F.4th at 913; *NRA v. Bondi*, 133 F.4th 1108, 1116 (11th Cir. 2025) (en banc) (W. Pryor, C.J.) ("[W]e may look to historical practice from the mid-to-late nineteenth century at least to confirm the Founding-era understanding of the Second Amendment."); *id.* at 1121 (relying in part on "[m]id-to-late nineteenth-century laws" to confirm constitutionality of Florida's firearm age restriction law); *Antonyuk v. James*, 120 F.4th 941, 973 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025); *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024), *rev'd in part on other grounds*, 146 S. Ct. 2032 (2026).[11]

This is not a case in which "early state constitutions and statutes actively encouraged" a policy that nineteenth-century tradition later

[11] Plaintiffs' cases (at 21) also looked to history far beyond the Founding period in interpreting the Bill of Rights. *Timbs v. Indiana*, 586 U.S. 146, 152 (2019) ("An even broader consensus obtained in 1868 upon ratification of the Fourteenth Amendment."); *Ramos v. Louisiana*, 590 U.S. 83, 90–91 (2020).

contradicted. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 480 (2020); *contra* Plaintiffs' Br. 22. On the contrary, as discussed below, lawmakers throughout the nineteenth century carried forward traditions of firearm regulation from the Founding era and adapted them to address evolving societal problems. In a decision upholding an earlier Texas sensitive-places law—decided on the heels of the Fourteenth Amendment's ratification and far closer to the Founding than today—the Texas Supreme Court found no constitutional defect: "The history of our whole country but too well justifies the enactment of such laws." *See English*, 35 Tex. at 479.

## II. Each of the three sensitive-places laws is consistent with the Nation's tradition of firearm regulation.

If the Second Amendment's plain text covers an individual's conduct, the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Showing consistency with historical tradition requires pointing to historical regulations that are analogous to the challenged law. *Id.* at 28–30. And whether a historical regulation is analogous to a modern one depends on "how and why the regulations burden" the right to bear arms. *Id.* at 29. Courts ask "whether modern

and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*

Only "a well-established and representative historical *analogue*, not a historical *twin*," is required to justify a modern regulation. *Bruen*, 597 U.S. at 30. "Particularly when the modern law addresses a situation that could not have arisen" in the past, "it is too much to demand such a close match." *Wolford*, 146 S. Ct. at 2044. So when considering historical analogues, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. The point is that "[h]istorical regulations reveal a principle, not a mold." *Id.* at 740 (Barrett, J., concurring). Modern regulations may be upheld even if they "do[] not precisely match [their] historical precursors." *Id.* at 692 (majority opinion).

Section 46.03's sensitive-places restrictions are constitutional because they are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Indeed, sensitive-places laws date at least as far back as fourteenth-century England, where people were prohibited from going or riding "armed by night []or by day, in fairs,

markets, nor in the presence of the [King's] justices or other ministers." Statute of Northampton 1328, 2 Edw. 3, c.3 (ROA.553–61)[12]; *see also* 1402, 4 Hen. 4, c.29 (ROA.562–65). Similar laws continued into later centuries. 1534, 26 Hen. 8, c.6, § 4 (ROA.566–76) ("town, church, fair, market or other congregation" in Wales); 1715, 1 Geo., c.54, §§ 1, 6–10 (ROA.577–86) (similar in Scotland). And American colonies carried forward this tradition—at least two colonies passed similar laws prohibiting going or riding armed "in fairs" or "markets." *See* François-Xavier Martin, A Collection of the Statutes of England Now in Force in the State of North Carolina 60–61 (1792) (ROA.587–92); An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (ROA.593–95) (similar). Other colonies restricted firearms in other sensitive places. *See*, *e.g.*, Del. Const. art. 28 (1776) (ROA.596–603) (prohibiting people from "com[ing] armed to" elections).

---

[12] Plaintiffs curiously assert (at 29–30) that the Statute of Northampton was not "location dependent." This Court views it differently. *United States v. Allam*, 140 F.4th 289, 295, 297 (5th Cir. 2025) (describing the Statute as "a type of historical location-based regulation" whose "location-based restrictions" supported the constitutionality of a federal law barring firearms within 1,000 feet of a school).

Given this lineage of sensitive-places regulations dating back to the Middle Ages, it is unsurprising that courts have uniformly approved such restrictions even as the Supreme Court has struck down other anomalous gun-restrictive practices. Courts have upheld laws prohibiting carrying firearms into places where predominantly alcohol is sold and consumed, *see Kipke v. Moore*, 165 F.4th 194, 217–18 (4th Cir. 2026); *Antonyuk*, 120 F.4th at 1027–28; *Wolford*, 116 F.4th at 985–86; and laws prohibiting the carry of firearms at sporting events, including stadiums and racetracks, *see Antonyuk*, 120 F.4th at 1039 (sporting events); *Wolford*, 116 F.4th at 987–89 (stadiums and crowded places of amusement); *Kipke*, 165 F.4th at 216–17 (stadiums and racetracks); *Md. Shall Issue, Inc. v. Montgomery County.*, 680 F. Supp. 3d 567, 585–88 (D. Md. 2023) (recreational facilities and multipurpose exhibition facilities). And this Court is "always chary to create a circuit split." *Punch v. Bridenstine*, 945 F.3d 322, 331 (5th Cir. 2019).

Like the sensitive-places restrictions that other courts have upheld, the Texas laws at issue here regulate firearms where they present a special danger: at **(A)** establishments where predominantly alcohol is sold; **(B)** interscholastic events and sporting events; and **(C)** racetracks.

Because these laws follow a well-established tradition of analogous, location-based regulations, they are constitutional.

### A. Restricting firearms at businesses that derive most of their revenue from alcohol (section 46.03(a)(7)) is consistent with the tradition of regulating firearms and alcohol.

Both at the Founding and during Reconstruction, lawmakers were acutely aware of the danger of mixing alcohol and weapons. *See Wolford*, 116 F.4th at 985. Those in the Founding era understood that drinking could provoke dangerous behavior and breed crime. *See* Benjamin Rush, An Inquiry into the Effects of Ardent Spirits upon the Human Body and Mind 2 (8th ed., Boston, James Loring 1823). As a result, legislatures understood "the need to disarm intoxicated individuals who could not be trusted with weapons," particularly in "crowded spaces." *Antonyuk*, 120 F.4th at 1031.

Lawmakers sought to protect citizens from the dangerous mix of guns and alcohol in a variety of ways. Most relevant are three lines of laws that establish the tradition of regulating alcohol and guns: (1) laws reflecting legislators' general understanding that firearms and intoxication are a dangerous mix; (2) prohibitions on firearms where

alcohol is sold; and (3) prohibitions on firearms at ballrooms and social gatherings. Section 46.03(a)(7) is analogous to those provisions.

#### 1. Section 46.03(a)(7) is consistent with the tradition of regulating the dangerous mix of firearms and alcohol.

"[I]n a long line of regulations dating back to the colonial era, colonies, states, and cities have regulated in ways reflecting their understanding that firearms and intoxication are a dangerous mix." *Wolford*, 116 F.4th at 985.

Start with colonial-era laws. In 1656, Virginia prohibited "shoot[ing] any gunns at drinkeing [events]." Acts of Mar. 10, 1655–6, Act XII, *reprinted in* 1 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia from the First Session of the Legislature, in the Year 1619 at 401–02 (1823), available at https://tinyurl.com/27hj6uk8. That law was prophylactic and did not turn on whether attendees became intoxicated. Similarly, in 1771, New York prohibited shooting around New Year's Eve to prevent the damage caused by combining alcohol with firearms. Act of Feb. 16, 1771, ch. 1501, *reprinted in* 5 The Colonial Laws of New York from the Year 1664 to the Revolution 244–46 (1894) (ROA.604–09).

The principle that alcohol and guns pose risks that can justify regulation extended into the nineteenth century, when many states also prohibited the carrying of firearms while intoxicated. 1867 Kan. Sess. Laws 25, ch. 12, § 1 (ROA.704–06); Mo. Rev. Stat. § 1274 (1879) (ROA.707–10); 1883 Wis. Laws 290, ch. 329, § 3 (ROA.711–14) (codified at Wis. Stat. § 4397b(3) (1889) (ROA.715–18)); 1909 Idaho Sess. Laws 6, § 1 (ROA.719–21); *see also* 1878 Miss. Laws 175, ch. 46, § 2 (ROA.722–24) ("That it shall not be lawful for any person to sell to any . . . person intoxicated, knowing him to be . . . in a state of intoxication, any" dangerous weapons).

Many cities had similar laws—which matters because "local variation in firearm regulation was the norm in the United States until the advent of firearm preemption laws in the mid-to-late twentieth century." Joseph Blocher & Patrick J. Charles, *The History and Tradition of Firearm Localism*, Texas L. Rev. (forthcoming), at *28, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6878118; *see* DeSoto, Mo., Rev. Ordinances, art. 6, § 224 (1888) (ROA.725–30); Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons at 58, § 1 (July 17, 1894) (ROA.731–36); Columbia, Mo., Gen. Ordinances, ch. 17, §§ 163–

64 (1890) (ROA.737–40); Lyons, Kan., Ordinance No. 179, § 1 (Sept. 7, 1891) (ROA.741–42); Blackwell, Okla., Town Ordinance No. 21, § 3 (Aug. 7, 1894) (ROA.743–44); Wallace, Kan., Ordinance, § 3 (Dec. 22, 1887) (ROA.745–46); Greenfield, Mo., Ordinance No. 39, § 1 (Jan. 4, 1886) (ROA.747–48); Jerome, Ariz., Town Ordinance No. 2, § 21 (Mar. 21, 1899) (ROA.749–56); Brookfield, Mo., Gen. Ordinances 116, § 32 (1900) (ROA.757–61).

Finally, some cities "prohibited retailers of liquor from keeping gunpowder," including Chicago in 1851 and St. Paul in 1858. *Wolford*, 116 F.4th at 985; Chi., Ill., Ordinances, ch. 16, § 6 (July 23, 1851) (ROA.762–71); St. Paul, Minn., An Ordinance to Regulate the Sale of Gunpowder, ch. 21, § 4 (June 29, 1858) (ROA.772–74).

There was no dispute about the constitutionality of these laws, *see Wolford*, 116 F.4th at 985, and at least one state supreme court contemporaneously held that a statute's prohibition on carrying while intoxicated was "in perfect harmony with the [state] constitution." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

### 2. Section 46.03(a)(7) is consistent with the tradition of prohibiting firearms where alcohol is sold.

State, territorial, and local laws prohibiting firearms in places where alcohol and liquor were sold are directly analogous to section 46.03(a)(7). For example, in 1890, Oklahoma banned firearms at "any place where intoxicating liquors are sold." 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7 (ROA.649–54).[13] In 1853, New Mexico prohibited firearms at a "Ball or Fandango"[14] and at any "room adjoining said ball where Liquors are sold." 1853 N.M. Terr. Laws 67, § 3 (ROA.775–84). In 1870, San Antonio banned firearms at any "bar-room" or "drinking saloon." San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly Weapons, § 1 (Dec. 14, 1870) (ROA.485–86). Similarly, in 1879, New Orleans banned firearms at any "public hall" or "tavern." New Orleans, La., General Ordinances, tit. 1, ch. 1, art. 1 (May 1879)

---

[13] While *Bruen* cautioned against giving too much weight to territorial laws, it did not compel "automatic rejection of any territorial laws and statutes," and courts of appeals have found territorial laws to carry weight when, as here, they were "consistent with" contemporaneous state laws. *Antonyuk*, 120 F.4th at 1029; *see Schoenthal*, 150 F.4th 913 n.21.

[14] "The term 'fandango' as used in New Mexico at the time meant a social gathering akin to a ball; an 'assembl[y] where dancing and frolicking are carried on.'" *Wolford*, 116 F.4th at 986 n.5 (quoting Fandango, Dictionary of American Regional English (1991)).

(ROA.785–90). And in 1889, the territory of Arizona required the keepers of "drinking saloon[s]" to "keep posted up in a conspicuous place in his bar room . . . a plain notice to travelers to divest themselves of their weapons." 1889 Ariz. Terr. Sess. Laws 17, § 7 (ROA.791–97).

#### 3. Section 46.03(a)(7) is consistent with the tradition of prohibiting the carrying of firearms at ballrooms and social gatherings.

A third line of laws "broadly prohibited the carry of firearms at ballrooms and at social gatherings." *Wolford*, 116 F.4th at 986. Although "[b]ars and restaurants are not ballrooms," this line of regulations "show[s] a well-established tradition of prohibiting firearms at crowded places, which included, at times, bars and restaurants." *Id.* Alcohol "was often served" at ballrooms "and drinking (sometimes copiously) was a favorite ballroom activity." Kellen Heniford & Kari Still, *Panic! At the Ballroom: The 1804 New Orleans Ballroom Weapons Ban in a Post-*Bruen *Context*, 73 Buffalo L. Rev. 679, 703 (2025). Because balls "united wine, whiskey, honor-conscious men often heavily armed, and 'a great throng of women' they were determined to impress," "[v]iolence [was] commonplace." *Id.* at 708 (quoting 1 Marcel Giraud, A History of French Louisiana 159 (2d prtg. 1990) (Joseph C. Lambert trans., 1974)).

Accordingly, throughout the nineteenth century, states, territories, and localities passed laws prohibiting firearms at ballrooms and social gatherings, including a Texas law enacted immediately after the Fourteenth Amendment's ratification. *See*, *e.g.*, 12th Leg., 1st C.S., ch. 46, § 1 (ROA.475–78); Tex. Penal Code, tit. 9, ch. 4, art. 320 (1879) (ROA.798–801); *see also* New Orleans, La., An Ordinance Respecting Public Balls, art. 1 (Oct. 27, 1817) (ROA.802–08) (prohibiting weapons in public ballrooms and requiring all weapons to be "deposite[d]" at "the entrance"); 1853 N.M. Terr. Laws 67, § 3 (ROA.775–84) (prohibiting firearms at a ball or fandango); 1889 Ariz. Terr. Sess. Laws 17, § 3 (ROA.791–97) (prohibiting firearms at any "ball room, social party or social gathering"); 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7 (ROA.649–54) (same); 1903 Mont. Laws 49, ch. 35, § 3 (ROA.809–14) (same); 1875 Mo. Laws 50, § 1 (ROA.817–20) (prohibiting firearms at "any place where people [are] assembled for . . . social purposes"); Waco, Tex., An Ordinance (July 9, 1891) (ROA.815–16).[15]

---

[15] As the district court pointed out, "the thriving cowtown" of Abilene, Kansas took things a step farther. ROA.917. It was so concerned about an influx of gun-carrying Texas cowboys "eager to socialize" and "the possibility of confrontations" that it "banned [firearms] within the city

[*footnote continued on next page*]

*　　*　　*

These laws show a tradition of disarming individuals (the "how") in situations in which the mix of firearms and alcohol could present a special danger (the "why"). Texas's prohibition on carrying firearms on the "premises of a business" licensed to sell alcohol "if the business derives 51 percent or more of its income" from selling alcohol falls comfortably in that tradition. Tex. Penal Code § 46.03(a)(7).

Other courts agree. The Second Circuit found a "consistent and representative national tradition of regulating firearms due to the dangers posed by armed intoxicated individuals" by analyzing "six analogues, which applied to nine-and-a-half percent of Americans by 1889"—Kansas, Wisconsin, and Missouri laws "disarming intoxicated persons," Mississippi's law "prohibiting the sale of firearms to intoxicated persons," and Arizona and Oklahoma laws "prohibiting firearms in liquor-serving or -selling establishments." *Antonyuk*, 120 F.4th at 1030.

---

limits." ROA.917–18 (alteration in original) (quoting Joseph G. Rosa, *They Called Him Wild Bill: The Life and Adventures of James Butler Hickok* 120–22 (Univ. Okla. Press 1964)); *see also* Abilene, Kan., Ordinance Relating to the Carrying of Firearms and Other Deadly Weapons (May 12, 1870).

And in a part of the Ninth Circuit's *Wolford* decision untouched by the Supreme Court, the court held that "bars and restaurants that sell alcohol are among the Nation's 'sensitive places' where firearms may be prohibited" by considering a similar, although not identical, set of laws to those discussed above. 116 F.4th at 986. The court noted that although four directly on-point laws—from New Mexico, San Antonio, Oklahoma, and New Orleans—"post-dated the ratification of the Second Amendment, [and] governed only a small population," they "were enacted both before and soon after the ratification of the Fourteenth Amendment and are similar in all material respects to" the challenged "modern laws." *Id.* These laws "provide support analogous to that provided by the few, local, post-ratification regulations that justified designating schools as sensitive places." *Id.*

Plaintiffs nevertheless assert (at 28) that section 46.03(a)(7) must be unconstitutional because the historical record does not reflect "outright bans on carrying" in taverns during the Founding era. By demanding such a close historical analogue, they ignore that a "historical twin" or "precise historical precursor" is not required. *Hemani*, 146 S. Ct.

at 1686 (citation modified).[16] In *Rahimi*, there was no "historical twin" to the federal statute prohibiting those with a domestic violence restraining order from possessing a firearm, despite the fact that domestic violence and firearms both existed at the Founding. Yet the Supreme Court rejected distinctions no smaller than those here. It looked to "two distinct legal regimes" (surety and going armed laws), and without denying the gaps between those laws and the one at issue, it concluded that the prohibition on "the possession of firearms by those found by a court to present a threat to others fit[] neatly within the

[16] Plaintiffs insist (at 16) that the existence of firearms and taverns in colonial times means that the same "general societal problem" of firearms in bars has prevailed since the Founding. Not so. The single-fire, muzzle-loaded guns common at the Founding "were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire." Randolph Roth, *Why Guns Are and Aren't the Problem: The Relationship Between Guns and Homicide in American History*, *in* A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment 113, 117 (Jennifer Tucker et al. eds., 2019). "[M]ost owners stored their guns empty" and had to engage in a lengthy loading process "before every use." *Id.* Thus, "[f]amily and household homicides—most of which were caused by abuse or simple assaults that got out of control—were committed almost exclusively with weapons that were close at hand," which were not loaded guns but rather "whips, sticks, hoes, shovels, axes, knives, feet, or fists." *Id.* In colonial times, firearms simply did not pose the risk they later would for turning sudden alcohol-induced arguments into homicides.

tradition" that those legal regimes represent. 602 U.S. at 694, 698. The Court emphasized the *principles* underlying the historical laws, which gave it "no trouble" in concluding that the law at issue was constitutional. *Id.* at 700.

So too here. The historical record of prohibiting the dangerous combination of alcohol and firearms confirms that section 46.03(a)(7) is "consistent with the principles that underpin our regulatory tradition" of prohibiting carry of firearms in places where alcohol is sold or where individuals may become intoxicated. *Rahimi*, 602 U.S. at 692. If anything, section 46.03(a)(7) is an even closer fit to this historical tradition than the federal law in *Rahimi* was to the surety and going armed laws that the Supreme Court analyzed. In this case, the historical analogues are not merely regimes from which a principle must be inferred. They are direct forerunners of section 46.03(a)(7), addressing the mix of alcohol and firearms. Like the Texas law, they concerned the problems of combining firearms and alcohol, including in the very same kind of place: venues given over to the sale and consumption of alcohol. And they did so for the very same reason—the danger of mixing arms, crowds, and drink.

Plaintiffs also try to discount (at 3) many of section 46.03(a)(7)'s predecessor laws by claiming that *Connelly* "rejected" them. But *Connelly* is not the friend they think it is. Facing the federal firearm ban on any "unlawful user" of a controlled substance, the Court surveyed the historical record and concluded that it "provide[d] support for banning the carry of firearms while actively intoxicated." 117 F.4th at 281 (emphases omitted). Where the unlawful-user ban went wrong was not the problem it sought to address—both it and historical analogues meant to "prevent[] intoxicated individuals from carrying weapons"—but the broad scope of its prohibition. *See id.* at 281–82. It banned "all [firearm] possession . . . for an undefined set of 'user[s],' even while they are not intoxicated." *Id.* at 282 (emphasis omitted).

The Supreme Court's decision on the as-applied challenge in *Hemani* changes nothing. To be sure, in holding that the federal unlawful substance user ban was unlike historical laws permitting the detention of habitual drunkards, *Hemani* recognized "a culture of copious drinking in early America." 146 S. Ct. at 1688 (citation modified). But the problem for the government was not that history precluded regulating the mix of intoxicating substances and firearms; it was that

the modern-day status crime swept too broadly by "automatically disarm[ing] anyone who regularly uses any amount of any controlled substance for anything other than its 'prescribed purpose' . . . without regard to whether their substance use has the kind of incapacitating effect on them that historical habitual drunkard laws normally required." *Id.* at 1689. After acknowledging that "drugs and guns can sometimes make for a dangerous mix," *id.* at 1687, the Court pointedly explained it did "not address efforts to ban . . . those presently intoxicated[] from possessing a firearm," *id.* at 1693. And it made clear that its ruling did not strike down the unlawful substance user ban in all applications. *See id.*

Moreover, contrary to plaintiffs' suggestion (at Suppl. Br. 9), *Hemani* did not categorically renounce any "prophylactic ban" on firearm possession. *Cf. Hemani*, 146 S. Ct. at 1693 (declining to "address other prophylactic laws Congress might adopt after determining that users of a particular drug pose a special risk of misusing firearms"). All sensitive-places laws—which are "presumptively lawful," *Heller*, 554 U.S. at 626–27 & n.26—are prophylactic in that they include in their sweep people whose firearm possession would not actually pose a danger.

Section 46.03(a)(7) hews much closer to the bans on carrying a firearm while intoxicated (whose constitutionality plaintiffs apparently concede (at 6)) than the vague status crime of carrying a firearm while being an unlawful drug user. It commonsensically pursues the Legislature's goal of preventing intoxicated individuals from carrying weapons by regulating establishments that derive most of their income from the sale of alcohol for "on-premises consumption." *See* Tex. Penal Code § 46.03(a)(7). Moreover, it recognizes that fights break out at bars more often than other places (thus the term "barroom brawl," which earns a slot in Merriam-Webster), and that the presence of loaded firearms—no matter who is carrying them—can turn such fights into homicides.[17] An establishment where most but not all patrons are likely to be drinking is a "specific place[] where firearms are likely to be misused." *See Wolford*, 146 S. Ct. at 2058 (Barrett, J., concurring).

[17] Given the connection between alcohol and violence, it is perhaps unsurprising that about one in four federal prisoners reports using alcohol at the time of his offense. Laura M. Maruschak et al., Bureau of Just. Stat., *Alcohol and Drug Use and Treatment Reported by Prisoners: Survey of Prison Inmates, 2016* at 8 tbl.5 (2021).

Texas, like many other States, has determined that allowing guns in bars and other establishments that serve alcohol poses too great a risk for its citizens. *See supra* n.5 (citing Louisiana's and Mississippi's similar laws). Whatever private business owners might do in section 46.03(a)(7)'s absence, *see* Plaintiffs' Br. 8, it is the Legislature's prerogative to make that determination for the safety of the People it represents. *See Mugler v. Kansas*, 123 U.S. 623, 663 (1887) ("It cannot be supposed that the States intended, by adopting [the Fourteenth] Amendment, to impose restraints upon the exercise of their powers for the protection of the safety, health, or morals of the community.").

By restricting the carrying of firearms at places where people gather to drink, section 46.03(a)(7) follows this Nation's well-established tradition of regulating the dangerous mix of firearms and alcohol. The law is therefore constitutional.

### B. Restricting firearms at interscholastic and sporting events (section 46.03(a)(8)) is consistent with the tradition of prohibiting firearms at schools and crowded places of amusement.

Section 46.03(a)(8)'s prohibition on firearms where a "high school" or "collegiate" sporting event or an "interscholastic event is taking place" is consistent with the Nation's tradition of prohibiting firearms at schools

and places where people gather for educational purposes. And its prohibition on firearms "where a high school, collegiate, or professional sporting event" is taking place is further consistent with the Nation's tradition of prohibiting firearms at crowded places of amusement.

**1. Section 46.03(a)(8) is consistent with the tradition of prohibiting firearms at schools and places where people gather for literary or educational purposes.**

The Supreme Court "assume[s] it settled that [schools] were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. The Court has repeated that assurance—for *all* people and not just students—in opinion after opinion. *Heller*, 554 U.S. at 626–27 & n.26; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Rahimi*, 602 U.S. at 735 (Kavanaugh, J., concurring); *Wolford*, 146 S. Ct. at 2042. And as the district court explained, schools are a close analogue to the premises where high school or collegiate sporting or other interscholastic competitions are taking place—even when those events occur off campus. ROA.912–13.

Given the Supreme Court's recognition that restrictions on firearms at schools are presumptively lawful, it is unnecessary to march through

the historical analogues that justify section 46.03(a)(8)'s restriction on firearms at interscholastic events. *See Schoenthal*, 150 F.4th at 908–09.

In any event, section 46.03(a)(8) is directly analogous to the many state and local laws that prohibited firearms in school rooms or where people assembled for educational, literary or scientific purposes. *See*, *e.g.*, 1875 Mo. Laws 50, § 1 (ROA.817–20); Tex. Penal Code, tit. 9, ch. 4, art. 320 (1879) (ROA.798–801); 1889 Ariz. Terr. Sess. Laws 17, § 3 (ROA.791–97); 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7 (ROA.649–54); 1903 Mont. Laws 49, ch. 35, § 3 (ROA.809–14); *see also* San Antonio, Tex., Ordinance Concerning the Carrying of Arms or Deadly Weapons, § 1 (Dec. 14, 1870) (ROA.485–86); Stockton, Kan., Ordinance No. 76, § 1 (July 1, 1887) (ROA.821–22); DeSoto, Mo., Rev. Ordinances, art. 6, § 224 (1888) (ROA.725–30); Warrensburg, Mo., Concealed or Deadly Weapons, § 1 (June 5, 1890) (ROA.827–28); Waco, Tex., An Ordinance (July 9, 1891) (ROA.815–16); Leonard, Mo., Ordinance No. 23, § 1 (July 6, 1891) (ROA.823–24); Marceline, Mo., Ordinance No. 9, § 8 (Mar. 12, 1892) (ROA.825–26); Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons at 58, § 1 (July 17, 1894) (ROA.731–36); Jerome, Ariz.,

Town Ordinance No. 2, § 21 (Mar. 21, 1899) (ROA.749–56); Brookfield, Mo., Gen. Ordinances 116, § 32 (1900) (ROA.757–61).

Interscholastic events and high school and collegiate sporting events serve to educate and socialize children and young adults, "purposes furthered by prohibitions on bringing firearms into those locations." *Md. Shall Issue*, 680 F. Supp. 3d at 584. Both the historical analogues and their modern versions serve the same "why"—they "are meant to protect the same or similar vulnerable populations": students and children. *Id*. And this analogy applies equally to high school and collegiate sporting events because "*Bruen* did not distinguish between public schools and private schools or limit the term 'schools' based on the age of the students." *Id.* at 583.

Plaintiffs do nothing to contend with the Supreme Court's clear recognition that schools are locations "where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. Instead, they brush off (at 41) that guidance as nothing but "[s]chools' historical exercise of *in loco parentis* authority to restrict students' use of arms on campus." "But it would be odd for the Supreme Court to talk about schools in the context of sensitive places if it was actually referring

to restrictions on students, a subset of those occupying the place." *Schoenthal*, 150 F.4th at 909.

Unsurprisingly, then, courts have upheld similar regulations. For instance, in *Wolford*, the Ninth Circuit concluded that "youth centers . . . are akin to schools." 116 F.4th at 985; *see also Antonyuk*, 120 F.4th at 1119 n.80 ("Insofar as the State relies on the tradition of regulating firearms in places frequented by children as an analogue for [public parks], *Bruen* tells us that tradition is well-established and representative."). The Fourth Circuit similarly concluded that the "prohibition of guns on school grounds is constitutional." *Kipke*, 165 F.4th at 212; *see also Md. Shall Issue*, 680 F. Supp. 3d at 584 (childcare facilities are analogous to schools); *Mintz v. Chiumento*, 724 F. Supp. 3d 40, 64–65 (N.D.N.Y. 2024) (upholding firearm restriction at summer camps, analogizing them to schools).

Plaintiffs also attempt to narrow the facial challenge that they chose to bring. *Compare* ROA.23 (alleging that the bans are "facially unconstitutional"), *with* Plaintiffs' Br. 39 (disclaiming challenge "to the extent that [the law] applies to events on school grounds"). But as another circuit has recognized, plaintiffs may not artificially narrow their

Second Amendment facial challenge to an as-applied one on appeal—that would deprive the parties of the crucial fact development necessary to assess as-applied challenges. *Christian*, 176 F.4th at 204.

#### 2. Section 46.03(a)(8) is consistent with the tradition of prohibiting firearms in crowded places of amusement.

Today's organized sports did not exist at the Founding.[18] But sporting events are analogous to crowded places of amusement at which firearms were restricted "[b]oth before and shortly following the ratification of the Fourteenth Amendment [in] cities, states, and territories." *Wolford*, 116 F.4th at 987.

---

[18] Plaintiffs assert (at 47) without citing anything that "sports venues existed at the Founding." Plaintiffs' lack of citation is unsurprising—at the Founding, sports were "dominated by participatory pastimes" like fishing, hunting, and riding horses. Steven A. Riess, *Sports in America From Colonial Times to the Twenty-First Century* 9 (2015). Though modern baseball was developed by Alexander Cartwright and the New York Knickerbocker Base Ball Club in 1845, only in 1869 did the first all-salaried team arrive—the Cincinnati Red Stockings. *Id.* at 15–16. That progression traces to the fact that "a real boom in sports took place after the Civil War" that was tied to other phenomena like urbanization, cheap mass transit, and industrialism. *Id.* at 17; *see also Kipke*, 165 F.4th at 217 ("various places of amusement, including stadiums, racetracks, casinos, and amusement parks did not exist in modern form in 1791").

Like historical laws prohibiting carry at crowded places of amusement, section 46.03(a)(8) seeks to "protect individuals engaged in these recreational and social activities from confrontations and encounters involving firearms," *Md. Shall Issue*, 680 F. Supp. 3d at 587–88, maintain "orderly and peaceable assembly," and "protect 'the duties and proprieties of social life' in such spaces." *Antonyuk*, 120 F.4th at 1021, 1027. If anything, the concerns that the historical analogues sought to address apply with even greater force to modern sporting events, where, as the district court recognized, many are "highly inebriated and highly emotional." ROA.966. The danger that ordinary confrontations turn deadly is especially amplified at, for example, stadiums with "100,000 people with alcohol flowing freely." ROA.949. Just imagine Texas-OU or Texas-Texas A&M with thousands of guns in the stands.[19]

The historical record backs the common-sense notion that firearms may be prohibited at these contentious events. In addition to the laws

---

[19] *See also Untold: Malice at the Palace*, Netflix (released 2021) (detailing the mass violence that erupted between fans and players during a 2004 NBA game between the Detroit Pistons and Indiana Pacers).

prohibiting firearms at ballrooms and social gatherings, *supra* pp.37–39, and places where people are assembled for literary, educational, or social purposes, *supra* pp.47–51, many historical laws prohibited firearms at crowded places of amusement. As explained above, Texas itself banned firearms at "any circus, show, or public exhibition of any kind." Tex. Penal Code, tit. 9, ch. 4, art. 320 (1879) (ROA.798–801). Other states and territories had similar laws. *See* 1869 Tenn. Acts 23, ch. 22, § 2 (ROA.829–32) (prohibiting the carrying of a pistol or other "deadly or dangerous weapon" at "any fair, race course, or other public assembly of the people"); 1889 Ariz. Terr. Sess. Laws 17, § 3 (ROA.791–97) (prohibiting firearms in any "place where persons are assembled for amusement . . . or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering"); 1890 Okla. Terr. Stats. 496, ch. 25, art. 47, § 7 (ROA.649–54) (same); 1903 Mont. Laws 49, ch. 35, § 3 (ROA.809–14) (same).

Firearms were prohibited in fairs and markets dating back to fourteenth-century England. *See* Statute of Northampton 1328, 2 Edw. 3, c.3 (ROA.553–61); 1402, 4 Hen. 4, c.29 (ROA.562–65); 1534, 26 Hen. 8, c.6, § 4 (ROA.566–76); 1715, 1 Geo., c.54, §§ 1 & 6–10 (ROA.577–86). This

tradition was adopted in colonial America where at least two colonies, Virginia and North Carolina, passed similar laws prohibiting going or riding armed "in fairs or markets, or in other places, in terror of the county." An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (ROA.593–95); Martin, *supra* p.60–61 (ROA.587–92) (similar). And it continued into the early nineteenth century: Congress prohibited arms at fairs in Washington, D.C. in 1816. *See* An Act for the Punishment of Certain Crimes and Offences, within the District of Columbia § 40 (1816) (prohibiting going or riding "armed by night nor by day, in fairs, or markets, or in other places, in terror of the country"), available at https://tinyurl.com/yzbxezzm. Tennessee prohibited firearms at fairs in 1869. 1869 Tenn. Acts 23, ch. 22, § 2 (ROA.829–32).

Other states and localities more broadly prohibited firearms at "public gathering[s]." *See* 1870 Ga. Laws 421, tit. 16, no. 285, § 1 (ROA.833–36); 1875 Mo. Laws 50, § 1 (ROA.817–20); Stockton, Kan., Ordinance No. 76, § 1 (July 1, 1887) (ROA.821–22) (prohibiting carrying "into any other public assemblage of persons not met for any unlawful purpose"); Waco, Tex., An Ordinance (July 9, 1891) (ROA.815–16) (prohibiting firearms "where persons are assembled for amusement . . .

or into any circus, show or public exhibition of any kind"); Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons at 58, § 1 (July 17, 1894) (ROA.731–36) ("any other public assemblage of persons met for any lawful purpose").

Contemporary courts agreed on these laws' constitutionality under state analogs to the Second Amendment. *See Wolford*, 116 F.4th at 987–88 (collecting cases); *Hill v. State*, 53 Ga. 472, 476 (1874) ("the bearing [at a concert] of arms of any sort, is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners"); *Andrews v. State*, 50 Tenn. 165, 182 (1871) ("a man may well be prohibited from carrying his arms to . . . [a] public assemblage"); *Shelby*, 2 S.W. at 469 ("The mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments.").

These courts "regularly upheld convictions for violating the statutes without even questioning the constitutionality of the laws." *Wolford*, 116 F.4th at 988; *see*, *e.g.*, *Wynne v. State*, 51 S.E. 636, 637 (Ga. 1905)

(affirming conviction for carrying a shotgun to a public gathering); *State v. Pigg*, 85 Mo. App. 399, 402 (1900) (affirming conviction for "going into the dwelling house of Josiah Jones, where there was a social gathering, having about his person a deadly weapon"); *Maupin v. State*, 17 S.W. 1038, 1039 (Tenn. 1890) (affirming conviction for "carry[ing] pocket-pistols" at a grist-mill, which is "a public place,—a place to which customers were constantly invited and daily expected to go").

Plaintiffs have little to say about this history (at 43–44). And their repeated invocation of *Bruen*'s instruction that a place is not sensitive "simply because it is crowded" mistakes the tradition on which section 46.03(a)(8) rests. 597 U.S. at 31. *Bruen* did not hold that crowds are irrelevant; it rejected only the boundless proposition that "all places of public congregation that are not isolated from law enforcement" could define the category of sensitive places. *Id.*

The law challenged here does no such thing. It instead targets venues where antagonistic—and often inebriated—crowds gather with their attention diverted and their guard lowered. Regulating firearms at *such* crowded places of amusement is a tradition that has "endur[ed] from medieval England to Reconstruction America and beyond." *Antonyuk*,

120 F.4th at 1019. Courts have upheld restrictions similar to Texas's based on this well-established tradition. *See Wolford*, 116 F.4th at 987–89 (firearm ban at stadiums and other crowded places of amusement likely constitutional based on a tradition of regulations at "places for social gathering and amusement"); *Antonyuk*, 120 F.4th at 1037–38 (firearm ban at theaters likely constitutional because it was consistent with a tradition of prohibiting firearms in "quintessentially crowded places" where people are gathered for amusement).

Plaintiffs point (at 44) to marksmanship exhibitions as examples of firearms being allowed at crowded sporting events at the Founding. That firearms were permitted at firearm competitions is unremarkable. Texas exempts shooting sports from its prohibition: A person may carry a firearm where they are a "participant in the event and a firearm . . . is used in the event." *See* Tex. Penal Code § 46.03(a)(8). So contrary to plaintiffs' argument, events like Founding-era marksmanship exhibitions would not be prohibited under the law as it stands today. And plaintiffs never explain how the marksmanship exhibition laws they point to detract from the historical laws that barred carry in other crowded spaces where people congregated for amusement.

Plaintiffs also contend (at 16) that restricting firearms at sporting events runs counter to the "Founding-era tradition requiring individuals to be armed at certain public gatherings." But those laws shed no light on a legislature's ability to restrict the carrying of guns in other places. A collective-defense-related mandate has nothing to do with the constitutionality of a public-safety-related restriction on carrying guns.

* * *

Major sporting events today like the World Cup and Super Bowl did not exist at the Founding and in the early Republic, but their historical analogues did. And Americans' desire for physical safety and peace at those spaces has remained the same. The historical tradition of restricting firearms at such spaces supports the constitutionality of section 46.03(a)(8).

### C. Restricting firearms at racetracks (section 46.03(a)(4)) is consistent with the historical tradition of prohibiting firearms at crowded places of amusement.

Like modern stadiums and sporting events, modern racetracks are crowded places for amusement—and ones that pose an additional risk of violence due to the gambling and drinking that take place there. That risk of hostile confrontations at racetracks is obvious given that

attendees have a financial—not just emotional—stake in winning and losing.

Like the prohibition on firearms at sporting events, Texas's restriction on carrying firearms at racetracks is consistent with the Nation's tradition of prohibiting firearms in crowded places of social amusement. *See supra* pp.51–58; *Antonyuk*, 120 F.4th at 1036, 1038 (upholding statute "regulat[ing] firearms in discrete, densely crowded physical spaces wherein people assemble for amusement," including at racetracks).

Plaintiffs are wrong to linger (at 58) on the lack of Founding-era provisions specifically banning firearms at racetracks because American horseracing has evolved over the centuries in significant ways that bear on the risks of carrying firearms. American horseracing traces back to the 1600s, but it took centuries for it to become formalized at racetracks. In colonial America, horseracing was "unorganized" and "spontaneous." 1 John Hervey, Racing in America: 1665–1865, at 29 (1944). Given the cost and expense of clearing land, only one oval racecourse existed (in what is now Long Island). *Id.* at 29–30; William H.P. Robertson, The History of Thoroughbred Racing in America 7 (1964). Instead, "quarter

horses" raced short, one-on-one, straight-line sprints. Hervey, *supra* p.22. These races often took place in the streets, which led to regulations banning them in places like Jamestown, Newport, and Philadelphia. *Id.* at 16, 43; Robertson, *supra* p.8. Racing in streets persisted at the Founding; shortly after Kentucky became a state in 1792, the Trustees of Lexington "recommend[ed] it to the people of the town, to call a public meeting, to consider of the means which ought to be adopted for applying a remedy to the growing evil" of "racing through the streets." Hervey, *supra*, at 225; Robertson, *supra* p.8.

After the Revolution, an "Anti-Racing Crusade" emerged as part of "[a] natural reaction against things English." Hervey, *supra* p.131; Robertson, *supra* p.31. New York, Pennsylvania, and New Jersey passed laws "intended to prevent racing" and "[s]imilar legislation has been in existence on and off in various states ever since." Robertson, *supra* p.31. Where racing was permitted, racecourses did not contain grandstands. *See id.* at 33. Many people watched races from their carriages, and "the tiny stands provided for officials became symbols of prestige." *Id.*

Things changed after the Civil War. "The pure concept of sport for sport's sake had to be tempered with the realities of economic necessity,"

*id.* at 91, "requir[ing] track operators to develop new sources of revenue." Gary A. O'Dell, *Under Siege: Kentucky and the Transformation of American Thoroughbred Racing, 1865-1936*, 118 Reg. Ky. Hist. Soc'y 389, 402 (2020). "One way to do this was to attract a greater public patronage . . . by moving . . . from wagers made between individuals to trackside betting." *Id.* This was accomplished by bringing two new forms of wagering—bookmaking and pari-mutuels—into racetracks. *Id.* at 404–05. "[R]acing was transformed from a pastime of elites into a national industry" with "tremendous popularity and profitability," but "the increased dependence upon gambling revenue promoted crime and corruption." *Id.* at 402–03.

Because racetracks in their modern form did not exist at the Founding, a "historical twin" or "dead ringer" prohibiting firearm carry at those locations could not have existed and is not required for Texas's racetrack provision to pass constitutional muster. *Bruen*, 597 U.S. at 30. As explained, states have historically restricted carrying of firearms at crowded places of amusement; a racetrack is a crowded place of amusement; section 46.03(a)(4) is therefore "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at

692. And as racing evolved toward more frequent events, with large crowds, on-site alcohol sales, and *crucially*, centralized gambling, at least one state prohibited carry where racing occurred: In 1869, Tennessee made it unlawful for "any person attending any . . . race course . . . to carry about his person, concealed or otherwise, any pistol." 1869 Tenn. Acts 23, ch. 22, § 2 (ROA.829–32).

Texas's ban on firearms at racetracks illustrates this very point. Since its admission into the Union in 1845, the Lone Star State had a general ban on all forms of gambling. *See* Tex. Penal Code, tit. 13, ch. 4 (1856) (ROA.840–55). That general prohibition persists today. *See* Tex. Penal Code § 47.02. Yet in 1987, Texans voted in a narrow exception for "pari-mutuel wagering" at horse and greyhound races. *See* Tex. Occ. Code § 2021.001 *et seq.* (Texas Racing Act); Tex. Penal Code § 47.09(a)(1)(D). It was only then that it became necessary for Texas to address the carrying of firearms in places where gambling occurred. Texas promptly did so by enacting what is now section 46.03(a)(4) in 1989. *See* 71st Leg., R.S., ch. 749, § 2 (ROA.551–52).

Lack of a historical "dead ringer" for section 46.03(a)(4) (which is not even required by *Bruen* and *Rahimi*) is not a function of firearms

historically being permitted at racetracks with pari-mutuel gambling. Rather, it is a function of the less formal way that horse racing occurred during early American history; the development of open-to-all, centralized gambling at racecourses after the Civil War; and the patchwork of historical prohibitions on both racetracks and gambling.

* * *

Each of Texas's location-specific restrictions challenged by plaintiffs is rooted in the Nation's history and tradition. The Supreme Court's recent decision in *Wolford* doesn't call that conclusion into question. There, the Supreme Court confronted a Hawaii law that, by default, prohibited firearm possession "on private property of another." 146 S. Ct. at 2046. The rule was so broad and criminalized firearm possession in so many places that it unconstitutionally "hobble[d]" the right to bear arms. *Id.* at 2041.

Plaintiffs' arguments that the narrow sensitive-places laws in Texas—the gold standard of Second Amendment protection—are comparable to an effective firearm ban in Hawaii are self-defeating (as their watered-down retelling of the hypothetical woman from *Wolford* exemplifies). *Compare Wolford*, 146 S. Ct. at 2048–49, *with* Plaintiffs'

Suppl. Br. 7–8. What made Hawaii's law problematic was not that it barred firearm possession in some places—it was that it effectively barred firearm possession in *all* places. *See Wolford*, 146 S. Ct. at 2040–41. That is why the law fell outside the tradition of colonial antipoaching laws that otherwise "support the principle that when a State identifies specific places that are prone to particular 'abuse[s]' of the right, it can respond with 'focused regulations' to address the threat." *Id.* at 2058 (Barrett, J., concurring) (alteration in original) (first quoting William Rawle, View of the Constitution of the United States of America 123 (1825); and then quoting *Rahimi*, 602 U.S. at 700)).

Texas's sensitive-places restrictions are not like Hawaii's outlier law that prevented public carry virtually everywhere. They are limited restrictions on the right to carry in the types of places where Texans for generations have agreed that firearms do not belong. The restrictions survive Second Amendment scrutiny.

## CONCLUSION

The Court should affirm.

Dated: August 14, 2026

Respectfully submitted,

/s/ Gregg Costa
Gregg Costa
Kylie Calabrese
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, Texas 77002
Telephone: (346) 718-6600
*gcosta@gibsondunn.com*
*kcalabrese@gibsondunn.com*

Blake J. Ellison
GIBSON, DUNN & CRUTCHER LLP
1700 M Street N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
*bellison@gibsondunn.com*

Eric Ruben
SMU DEDMAN SCHOOL OF LAW
3315 Daniel Avenue
Dallas, Texas 75205
Telephone: (214) 768-2581
*eruben@smu.edu*

Andrew Mitchell
Arjun Ogale
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201
Telephone: (214) 698-3100
*amitchell@gibsondunn.com*
*aogale@gibsondunn.com*

COUNSEL FOR COURT-APPOINTED AMICI CURIAE

## CERTIFICATE OF SERVICE

I certify that, on August 14, 2026, a true and correct copy of the foregoing brief was served via CM/ECF on all counsel of record.

/s/ *Gregg Costa*
Gregg Costa

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the typestyle requirements of Rule 32(a)(6) because it was prepared in 14-point New Century Schoolbook, a proportionally spaced typeface, using Microsoft Word for Microsoft 365. This brief complies with the type-volume limitation of Rule 29(a)(5) and this Court's order of July 2, 2026, which permits a brief of up to 13,000 words, because it contains 12,869 words, excluding the parts exempted by Rule 32(f) and Fifth Circuit Rule 32.2.

I certify that: (1) any required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission of this document is an exact copy of any corresponding paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus-scanning program and is free of viruses.

/s/ *Gregg Costa*
Gregg Costa