No. 26-10302

# In the United States Court of Appeals for the Fifth Circuit

CHARLES ZIEGENFUSS; DAVID MONTGOMERY; BRIAN ROBINSON; FIREARMS POLICY COALITION, INCORPORATED,

*Plaintiffs-Appellants*

*v.*

FREEMAN MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR AND COLONEL OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendant-Appellee*

On Appeal from the United States District Court, Northern District of Texas
Fort Worth Division, No. 4:24-CV-1049
Hon. Mark Pittman, Judge Presiding

## AMICUS BRIEF OF TEXAS RESTAURANT ASSOCIATION IN SUPPORT OF THE JUDGMENT

**YETTER COLEMAN LLP**
Grant B. Martinez
Andrew T. Ingram
600 Travis Street, Suite 5400
Houston, Texas 77002
713-632-8000

**Attorneys for Amicus Curiae Texas Restaurant Association**

## Supplemental Certificate of Interested Persons

**No. 26-10302**

Charles Ziegenfuss; David Montgomery; Brian Robinson; Firearms Policy Coalition, Incorporated,

*Plaintiffs-Appellants*,

*v.*

Freeman Martin, in his official capacity as Director and Colonel of the Texas Department of Public Safety

*Defendant-Appellee*.

The undersigned counsel certifies the following listed persons have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate their possible recusal or disqualification:

1. Amicus Curiae Texas Restaurant Association is represented in the Fifth Circuit by:

Grant B. Martinez
Andrew T. Ingram
Yetter Coleman LLP
600 Travis Street, Suite 5400
Houston, Texas 77002

Texas Restaurant Association, a nonprofit corporation, has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

*/s/ Andrew T. Ingram*
Andrew T. Ingram
*Attorney of record for Amicus Curiae*
*Texas Restaurant Association*

## Table of Contents


Page

Supplemental Certificate of Interested Persons .................... 2

Table of Authorities .................... 5

Interest of Amicus Curiae .................... 7

Summary of the Argument .................... 9

I. Restaurant and bar owners care about the safety of their team members and guests. .................... 11

II. Eliminating the 51% rule would impose new costs and duties on bars and restaurants. .................... 14

III. Science corroborates commonsense: Guns and alcohol don't mix. .................... 19

IV. History shows the wisdom of keeping guns out of bars. .................... 23

Certificate of Service .................... 27

Certificate of Compliance .................... 28

## Table of Authorities

Page(s)

### Case

*Bay Area Unitarian Universalist Church v. Ogg*,
2026 WL 2209133 (5th Cir. 2026) .......... 15

### Statutes

Tex. Penal Code § 30.06 .......... 15, 16, 17, 18

Tex. Penal Code § 30.07 .......... 15, 16, 17, 18

Tex. Penal Code § 46.02 .......... 15, 16

Tex. Penal Code § 46.03 .......... 9, 16

### Other Authorities

Cleveland Clinic, *Blood Alcohol Content (BAC)*,
https://my.clevelandclinic.org/health/diagnostics/22689-blood-alcohol-content-bac .......... 21

Daniel J. O. Roche & Andrea C. King, *Alcohol Impairment of Saccadic and Smooth Pursuit Eye Movements: Impact of Risk Factors for Alcohol Dependence*, 212 Psychopharmacology 33 (2010) .......... 21

Edmund Burke, *Reflections on the Revolution in France* 156 (Penguin Books 1969) (1790) .......... 25

G. K. Chesterton, *The Thing* (1929) .......... 11

Jin-Ju Kang et al., *Recording and Interpretation of Ocular Movements: Saccades, Smooth Pursuit, and Optokinetic Nystagmus*, 25 Annals of Clinical Neurophysiology, 55 (2023) .......... 21

John Caile, U.S. Concealed Carry Ass'n, *Firearms and Alcohol*,
https://www.usconcealedcarry.com/blog/firearms-and-alcohol/ (last updated May 10, 2019) .......... 13

Kim Fromme et al., *Effects of Alcohol Intoxication on the Perceived Consequence of Risk Taking,* 5 Experimental and Clinical Psychopharmacology 14 (1997) .......... 20

Mark Nawrot et al., *Disruption of Eye Movements by Ethanol Intoxication Affects Perception of Depth from Motion Parallax*, 15 Psychol. Sci. 858 (2004) .......... 22

Nat'l Highway Traffic Safety Ass'n, *Drunk Driving*, https://www.nhtsa.gov/risky-driving/drunk-driving .......... 20

Neda Nozari, *Identifying Physical and Physiological Parameters to Produce the Best Performance in a Shooting Sport Athlete*, https://www.issf-sports.org/news/3317 (May 10, 2019) .......... 21

*Tombstone* (Cinergi Pictures 1993) .......... 24

U.S. Concealed Carry Ass'n, *In Which States Can You Concealed Carry and Drink Alcohol?*, https://www.usconcealedcarry.com/blog/in-which-states-can-you-concealed-carry-and-drink-alcohol/ .......... 12

William H. Forbis, *The Cowboys* (1973) .......... 24

## INTEREST OF AMICUS CURIAE[1]

The Texas Restaurant Association is the premier business association representing the state's $138 billion foodservice industry, encompassing upwards of 58,000 establishments and supporting a workforce of approximately 1.5 million Texans—more than 11% of the state's total employment. For nearly 90 years, TRA has championed the industry, serving as an indispensable resource and powerful advocate for foodservice businesses of every size. In an industry with famously tight margins, TRA advocates for the laws that make the difference between businesses thriving and businesses closing.

At the end of 2025, the Texas Restaurant Association acquired the Texas Bar & Nightclub Alliance. The combined organization supports all of its members in maintaining a high standard of professionalism for safely serving alcoholic beverages, providing an alcohol seller-server training course approved by the Texas Alcoholic Beverage Commission and regularly offering education and other resources for team members who serve alcohol. TRA has firsthand experience with the practical realities of serving alcohol safely.

---

[1] The parties consent to the filing of this brief. Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or part; no party, counsel for a party, or any person other than *amicus curiae* or their counsel made a monetary contribution toward the preparation and submission of this brief.

TRA supports affirming the district court's decision for the same reason it supports the laws against driving while intoxicated and the use of designated drivers: TRA is committed to creating safe and fun environments for Texas adults who choose to enjoy alcoholic drinks.

## Summary of the Argument

The district court was right to uphold the constitutionality of Texas Penal Code Section 46.03 and the "51% Rule" in particular. Texas restaurant and bar owners understand this brightline rule and value the protection it gives them, their team members, and their customers.

TRA owners and operators take the safety of their team members and guests seriously. At the same time, they need police and appropriate legislation to assist them. The current blanket ban on firearms in establishments that derive 51% or more of their income from the sale of alcoholic beverages strikes the right balance between government enforcement and proprietor decision-making. Striking down that brightline rule will force team members, including teenage hosts and hostesses, to be the frontline regulators for guns in restaurants and bars. Insurance and security costs will balloon. And dangerous confrontations with intoxicated, armed guests will become more common.

No one knows the risks and challenges of serving alcohol safely better than those in the hospitality industry. Drinking can be a part of a great time with friends and family, but it also can temporarily impair judgment, weaken inhibitions, and worsen motor skills. As the brief shows, scientific studies corroborate commonsense

and prove that drinking even small amounts of alcohol can make it unsafe for even a law-abiding person to possess a gun.

TRA embraces practical legislation on this issue. As the Supreme Court has held, history and tradition—the accumulated practical wisdom of ages past—are to be our guides to the Second Amendment. The Texas experience, going back to the days of the Old West, supports keeping guns out of bars and restaurants that derive 51% or more of their income from the sale of alcoholic beverages.

## Argument

*There exists . . . a fence or gate erected across a road. The more modern type of reformer goes gaily up to it and says, "I don't see the use of this; let us clear it away." To which the more intelligent type of reformer will do well to answer: "If you don't see the use of it, I certainly won't let you clear it away."*

- G. K. Chesterton, *The Thing* 29 (1929).

### I. Restaurant and bar owners care about the safety of their team members and guests.

Managing a bar well takes knowledge of human nature and years of practical experience. Bars are crowded places where Texans gather to watch the game and end up cheering the victories or mourning the losses of their favorite team (often well within earshot of one another). They are where many Texans met their spouses—places where romantic sparks ignite and hearts are broken. They are places where people come to chat, dance, sing, and relax (where the heart and not the head can lead the way). All of these powerful emotions can pose a challenge for bar owners and their team members trying to keep everyone healthy and safe. Eliminating the 51% rule will make that challenge far more difficult and dangerous.

Many members of the TRA are themselves gun owners who keep firearms for self-defense, hunting, and target shooting. TRA is not opposed to lawful gun

ownership. But responsible gun owners, including those who carry for self-defense, know that guns and alcohol service do not mix.

The United States Concealed Carry Association agrees. In an article for their members and the public on state laws governing concealed carry and alcohol, they flatly inform their readers:

> As a responsibly armed American, regardless of the laws in your state, it is unwise to carry while under the influence of any substance that could impair your judgment, slow your reaction times or impact your decision-making abilities. Any decision you make while carrying a firearm could have life-altering consequences.

U.S. Concealed Carry Ass'n, *In Which States Can You Concealed Carry and Drink Alcohol?*, https://www.usconcealedcarry.com/blog/in-which-states-can-you-concealed-carry-and-drink-alcohol/ (last updated Dec. 29, 2019). This is sound commonsense.[2]

John Caile, a contributing writer for *Concealed Carry Magazine* and noted Second Amendment rights activist, echoes the same advice in an article published by the USCCA: "Given all the negative possibilities that are brought about by

[2] "USCCA (United States Concealed Carry Association) is a membership organization of more than 800,000 responsibly armed members. The U.S. Concealed Carry Association exists to help responsible gun owners like you avoid danger, save lives & keep your family safe. Since its inception in 2003, and together with its flagship publication Concealed Carry Magazine, the USCCA has proudly supported a community of hundreds of thousands of patriots." *Id.*

drinking while carrying, it seems smart to simply not do it. It's the same as going out of our way to avoid conflicts such as road rage or escalating frivolous arguments." John Caile, U.S. Concealed Carry Ass'n, *Firearms and Alcohol*, https://www.usconcealedcarry.com/blog/firearms-and-alcohol/ (last updated May 10, 2019).[3]

Caile does not mince words, "Today we're going to discuss why you should avoid combining firearms and alcohol." *Id*. He teaches, "Anytime we pick up a gun, we are taking on an awesome responsibility. Obviously, when we decide to carry a firearm in public, everything we do takes on additional responsibility as well as risk. Most of you know that." *Id.* Furthermore, Caille recognizes what the science shows on the connection between loss of judgment and small amounts of alcohol: "Research has shown that judgment is the first thing to be impaired, long before any sense of intoxication is even felt." *Id.*

Human emotions are messy. Bartenders are no strangers to serving as ad hoc counselors and conflict de-escalators. It is hard enough for restaurant and bar team members to calm someone furious over a losing game of pool, seeing red over a

[3] According to his byline, "NRA Certified Instructor John Caile has more than 35 years of experience in the firearms industry." *Id.* Caille's article does state, however, that he favors allowing concealed carry in bars so long as the person carrying does not himself drink. *Id.* The TRA differs with him on this point for reasons explained in Section II, *infra*.

spurned romantic overture, or packed in a crowded dance floor on a Saturday night. TRA supports the current law: it saves lives by keeping firearms out of these fervent social spaces.

## II. Eliminating the 51% rule would impose new costs and duties on bars and restaurants.

If the blanket ban enacted by the Texas Legislature can no longer be enforced, then the new legal world will be much more expensive, difficult, and dangerous for restaurant and bar owners and their team members.

Eliminating the strong blanket ban on carrying guns in Texas bars will increase insurance and security costs for those in the industry. Insurance companies consider the size and scope of tort liability when writing policies. They understand what the scientific studies prove about the dangers of mixing alcohol and guns—what common sense tells us. And they will certainly adjust their rates upward for bars and restaurants that no longer can count on the deterrence the blanket ban and its felony penalty provide to keep guns out of bars. This is deeply concerning since insurance costs are already climbing to an unsustainable level for many local business owners in Texas.

Security costs will also increase, especially for the busiest bars and nightclubs. Eliminating the current ban changes the risk calculus in every confrontation between staff, security, and misbehaving customers. With more bad actors armed because of

the elimination of serious penalties for carrying firearms, more security staff will need to be armed. Hiring armed security (such as off-duty police officers) costs substantially more than good personnel who are not trained and licensed to carry firearms. Of course, hiring armed security will necessarily give rise to even higher insurance rates.

TRA and its members respect and appreciate law enforcement officers and lawmakers. However, they want to be their allies, not fill their shoes. Indeed, they rely on smart laws with sufficient penalties to help them operate safe establishments.

The plaintiffs argue that they are not seeking to overturn two other laws that regulate firearms in restaurants and bars. They do not contest the prohibition on carrying a handgun while "intoxicated," Tex. Penal Code § 46.02(a-6), and they do not contest the right of ownership to exclude those open or concealed carrying by posting appropriate signage, *id.* §§ 30.06–07. *See generally Bay Area Unitarian Universalist Church v. Ogg*, 2026 WL 2209133, at *1 (5th Cir. 2026) (en banc) (explaining the signage statutes and dismissing a First Amendment challenge to them for want of standing).

But relying on these laws instead of the simple 51% rule plaintiffs challenge will shift the onus of firearm safety to bar and restaurant operators and their staff, while depriving them of the legal backing to successfully carry those same new burdens. It

substitutes individualized enforcement by private employees with lesser penalties for a clean ban enforced by police as a felony-grade offense.

The current blanket prohibition under Penal Code Section 46.03 makes it a third-degree felony to bring a firearm into any bar or restaurant that derives more than 51% of its revenue from the sales of alcoholic beverages. *Id.* § 46.03(g). By contrast, the prohibition on carrying a handgun while intoxicated is a Class A misdemeanor. *Id.* § 46.02(b).

Plaintiffs make much of the fact that any business owner can choose to exclude guns from his or her property, but the penalty for disregarding a business owner's signage is a mere Class C misdemeanor (the same as a speeding ticket). *Id.* §§ 30.06(d), 30.07(d). The penalty grows if an armed person disregards the owners' wishes posted on the statutory signage, but only if he or she refuses to leave after being asked to do so by the business. *Id.* Even then, the penalty for refusing to leave after being confronted is still only a Class A misdemeanor. *Id.*

These misdemeanor laws are not enough to protect both the safety of the public and the livelihoods of TRA members. They are more complex to comply with and require more judgment calls by team members. They also carry such weak penalties that restaurant and bar team members will no longer have a credible legal

deterrent backing them up when they try to do the responsible thing and keep customers from drinking while armed.

If the plaintiffs succeed, bars that wish to exclude guns from their premises will have to post additional signage in English and Spanish, covering both concealed and openly carried weapons, that must be precisely worded. *See id.* §§ 30.06–.07. And some bar owners will not make that choice. The result will be a world in which team members will have to tell armed men and women that they cannot come into a bar (even if they are welcome to enter armed at one down the street).[4] A simple bright line rule keeps everyone on the same page and prevents arguments that can turn deadly.

Consider the ban on carrying a handgun while intoxicated. The statute furnishes no definition of "intoxicated." *See id.* § 46.02(a-6). At what point should a bar team member call the police, ask an armed person to leave, or refuse further drink service? This problem is only aggravated by the fact that even a small amount of alcohol decreases a person's ability to use a gun responsibly. *See infra*, Section III.

[4] Hosts and hostesses (often the youngest team members) were pressed into the frontlines of public health during the COVID pandemic. For TRA members, memories are still raw of hosts and hostesses being harassed, cussed, and even spat upon for enforcing the mask mandates imposed by state and local authorities.

Furthermore, the deterrent to entering a bar with a concealed weapon, whether or not the operator permits it, is miniscule and unlikely to deter someone who does not want to disarm for either fair or foul purposes. Because the weapon is concealed, he is unlikely to be detected, and if he is detected and does not refuse to leave when asked, he only risks a Class C misdemeanor punishable "by a fine not to exceed $200." Tex. Penal Code §§ 30.06(d), 30.07(d).

In each of these scenarios without the brightline 51% rule, the practical outcome is more confrontations between restaurant and bar employees—who are often teenagers or young adults—and armed customers. In many instances these armed customers will already be under the influence of alcohol, consumed at that business or in a previous location. There is a very real danger that these confrontations will result in violence and even lost life. Contrast that with today, when a restaurant or bar employee who is concerned that a customer is violating the 51% rule does not need to consider initiating a confrontation himself or herself or ask how much the customer may have already had to drink; today, that employee may simply call in professional law enforcement to handle the situation safely.

Plaintiffs say that they wish to enter bars armed without drinking any alcohol, but often, people plan to refrain from drinking and then change their minds. This makes for a slippery slope and would again leave team members having to decide

when someone has become intoxicated and can no longer responsibly or legally carry a weapon. Texas does not need restaurant and bar team members to be the arbiters of these questions with potentially life-altering ramifications.

Restaurant and bar owners entered the industry to serve good food and drinks, not become law enforcement officers. With over a tenth of all employed Texans working in this sector, this important industry to the Texas economy should not be hobbled by an unfunded mandate to maintain public safety with nothing but the threat of misdemeanor citations backing them up.

## III. Science corroborates commonsense: Guns and alcohol don't mix.

TRA opposes anyone but police officers carrying guns in restaurants or bars that derive 51% or more of their income from the sale of alcoholic beverages for many of the same reasons it opposes drunk driving. Legislators, out of a valid concern for public safety, criminalize drunk driving because alcohol affects mental and physical capacities. The same concern for safety justifies restrictions on guns in bars. Scientific research on the effects of alcohol consumption reinforces the commonsense notion that a person under the influence should not wield a deadly weapon.

Alcohol slows down brain activity, resulting in greater risk taking and impulsivity. Notably, it alters people's expectations about potential negative

consequences through interference with self-control and the brain's decision-making functions. Kim Fromme et al., *Effects of Alcohol Intoxication on the Perceived Consequence of Risk Taking,* 5 Experimental and Clinical Psychopharmacology 14, 21 (1997) (all results are based on blood alcohol concentration of 0.08%). Unsurprisingly, two studies of large groups of young adults (in Austin, Texas) showed that participants rated negative consequences as much less likely when they were intoxicated versus when they had not been drinking. *Id.* at 18, 20.

Alcohol alters not just our minds but our bodies. Most people know the signs of inebriation: poor balance, slurred speech, and dilated pupils. States ban driving under the influence only after a certain blood alcohol concentration, but as the National Highway Traffic Safety Administration points out, these incapacitations can kick in after small amounts of alcohol consumption. For example, at a 0.02% BAC, the "predictable effects on driving" include a "decline in visual functions (rapid tracking of a moving target,)"; at a 0.05% BAC, individuals can experience "reduced coordination" and "reduced ability to track moving objects." Nat'l Highway Traffic Safety Ass'n, *Drunk Driving*, https://www.nhtsa.gov/risky-driving/drunk-driving (last visited Aug. 20, 2026). This is why TRA supports using designated drivers, taxis, or ridesharing services. Of course, the same physical

changes that impair the ability to operate a motor vehicle also impair the ability to accurately use a weapon.

Like driving, shooting a gun requires physical and perceptual abilities, including stability, grip strength, visual tracking, and reaction time. Neda Nozari, *Identifying Physical and Physiological Parameters to Produce the Best Performance in a Shooting Sport Athlete*, https://www.issf-sports.org/news/3317 (May 10, 2019) (reporting an expert physician's conclusions on alcohol's impact on marksmanship). Alcohol impairs many of these abilities. For example, at a BAC of 0.08%, individuals can experience "reduced muscle coordination," and at a BAC of over 0.15%, individuals can experience "loss of balance and some muscle control." Cleveland Clinic, *Blood Alcohol Content (BAC)*, https://my.clevelandclinic.org/health/diagnostics/22689-blood-alcohol-content-bac (last updated Apr. 11, 2022).

Alcohol weakens visual perception. One study found that alcohol "impairs smooth pursuit and saccadic eye movements"—that is, the ability to track a moving object and the ability to quickly shift focus between focal points. Daniel J. O. Roche & Andrea C. King, *Alcohol Impairment of Saccadic and Smooth Pursuit Eye Movements: Impact of Risk Factors for Alcohol Dependence*, 212 Psychopharmacology 33, 42 (2010); *see also* Jin-Ju Kang et al., *Recording and Interpretation of Ocular Movements: Saccades,*

*Smooth Pursuit, and Optokinetic Nystagmus*, 25 Annals of Clinical Neurophysiology, 55, 55–59 (2023) (explaining how these functions of the eye allow focusing and following what a person is looking at). Another study found that intoxication negatively impacts depth perception by disrupting "the ability to recover depth from retinal motion generated by observer translation," also known as motion parallax. Mark Nawrot et al., *Disruption of Eye Movements by Ethanol Intoxication Affects Perception of Depth from Motion Parallax*, 15 Psychol. Sci. 858, 858 (2004). Motion parallax "relies on the slow eye movement system," but because of alcohol's disrupting effect on this system, "ethanol intoxication impairs the perception of depth from motion parallax." *Id.* Bottomline—alcohol distorts vision, making accuracy a serious concern.

For bar guests concerned about self-defense and defense of others, the risk of an errant shot hitting an innocent person is greatly increased by alcohol consumption. Their ability to track the target, gauge the target's depth, and focus on the target can be seriously impaired.

Scientific evidence of the mental and physical effects of alcohol justifies TRA's support for Texas's blanket prohibition of guns in bars that derive 51% or more of their income from the sale of alcoholic beverages. TRA members take seriously the safety of their customers and team members. Due to the physical and

mental impact of alcohol, allowing guns in bars and restaurants that serve large quantities of adult beverages undermines owners' ability to create a safe environment for recreation and relaxation.

## IV. History shows the wisdom of keeping guns out of bars.

The People of Texas, through their Legislature, did not erect this fence between bars and guns idly. Decades of experience with the consequences of not keeping them apart informed that conclusion.

As the district court's opinion correctly recognized, American law has long recognized that the right to keep and bear arms needs to be subjected to regulation in places of public drinking. This tradition is evident in laws that control firearm access in alcohol selling and serving establishments. Historical evidence supports the validity of the 51% law, not as a modern invention, but as a longstanding tradition to prevent the predictable dangers that result from carrying or using a weapon in settings where alcohol flows.

Texas was established by men and women who were no strangers to the value of firearms as a tool for hunting and self-defense. Western fiction like *Lonesome Dove* and the oeuvre of John Wayne are a big part of how those years are remembered. And in those times of cowboys, lawmen, and outlaws, the saloon where patrons had to "check their iron" is an archetypal backdrop.

In both Hollywood films and in the history books, men entering the saloons of the western frontier were often required to give up their guns, whether at the saloon door or upon entering the cattle town. As Virgil Earp tells the people of Tombstone: "Nobody's saying you can't own a gun; nobody's even saying you can't carry a gun; all we're saying is you can't carry a gun in town." *Tombstone* (Cinergi Pictures 1993). Of course, the reason why Earp (the real and the fictional one) supported disarming the town's cowboys was not because they were there to eat ice cream—saloons were big business in western cow towns.

History shows that citizens of these towns supported the limits on carrying guns for the same reason their descendants in the modern TRA do today—the best way for everyone to have a good time while drinking is to leave the guns behind:

> As time passed, the cattle towns became increasingly strict, at least in their public posture toward the cowboys. "We expect them to have all the fun they can get," announced one local editor, "but they must acknowledge that the citizens of our town have a right to insist upon a strict compliance with the city's laws."
>
> . . .
>
> Signs of warning went up at the entrances to the main thoroughfares. One, which was posted on two pine boards, bore this legend: "All person are hereby forbidden the carrying of firearms or other dangerous weapons within the city limits under penalty of fine and imprisonment. By Order of the Mayor."

William H. Forbis, *The Cowboys* 186 (1973).

The experience of the people of Texas has been that a good time with alcoholic beverages can best be had in public without the presence of firearms. Human beings and the effects alcohol has upon them have not been so changed since the days of Wyatt Earp that his policies are of no relevance to today. *Cf.* Edmund Burke, *Reflections on the Revolution in France* 156 (Penguin Books 1969) (1790) ("This sort of people are so taken up with their theories about the rights of man that they have totally forgot his nature.").

## Conclusion

The Texas Restaurant Association urges the Court to affirm the judgment of the district court to protect the safety and livelihood of Texans who work in and enjoy the State's bars, nightclubs, and restaurants.

Dated: August 21, 2026

Respectfully submitted,

*/s/ Andrew T. Ingram*
Grant B. Martinez
gmartinez@yettercoleman.com
Andrew T. Ingram
aingram@yettercoleman.com
**YETTER COLEMAN LLP**
600 Travis Street, Suite 5400
Houston, Texas 77002
(713) 632-8000

**Attorneys for Amicus Curiae**
**Texas Restaurant Association**

## Certificate of Service

I certify that this document was filed with the Court via the court's electronic filing system, on the 21st day of August, 2026, and an electronic copy of the document was served on all counsel of record via the court's electronic filing system on the same date.

/s/ Andrew T. Ingram
Andrew T. Ingram

## Certificate of Compliance

1. This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 29(a)(5) because this document contains 3,679 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Office Word 2016 in 14-Point Equity A font.

Date: August 21, 2026

/s/ Andrew T. Ingram
Andrew T. Ingram