No. 26-10302

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

CHARLES ZIEGENFUSS; DAVID MONTGOMERY; BRIAN ROBINSON; FIREARMS POLICY COALITION, INC.,
*Plaintiffs-Appellants*,

v.

FREEMAN MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR AND COLONEL OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY,
*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
(No. 4:24-cv-01049)

# BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE IN SUPPORT OF THE JUDGMENT BELOW

Janet Carter
William J. Taylor, Jr.
Rachel A.B. Danner
Everytown Law
450 Lexington Avenue,
P.O. Box 4184
New York, NY 10163
(347) 674-0972
rdanner@everytown.org

August 21, 2026

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*Ziegenfuss v. Martin*, No. 26-10302

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1, in addition to those previously listed in briefs filed in this case, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. Amicus curiae
    a. Everytown for Gun Safety[1]

2. Counsel for amicus curiae
    a. Janet Carter, Everytown Law
    b. William J. Taylor, Jr., Everytown Law
    c. Rachel A.B. Danner, Everytown Law

Dated: August 21, 2026

By: /s/ Rachel A.B. Danner
Attorney of record for Everytown for Gun Safety

---

[1] Everytown for Gun Safety's formal name is Everytown for Gun Safety Action Fund. It has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

**INTEREST OF AMICUS CURIAE** ........ **1**

**INTRODUCTION AND SUMMARY OF ARGUMENT** ........ **1**

**ARGUMENT** ........ **3**

I. Reconstruction-Era and Later Evidence is a Crucial Part of the *Bruen* Analysis ........ 3

A. Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus ........ 4

B. If the Court Reaches the Time-Period Question, the Proper Focus is the Reconstruction Era ........ 12

II. Sensitive Places Are Not Defined by Government-Provided Security ........ 22

A. Schools and Government Buildings ........ 23

B. Legislative Buildings, Polling Places, and Courthouses ........ 25

**CONCLUSION** ........ **29**

## TABLE OF AUTHORITIES

### Cases

*Antonyuk v. James*,
120 F.4th 941 (2d Cir. 2024), *cert. denied*,
145 S. Ct. 1900 (2025) .......... 10, 14, 15, 20

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc), *cert. denied*,
145 S. Ct. 1534 (2025) .......... 8

*Bonidy v. U.S. Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015) .......... 24

*Burson v. Freeman*,
504 U.S. 191 (1992) .......... 26

*Christian v. James*,
176 F.4th 189 (2d Cir. 2026) .......... 10

*Crawford v. Washington*,
541 U.S. 36 (2004) .......... 20

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... 4, 23

*Espinoza v. Montana Dep't of Revenue*,
591 U.S. 464 (2020) .......... 7

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) .......... 15

*Freedom From Religion Found. v. Mack*,
49 F.4th 941 (5th Cir. 2022) .......... 16

*Frey v. City of New York,*
157 F.4th 118 (2d Cir. 2025) .......... 5, 8, 10

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) .......... 14

*Hanson v. District of Columbia*,
120 F.4th 223 (D.C. Cir. 2024), *cert. denied*,
145 S. Ct. 2778 (2025) ........................................................................ 8

*Kipke v. Moore*,
165 F.4th 194 (4th Cir. 2026), *petitions for cert. filed*,
Nos. 25-1324 (U.S. Apr. 15, 2026), 25-1206
(U.S. Apr. 20, 2026) ................................................................... 22, 24

*LaFave v. County of Fairfax*,
No. 1:23-cv-01605, 2024 WL 3928883 (E.D. Va. Aug. 23, 2024),
*aff'd in part and vacated in part on other grounds*,
149 F.4th 476 (4th Cir. 2025), *cert. denied*,
146 S. Ct. 1799 (2026) ....................................................... 15, 22, 24

*Lara v. Comm'r Penn. State Police*,
125 F.4th 428 (3d Cir. 2025) ............................................................ 20

*Mahanoy Area Sch. Dist. v. B. L.*,
594 U.S. 180 (2021) ........................................................................ 17

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ........................................................................ 14

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ........................................................................ 18

*Md. Shall Issue, Inc. v. Montgomery County*,
680 F. Supp. 3d 567 (D. Md. 2023), *appeal docketed*,
No. 23-1719 (4th Cir. July 10, 2023) ................................................. 16

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
60 F.4th 956 (5th Cir. 2023) ............................................................ 16

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ............................................................ 21

*Nastri v. Bondi*,
828 F. Supp. 3d 316 (D. Conn. 2026), *appeal docketed*,
No. 26-925 (2d Cir. Apr. 4, 2026) ........................................... 22, 25, 26

*Nat'l Rifle Ass'n v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) (en banc), *cert. denied*,
--- S. Ct. ----, 2026 WL 1871313 (June 30, 2026) .......................... 15, 17

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023) ........................................ 15, 17

*Nev. Comm'n on Ethics v. Carrigan*,
564 U.S. 117 (2011) ........................................................................ 11, 20

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022) .............................. 2, 5, 6, 9, 12, 13, 14, 15, 18, 19, 23

*Ocean State Tactical, LLC v. Rhode Island*,
95 F.4th 38 (1st Cir. 2024), *cert. denied*,
145 S. Ct. 2771 (2025) .......................................................................... 8

*Pinales v. Lopez*,
765 F. Supp. 3d 1024 (D. Haw. 2025) .................................................. 20

*Ramos v. Louisiana*,
590 U.S. 83 (2020) ................................................................................ 7

*Rupp v. Bonta*,
723 F. Supp. 3d 837 (C.D. Cal. 2024), *appeal docketed*,
No. 24-2583 (9th Cir. Apr. 24, 2024) .............................................. 15, 21

*Schoenthal v. Raoul*,
150 F.4th 889 (7th Cir. 2025), *cert. denied*,
146 S. Ct. 2158 (2026) ......................................... 3, 8, 21, 22, 23, 25, 27

*Timbs v. Indiana*,
586 U.S. 146 (2019) .............................................................................. 7

*United States v. Allam*,
140 F.4th 289 (5th Cir. 2025) ....................................................... 2, 8, 12

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) ........................................................ 22, 23

*United States v. Connelly*,
117 F.4th 269 (5th Cir. 2024) ........................................................... 13

*United States v. Daniels*,
124 F.4th 967 (5th Cir. 2025), *cert. denied*, --- S. Ct. ----,
2026 WL 1855072 (June 29, 2026) ...................................................... 13

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012)............................................................. 14

*United States v. Hemani*,
146 S. Ct. 1677 (2026)........................................................... 4, 6, 12

*United States v. Rahimi*,
602 U.S. 680 (2024)................................................... 4, 5, 6, 10, 12

*United States v. Schnur*,
132 F.4th 863 (5th Cir. 2025) ............................................................. 8

*Virginia v. Moore*,
553 U.S. 164 (2008)............................................................... 7, 20

*We the Patriots, Inc. v. Lujan Grisham*,
697 F. Supp. 3d 1222 (D.N.M. 2023), *appeal dismissed*,
119 F.4th 1253 (10th Cir. 2024) ...................................................... 16

*Wolford v. Lopez*,
116 F.4th 959, (9th Cir. 2024), *rev'd in part on other grounds*,
146 S. Ct. 2032 (2026), *on remand*,
2026 WL 2291925 (9th Cir. Aug. 10, 2026) ......................... 9, 22, 23, 25

*Wolford v. Lopez*,
146 S. Ct. 2032 (2026)................................................... 6, 7, 9, 12, 23

*Worth v. Jacobson*,
108 F.4th 677 (8th Cir. 2025) ........................................................... 20

**Other Authorities**

Evan D. Bernick, *Fourteenth Amendment Confrontation*,
51 Hofstra L. Rev. 1 (2022)............................................................... 17

*Guarding the White House*, White House Hist. Ass'n, https://perma.cc/AF5E-4D59 .................................................. 28

Katie Zezima, *People Used to Be Able to Walk into the White House. Legally.*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND.................................................. 27

Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe.................................................. 26

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) .................................................. 17

Recent Case, *Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025), 138 Harv. L. Rev. 2143 (June 2025).................................................. 21

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) .......................... 17

United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission ........................... 27

**Constitutional Provisions**

Del. Const. of 1776, art. 28, reprinted in *The Constitutions of the Several Independent States of America* 143-44 (1786)................. 26

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly eleven million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[2]

## INTRODUCTION AND SUMMARY OF ARGUMENT

Texas restricts the carry of firearms at interscholastic and sporting events, racetracks, and bars and restaurants that derive 51%

---

[2] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

or more of their income from alcohol. If the Court disagrees with the State's jurisdictional and immunity arguments and reaches the merits,[3] it should conclude that those restrictions are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and its progeny, for the reasons set out in the brief of Court-appointed amici Eric Ruben and Gregg Costa, Dkt. 59 ("Ruben & Costa Br."). Everytown submits this amicus brief to expand on two points that support the constitutionality of these restrictions.

*First*, in conducting the Second Amendment historical inquiry, the Court should give significant weight to Reconstruction-era and later evidence. The decisions of the Supreme Court, as well as this Court's decision in *United States v. Allam*, 140 F.4th 289 (5th Cir. 2025), make clear that this is so regardless of which time period is the central focus of that inquiry: the founding era, when the Second Amendment was ratified, or the Reconstruction era, when it was made applicable to the

[3] This amicus brief focuses only on the merits of Plaintiffs' Second Amendment claims and does not address the Eleventh Amendment, standing, or leave-to-amend issues raised in the parties' briefs.

states through the Fourteenth Amendment. Thus, as in *Allam*, there is no need to resolve which period should be the central focus—though if the Court chooses to do so, originalist principles require focusing on the Reconstruction era.

*Second*, the Court should reject Plaintiffs' historically inaccurate theory that sensitive places are defined by comprehensive, government-provided security. As multiple courts have concluded, any effort to limit sensitive places to locations the government secures "does not withstand historical scrutiny." *Schoenthal v. Raoul*, 150 F.4th 889, 909 (7th Cir. 2025), *cert. denied*, 146 S. Ct. 2158 (2026).

## ARGUMENT

### I. Reconstruction-Era and Later Evidence is a Crucial Part of the *Bruen* Analysis

Plaintiffs argue that "the district court defied *Bruen* and binding Fifth Circuit precedent by relying too heavily on supposed analogues from the 19th century that conflicted with the regulatory regime at the Founding." *See* Plaintiffs' Brief, Dkt. 16 ("Pls. Br.") 19. That is not correct. Both the Supreme Court and this Court have made clear that evidence from Reconstruction and beyond is a critical part of the *Bruen* analysis. This Court should consider the consistent arc of regulatory

tradition stretching from before the founding through Reconstruction, just as it did in *Allam* and just as the Supreme Court did in *Bruen*, *United States v. Rahimi*, 602 U.S. 680 (2024), and *United States v. Hemani*, 146 S. Ct. 1677 (2026). And, as in each of those cases, the Court need not resolve the question of what time period serves as the primary focus of the inquiry in order to do so. If the Court wishes to answer that question, however, it should conclude that the inquiry centers on the Reconstruction era.

### A. Reconstruction-Era and Later Evidence is Crucial to the Historical Inquiry, Regardless of Which Era is the Focus

The Supreme Court has made clear that Reconstruction-era and later history is crucial to the Second Amendment analysis ever since its foundational decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). There, Justice Scalia's opinion for the Court called post-ratification history a "critical tool of constitutional interpretation" and examined "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Id.* at 605. In doing so, it relied on "19th-century cases that interpreted the Second Amendment," "discussion of the Second Amendment in

Congress and in public discourse after the Civil War," and "how post-Civil War commentators understood the right." *Bruen*, 597 U.S. at 21 (describing and quoting *Heller*, 554 U.S. at 610, 614, 616-19).

*Bruen* "reaffirmed the appropriateness of relying on post-Founding history." *Frey v. City of New York*, 157 F.4th 118, 129 (2d Cir. 2025). It relied on mid-19th-century cases and statutes, *see Bruen*, 597 U.S. at 51-57, and surveyed "public discourse surrounding Reconstruction," *id.* at 60. And in discussing sensitive places, *Bruen* indicated that "18th- *and 19th-century*" laws restricting the possession of guns in legislative assemblies, polling places, and courthouses satisfied its historical analysis. *Id.* at 30 (emphasis added).

*Rahimi* then put the relevance of 19th-century evidence even further beyond doubt. It rested its decision upholding a challenged federal law in large part on laws passed between 1836 and 1868. *See* 602 U.S. at 695 (relying on Massachusetts surety statute from 1836); *id.* at 696 (invoking similar statutes of nine other jurisdictions by citation to *Bruen*, 597 U.S. at 56 & n.23, which cites 1838 Wisconsin, 1840 Maine, 1846 Michigan, 1847 Virginia, 1851 Minnesota, 1854 Oregon,

1857 District of Columbia, 1860 Pennsylvania, and 1868 West Virginia surety laws).

As Justice Kavanaugh explained in *Rahimi*, "the Framers[] expect[ed] and inten[ded] that post-ratification history would be a proper and important tool" of constitutional interpretation. *Id.* at 725 (Kavanaugh, J., concurring); *see also id.* at 728-29 (collecting over thirty Supreme Court cases relying on post-ratification history, including evidence long after the founding). Justice Barrett likewise emphasized in *Rahimi* that "postenactment history can be an important tool," including to "liquidate ambiguous constitutional provisions." *Id.* at 738 (Barrett, J., concurring) (cleaned up). And that is consistent with *Bruen*'s guidance that "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." 597 U.S. at 35-36 (cleaned up).

More recently, in *Hemani*, the Supreme Court examined laws from the mid- to late-19th century at length, *see, e.g.*, 146 S. Ct. at 1688, 1690 & n.5—even as it declined once again to decide whether it should "primarily rely" on the founding-era or Reconstruction-era historical understanding, *see id.* at 1687 n.3. Similarly, in *Wolford v. Lopez*, 146 S.

Ct. 2032 (2026), the Court considered analogues from the mid- to late-19th century in its analysis, *see id.* at 2052-53, without deciding which time period should be the central focus, *see id.* at 2058 n.7 (Barrett, J., concurring) (observing that majority "rightly declines to resolve this question").[4]

Following the Supreme Court, this Court has likewise recognized that Reconstruction-era and later evidence is part of the historical inquiry. In *Allam*, it examined laws restricting firearms in educational

---

[4] Plaintiffs assert that the Supreme Court has a "practice of focusing on the Founding Era when analyzing other enumerated rights." Pls. Br. 21. However, the cases they cite expressly considered later history too. *See Ramos v. Louisiana*, 590 U.S. 83, 90-92 (2020) (looking to sources from 14th through late-19th centuries to determine meaning of Sixth Amendment right to jury trial); *Timbs v. Indiana*, 586 U.S. 146, 150-53 (2019) (looking to sources from Magna Carta to colonial era to Reconstruction to present day in interpreting Eighth Amendment Excessive Fines Clause); *Virginia v. Moore*, 553 U.S. 164, 169-70 & n.4 (2008) (examining late-19th century history when discerning scope of Fourth Amendment). And in *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020), the Court likewise relied on evidence from "the early 19th century ... through the end of the 19th century" showing that governments *supported* religious schools, and rejected the state's reliance on "a tradition *against* state support for religious schools [that] arose in the second half of the 19th century" because it contradicted earlier, affirmative evidence. *See id.* at 480-82. Here, by contrast, state and local laws from the Reconstruction era are fully consistent with founding-era and earlier laws. *See, e.g.*, Ruben & Costa Br. 27-29, 33-38.

settings from throughout the 1800s as well as "late-19th century" laws restricting firearms around polling places in rejecting a challenge to the federal law prohibiting the possession of firearms in school zones. *See* 140 F.4th at 297-99; *id.* at 298 (characterizing a Missouri statute from 1879 as the "closest analogue to our case"); *see also United States v. Schnur*, 132 F.4th 863, 869 (5th Cir. 2025) (citing *Range v. Att'y Gen.*, 69 F.4th 96, 111 (3d Cir. 2023) (Ambro J., concurring), for the proposition that "[c]ertain regulations contemporaneous with the Fourteenth Amendment's ratification reaffirm" the identified principle).

Numerous other circuits have similarly concluded that Reconstruction-era and later laws are crucial to *Bruen*'s historical analysis.[5] This is particularly so in sensitive places cases, where the

[5] *See, e.g.*, *Frey*, 157 F.4th at 129 (explaining that courts "may comfortably rely" on later history, especially Reconstruction-era history, "[e]ven if the 1791 understanding primarily controls"); *Schoenthal*, 150 F.4th at 913 (observing that "we and other circuits concur that evidence stretching into the nineteenth century is useful to a *Bruen* inquiry"); *see also, e.g.*, *Bianchi v. Brown*, 111 F.4th 438, 465-71 (4th Cir. 2024) (en banc) (relying on 19th- and 20th-century evidence), *cert. denied*, 145 S. Ct. 1534 (2025); *Hanson v. District of Columbia*, 120 F.4th 223, 237-40, 238 n.7 (D.C. Cir. 2024) (same), *cert. denied*, 145 S. Ct. 2778 (2025); *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46-48, 51-52 (1st Cir. 2024) (same), *cert. denied*, 145 S. Ct. 2771 (2025).

relevant tradition is well established, *see Bruen*, 597 U.S. at 30, and later history can help determine "[w]hether a place falls within that tradition," *see Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024), *rev'd in part on other grounds*, 146 S. Ct. 2032 (2026), *on remand*, 2026 WL 2291925 (9th Cir. Aug. 10, 2026) (reaffirming this portion of analysis).[6] Here, the Court should once again follow the Supreme Court and consider the full array of historical analogues presented in support of Texas's sensitive places laws.

Plaintiffs contend that the robust analogues identified by the district court are "inconsistent" with the founding-era history and should therefore be disregarded. *See* Pls. Br. 22-24. That is not correct. As Court-appointed amici thoroughly set out in their brief, consistent history dating from before the founding, through Reconstruction, and

[6] The *Wolford* plaintiffs asked the Supreme Court to grant certiorari both to decide the constitutionality of Hawaiʻi's private property default rule and to resolve the time-period question, which in plaintiffs' view should result in reinstatement of their sensitive-places challenges. *See* Petition for Writ of Certiorari, *Wolford*, 146 S. Ct. 2032 (No. 24-1046) at i-ii. The Court agreed to review only the first, private-property question. *See Wolford v. Lopez*, 146 S. Ct. 79 (2025).

into the 20th century supports the challenged laws. *See* Ruben & Costa Br. at 23-64.

Moreover, Plaintiffs' position that regulatory silence in one era necessarily creates a conflict with later regulation is unfounded. *See* Pls. Br. 23. As Justice Barrett has explained, assuming that "founding-era legislatures maximally exercised their power to regulate" creates a flawed "'use it or lose it' view of legislative authority." *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring). Likewise, the Second Circuit has observed that the absence of legislation in the founding era does not mean that anyone "deemed such a regulation inconsistent with the right to bear arms." *Frey*, 157 F.4th at 128 (quoting *Antonyuk v. James*, 120 F.4th 941, 969 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025)); *see Christian v. James*, 176 F.4th 189, 195, 199, 205-06 (2d Cir. 2026). "Thus," *Frey* explained, "the dearth of similar Founding-Era laws does not help … discern with clarity the scope of the Second Amendment right" and a court must "continue [its] march through history to ascertain the meaning of that as-yet ambiguous Constitutional provision." *Frey*, 157 F.4th at 130; *see Christian*, 176 F.4th at 195 (reiterating that "even where there is an absence of Founding-era

evidence supporting a historical tradition, '[a court] may focus on later evidence, especially from the Reconstruction era, to ascertain [the] scope' of the Second Amendment right" (first alteration added) (quoting *Frey*, 157 F.4th at 131)).

This understanding comports with common sense. If a regulation passed in the decades around Reconstruction did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in earlier decades, then it can be inferred that the regulation comports with the founding-era public understanding of the right. After all, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 785 (2002)). In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era tradition also reflects the founding-era understanding.

### B. If the Court Reaches the Time-Period Question, the Proper Focus is the Reconstruction Era

The Supreme Court has expressly left open which time period to privilege in the Second Amendment analysis, because in its cases to date it has found the public understanding of the right, as relevant to the challenged laws in those cases, to have remained consistent throughout our nation's history. *See Hemani*, 146 S. Ct. at 1687 n.3; *Rahimi*, 602 U.S. at 692 n.1; *Bruen*, 597 U.S. at 37-38; *see also Wolford*, 146 S. Ct. at 2058 n.7 (Barrett, J., concurring).[7] This Court has also not resolved that question. Plaintiffs point to *Reese* as determinative on this point. *See* Pls. Br. 20. But some months after *Reese*, in *Allam*, this Court recognized the "continuing debate" over the time-period question and declined to "join that debate" because there was no conflict between the history of the two eras. 140 F.4th at 295 n.6; *see id.* at 297 (citing *Reese*).

---

[7] To the extent Plaintiffs suggest that *Espinoza*, settled the time-period question, *see* Pls. Br. 21-22, that cannot be correct. *Espinoza* did not address the significance of the Fourteenth Amendment's ratification for the question of which time period (Reconstruction or founding) is most relevant to the historical inquiry, and cannot have resolved the issue that the Court has since repeatedly left open. The same is true for *Ramos*, *Timbs*, and *Moore*. *See* Pls. Br. 21.

*Reese*, therefore, could not have settled the time-period question in this Court.[8]

As in *Allam*, this Court need not resolve the time-period question in order to decide this case. But if the court chooses to address the issue, it should conclude that 1868 is the proper focus based on originalist principles. In a case involving a state law, that conclusion follows directly from the principle that "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634-35). The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the

---

[8] Plaintiffs also point to this Court's decisions in in *United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024), and *United States v. Daniels*, 124 F.4th 967 (5th Cir. 2025), *cert. denied*, --- S. Ct. ----, 2026 WL 1855072 (June 29, 2026). *See* Pls. Br. 20. But those decisions also do not decide this question. In *Connelly*, the Court simply noted that post-enactment history may be less illuminating than history contemporaneous with a right's adoption. *See* 117 F.4th at 280-81. While the Court seemingly assumed that this time was 1791 for the Second Amendment, it did not resolve the time-period question that the Supreme Court has left open—including, more than a year after *Daniels*, in *Hemani*. And the analysis in *Daniels* was "largely controlled by *Connelly*." 124 F.4th at 971.

Second." *Id.* at 37. Accordingly, focusing on 1868 in a case challenging a state law is the only way to answer the originalist question: How did the people understand the right at the time of its adoption?

The Supreme Court's decision in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), reinforces this conclusion. *McDonald* analyzed at length the public understanding around 1868 before holding that the Second Amendment constrains the states. *See id.* at 770-78. That approach is hard to square with a belief that only the 1791 understanding informs the content of the right: "It would be incongruous to deem the right to keep and bear arms fully applicable to the States by Reconstruction standards but then define its scope and limitations exclusively by 1791 standards." *Antonyuk*, 120 F.4th at 973.

Even before *Bruen*, courts recognized that the Reconstruction era should be the primary focus of historical inquiry when evaluating state and local gun laws. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."); *see also United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th

Cir. 2011).[9] Since *Bruen*, several well-reasoned, persuasive decisions from other courts have continued to "recogniz[e] the Reconstruction Era as more probative of the Second Amendment's scope than the Founding Era" in cases involving state or local laws. *LaFave v. County of Fairfax*, No. 1:23-cv-01605, 2024 WL 3928883, at *8 (E.D. Va. Aug. 23, 2024*),* *aff'd in part and vacated in part on other grounds*, 149 F.4th 476 (4th Cir. 2025), *cert. denied*, 146 S. Ct. 1799 (2026); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) ("*Bondi I*") ("[H]istorical sources from the Reconstruction Era are more probative of the Second Amendment's scope than those from the Founding Era."), *vacated on grant of reh'g en banc*, 72 F.4th 1346 (11th Cir. 2023);[10] *Rupp v. Bonta*,

---

[9] These courts reached this conclusion at the first, historical step of the pre-*Bruen* Second Amendment framework used by lower federal courts. Those analyses generally remain good law. *Bruen* rejected the second step (means-end scrutiny), but explained that the first "is broadly consistent with *Heller*." 597 U.S. at 19.

[10] Despite being vacated for rehearing en banc, *Bondi I*'s robust reasoning and authorities remain persuasive. *See Antonyuk*, 120 F.4th at 973-74 (finding *Bondi I* persuasive on this point after vacatur). The en banc Eleventh Circuit subsequently reached the same outcome as the panel in *Bondi I*, but declined to resolve this time-period question "because the law of both eras restricted the purchase of firearms by minors." *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (en banc) ("*Bondi II*"), *cert. denied*, --- S. Ct. ----, 2026 WL 1871313 (June 30, 2026).

723 F. Supp. 3d 837, 851, 876-78 (C.D. Cal. 2024) (reaching same conclusion), *appeal docketed*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Md. Shall Issue, Inc. v. Montgomery County*, 680 F. Supp. 3d 567, 582-83 (D. Md. 2023) (agreeing with *Bondi I*), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *We the Patriots, Inc. v. Lujan Grisham*, 697 F. Supp. 3d 1222, 1234 (D.N.M. 2023) (agreeing with *Bondi I* and *Maryland Shall Issue*), *appeal dismissed*, 119 F.4th 1253 (10th Cir. 2024).[11] And, as noted, still more courts—including this Court—have accepted that *both* Reconstruction- and founding-era evidence are relevant. *See supra* pp. 7-9 & n.5.

[11] Although this Court is not yet among those that have prioritized the Reconstruction era in Second Amendment cases, it has alluded to doing so in other contexts, including the Fourth Amendment and the First Amendment. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 970 (5th Cir. 2023) (theorizing that "perhaps, for state penal laws," the appropriate question is whether a regulation is "consistent with the original public meaning of the Fourteenth Amendment" rather than the Fourth); *see also Freedom From Religion Found. v. Mack*, 49 F.4th 941, 951 (5th Cir. 2022) (explaining in Establishment Clause case that because "[w]e address an incorporated amendment's application to a state … we must also consider practice around the time of incorporation," but "express[ing] no opinion on" whether to prioritize 1791 or 1868 in a challenge to a state law).

The conclusion that the 1868 understanding should govern in a case against a state is far from radical. It is the answer former Solicitor General Paul Clement, as counsel for New York's NRA affiliate, gave when asked by Justice Thomas during oral argument in *Bruen*.[12] It is also the position of prominent originalist scholars "across the political spectrum." *Bondi I*, 61 F.4th at 1322 n.9 (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see Bondi II*, 133 F.4th at 1154 (Rosenbaum, J., concurring) (same).[13] Both Justice Thomas and Justice Scalia have expressed similar views. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 212 (2021) (Thomas, J., dissenting) ("While the majority entirely ignores the relevant history, I

---

[12] *See* Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843) ("[If] the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.").

[13] *See also, e.g.*, Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"); Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008); Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

would begin the assessment of the scope of free-speech rights incorporated against the States by looking to what ordinary citizens at the time of the Fourteenth Amendment's ratification would have understood the right to encompass." (cleaned up)); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting) (calling for "further evidence of common practice in 1868, since I doubt that the Fourteenth Amendment time-warped the post-Civil War States back to the Revolution"). Simply put, a faithful originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

This conclusion raises the question (not directly presented here) as to the correct temporal focus in cases challenging federal laws. The originalist answer to that question is more complex, because the Second Amendment has bound the federal government since 1791, and yet *Bruen* stated that individual rights applicable against the states and against the federal government "have the same scope." 597 U.S. at 37.

But *Bruen* itself charted the path through this complexity. After identifying the issue, it cited scholars Akhil Amar and Kurt Lash, who have explained that the 1868 understanding should apply to both levels

of government. *See id.* at 37-38 (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998); Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022)). As Professor Lash wrote (and as quoted in *Bruen*), adoption of the Fourteenth Amendment "invested those original 1791 texts [of the Bill of Rights] with new 1868 meanings." *Id. at* 38 (citation omitted). The Court's choice to highlight only these two scholars is compelling evidence that it considered them to be correct, and thus that Reconstruction should be the central focus of the historical inquiry in challenges to both state and federal laws.[14]

The contrary decisions cited by Plaintiffs neither constitute a "prevailing view" among the circuits, *see* Pls. Br. 20 n.7, nor persuasively support Plaintiffs' preferred outcome on the time-period question. As discussed, *Reese* did not settle the issue in this Circuit. *See supra* pp. 12-13. As for the Third and Eighth Circuit decisions Plaintiffs

---

[14] *Bruen* identified no scholarship or other authority explaining how an originalist could accept the contrary position—inflicting upon the states an understanding of the Second Amendment different from the one the Reconstruction generation believed it was extending to them.

cite, both were based on what *Bruen* described as a "general[] assum[ption]" in prior cases, rather than on originalist principles. *See Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 440 (3d Cir. 2025) (invoking *Bruen*'s "general assumption" and citation to *Crawford v. Washington*, 541 U.S. 36, 42-50 (2004), *Virginia v. Moore*, 553 U.S. 164, 168-69 (2008), and *Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117, 122-25 (2011)); *Worth v. Jacobson*, 108 F.4th 677, 693 (8th Cir. 2025) (same). But *Crawford*, *Moore*, and *Carrigan* did not address the significance of the Fourteenth Amendment's ratification in making their "general assumption," and cannot have resolved the issue that *Bruen*, *Rahimi*, and *Hemani* expressly left open.[15] If the Supreme Court had believed they resolved the issue, it would have said so in *Bruen*.

This Court should join other courts in concluding that *Lara* and *Worth* are not persuasive. *See, e.g.*, *Antonyuk*, 120 F.4th at 974 (rejecting similar reasoning in earlier opinion in *Lara*); *Pinales v. Lopez*,

---

[15] Moreover, all three decisions looked to a wide span of history. *See supra* n.4 (discussing *Moore*); *Carrigan*, 564 U.S. at 122-25 (in interpreting First Amendment, finding consistent tradition from founding era through 21st century); *Crawford*, 541 U.S. at 43-50 (looking to sources from 16th through 19th centuries to determine meaning of Confrontation Clause).

765 F. Supp. 3d 1024, 1042 (D. Haw. 2025) (disagreeing with *Lara* and *Worth*); *Rupp*, 723 F. Supp. 3d at 877-78 (declining to follow earlier opinion in *Lara* because, "[r]ather than elevate an assumption to a holding, the Court thinks it best to address the issue from first principles"); *see also* Recent Case, *Lara v. Commissioner Pennsylvania State Police*, 125 F.4th 428 (3d Cir. 2025), 138 Harv. L. Rev. 2143, 2146-47 (June 2025) (noting that the "*Lara* court relied entirely on precedent to answer the time frame question[,] [b]ut that authority did not provide an answer" and arguing that "1868 meanings should … have guided the *Lara* court's analysis").[16]

[16] Plaintiffs' other citations provide even less support. The partial dissent they cite, *see* Pls. Br. 20 n.7 (citing *Christian*, 176 F.4th at 207 (Menashi, J., concurring in part and dissenting part)), is contrary to that circuit's law, *see id.* at 195 (majority opinion) ("1868 and 1791 are *both* focal points of our analysis" (emphasis added) (quoting *Antonyuk*, 120 F.4th at 972-73)). Similarly, the governing authority on the issue in the Seventh Circuit is *Schoenthal*, 150 F.4th at 913, which explained that 19th century evidence is "especially" useful "when reviewing a state law, given that the states were not bound by the Second Amendment until the Fourteenth Amendment was ratified in 1868"—and not *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), which long predates *Bruen* and did not engage with originalist principles.

## II. Sensitive Places Are Not Defined by Government-Provided Security

Plaintiffs argue that to be analogous to a historical sensitive place, a site must be "protected by heightened, government-provided security." Pls. Br. 25. Several courts have rejected this theory, both before and after *Bruen*. *See Schoenthal*, 150 F.4th at 909-10; *Wolford*, 116 F.4th at 981; *United States v. Class*, 930 F.3d 460, 464-65 (D.C. Cir. 2019); *Nastri v. Bondi*, 828 F. Supp. 3d 316, 332-35 (D. Conn. 2026), *appeal docketed*, No. 26-925 (2d Cir. Apr. 4, 2026); *LaFave*, 2024 WL 3928883, at *13; *see also Kipke v. Moore*, 165 F.4th 194, 223 n.2 (4th Cir. 2026) (Agee, J., concurring in part and dissenting in part), *petitions for cert. filed*, Nos. 25-1324 (U.S. Apr. 15, 2026), 25-1206 (U.S. Apr. 20, 2026).

This Court should follow those well-reasoned decisions and reject Plaintiffs' argument for at least two reasons. First, the government security argument is impossible to reconcile with the Supreme Court's recognition that guns may be prohibited in schools and government buildings. And second, the argument is irreconcilable with *Bruen*'s confirmation that prohibitions in legislative buildings, polling places, and courthouses are constitutional.

### A. Schools and Government Buildings

*Heller* recognized that guns may be prohibited in schools and government buildings, and *Bruen* and *Wolford* reiterated *Heller*'s statement. *See Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30; *see also id*. at 81 (Kavanaugh, J., concurring); *Wolford*, 146 S. Ct. at 2042. The constitutionality of these prohibitions alone is sufficient to defeat the comprehensive-security argument. Schools—which typically include not only buildings but yards, play areas, and athletic fields—routinely lack comprehensive, government-provided security. *See, e.g.*, *Wolford*, 116 F.4th at 981 (rejecting argument because "[m]any schools and polling places have few security measures—now or in the past—yet the Supreme Court listed those places as conclusively sensitive"); *Class*, 930 F.3d at 465 (observing that "many schools and government buildings—the paradigmatic 'sensitive places' identified in [*Heller*]—are open to the public, without any form of special security or screening" (cleaned up)). Thus, because *Bruen* said that "schools are places where firearms can be prohibited for all individuals," and schools often lack security, "what makes schools 'sensitive' … is not government provided security." *Schoenthal*, 150 F.4th at 909.

The same is true of government buildings. Any number of government buildings lack comprehensive security, such as public libraries, community recreation centers, and post offices. *See, e.g.*, *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1123 (10th Cir. 2015) (stating, in rejecting Second Amendment challenge to prohibition on firearms in post offices, that post office "d[id] not regularly employ any security officers"); *LaFave*, 2024 WL 3928883, at *13 (observing that "many recognized sensitive spaces lack enhanced security"). Thus, *Bruen* and *Wolford*'s endorsement of prohibitions in government buildings also defeats the government-security claim. *See Kipke*, 165 F.4th at 208 (upholding prohibitions in government-owned and -leased buildings despite plaintiffs' government-security argument); *id.* at 223 n.2, 229-30 (Agee, J., concurring in part and dissenting in part) (agreeing that government-buildings restriction is constitutional and expressly rejecting government-security argument).

In essence, Plaintiffs' comprehensive-security argument first ignores the Supreme Court's endorsement of firearms prohibitions in schools and government buildings, then invents a principle purportedly (but incorrectly, *see infra* Part II.B) based on the other location

restrictions *Bruen* approves, and then tries to deploy that principle as a reason to ignore the Supreme Court's endorsement of prohibitions in schools and government buildings. That is hopelessly circular.

### B. Legislative Buildings, Polling Places, and Courthouses

Even leaving aside that Plaintiffs' argument is impossible to reconcile with the constitutionality of firearms restrictions in schools and government buildings, the argument also "fails on its own terms." *Nastri*, 828 F. Supp. 3d at 333. As the Seventh Circuit explained in *Schoenthal*, the government-security principle "cannot unify even legislative assemblies, polling places, and courthouses," the three additional locations *Bruen* named. 150 F.4th at 909. Here, too, Plaintiffs have failed to establish that these locations all feature comprehensive security.

Polling places, for example, routinely lack government security. *See Wolford*, 116 F.4th at 981; *see also Nastri*, 828 F. Supp. 3d at 333 (disagreeing with the claim that government today "provides security in … legislative assemblies and, especially, polling places"). As one district court recently observed, "[m]illions of Americans vote in high school gymnasiums, churches, municipal offices, recreation centers, and other

places that would never qualify as 'secured locations protected by government-provided security.'" *Id.* (citation omitted). Indeed, law enforcement officers are often "barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion) (describing Tennessee law); *see also, e.g.*, Luke Barr, *Trump Says He Wants Police at Polling Sites. Experts Say that's Unlawful*, ABC News (Aug. 21, 2020), tinyurl.com/fcv5x9xe (quoting Minnesota Secretary of State explaining that "you can't preemptively station or assign [law enforcement officers] to a polling place. You just can't do it. It's unlawful."). The same was true historically. *See* Del. Const. of 1776, art. 28, reprinted in *The Constitutions of the Several Independent States of America* 143-44 (1786) (mandating that "*no persons* shall come armed" to any election and that no "battalion or company, in the pay of the continent, or of this or any other State" shall come within one mile of any election-place for twenty-four hours before or after an election (emphasis added)). To the extent law enforcement officials were present historically, "their role was largely to help run elections rather than

provide security." *Schoenthal*, 150 F.4th at 909-10; *see id.* at 909 n.18 (citing 18th century laws).

Historical legislative assemblies similarly lacked government security. Rather than evincing any sort of "comprehensive security," historical statutes demonstrate that "[l]egislative assemblies, including Congress, were often protected by merely one person, whose duties and abilities would be less-than-adequate to stave off violence." *Id.* at 909; *see also id.* at 909 n.16 (citing historical statutes).

Even such indisputably sensitive places as the U.S. Capitol and the White House lacked serious security for decades. *See* United States Capitol Police, *Mission & History*, https://www.uscp.gov/the-department/our-mission (explaining that when Congress moved to Washington, DC in 1800, a "lone watchman, John Golding, was hired to protect the Capitol Building," and that the watch remained one person until 1828, when it was expanded to four); *Schoenthal*, 150 F.4th at 909 n.16 (quoting same); Katie Zezima, *People Used to Be Able to Walk into the White House. Legally.*, Wash. Post (Sept. 23, 2014), https://perma.cc/M2UM-VHND ("Despite being open to the public, there was very little security at the White House until a drunk man threw

rocks at President John Tyler…. Abraham Lincoln … stationed guards at the White House. After the Civil War, however, security measures dropped off.”); *Guarding the White House*, White House Hist. Ass’n, https://perma.cc/AF5E-4D59 (timeline describing no guards at White House before 1830, other than militia presence on White House grounds during War of 1812, and no permanent security force until a four-man guard was established in 1842).

This Court should reject Plaintiffs’ ahistorical suggestion and should instead look to Supreme Court precedent and this Nation’s established tradition of sensitive-place restrictions, which demonstrate that Texas’s laws are constitutional.

## CONCLUSION

This Court should affirm the district court's judgment.

Dated: August 21, 2026

Respectfully submitted,

/s/ Rachel A.B. Danner
Janet Carter
William J. Taylor, Jr.
Rachel A.B. Danner
450 Lexington Avenue, P.O. Box 4184
New York, NY 10163
(347) 674-0972
rdanner@everytown.org

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because it contains 5809 words, excluding the portions exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: August 21, 2026

/s/ Rachel A.B. Danner
Rachel A.B. Danner
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

On August 21, 2026, I electronically filed this brief with the Clerk of Court of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system. All parties in the case are registered CM/ECF users.

Dated: August 21, 2026

/s/ Rachel A.B. Danner
Rachel A.B. Danner
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*