**No. 26-10302**

# In the United States Court of Appeals for the Fifth Circuit

---

Charles Ziegenfuss; David Montgomery; Brian Robinson; Firearms Policy Coalition, Incorporated,

*Plaintiffs – Appellants,*

*v.*

Freeman Martin, in his official capacity as Director and Colonel of the Texas Department of Public Safety,

*Defendant – Appellee.*

---

From the United States District Court for the Northern District of Texas, No. 4:24-CV-1049, Hon. Mark Timothy Pittman, U.S. District Judge, presiding.

---

## TEXAS SPORTS TEAMS' BRIEF IN SUPPORT OF APPOINTED AMICI CURIAE/ APPELLEES AND AFFIRMANCE

---

Mark Trachtenberg
Shayna Goldblatt Proler
HAYNES AND BOONE, LLP
1221 McKinney, Suite 4000
Houston, Texas 77010-2007
(713) 547-2000
*mark.trachtenberg@haynesboone.com*
*shayna.proler@haynesboone.com*

***Attorneys for Amici Curiae***

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Case Number and Style: No. 26-10302,
*Charles Ziegenfuss, et al. v. Freeman Martin.*

The undersigned counsel of record certifies that under Fifth Circuit Rule 29.2, which requires "a supplemental statement of interested parties, if necessary to fully disclose all those with an interest in the amicus brief," the following listed persons and entities have an interest in this amicus brief, as described in the fourth sentence of Fifth Circuit Rule 28.2.1. *See* 5th Cir. Rule 29.2; 5th Cir. Rule 28.2.1; *see also* 5th Cir. Rule 26.1.1. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

### I. Amici Curiae supporting affirmance of a judgment for Defendants-Appellees as advocated by Appointed Amici Curiae

- Houston Astros LLC
- Houston Dynamo FC
- Houston Dash
- FC Dallas
- Austin FC

*Counsel*:

HAYNES AND BOONE, LLP
Mark Trachtenberg
Shayna Goldblatt Proler
1221 McKinney, Suite 4000
Houston, Texas 77010-2007

*/s/ Mark Trachtenberg*
Mark Trachtenberg

## TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS .................... i

TABLE OF CONTENTS .......................................................................... iii

TABLE OF AUTHORITIES ..........................................................................v

STATEMENT OF INTEREST OF AMICI CURIAE..........................................1

INTRODUCTION ............................................................................................. 2

ARGUMENT AND AUTHORITIES ................................................................. 4

I. Section 46.03(a)(8) is the foundation for the Team Amici's security programs and is critical for public safety at their events. .............................. 4

    A. Complex, layered security programs rely on the no-firearms rule derived from Section 46.03(a)(8). ..................................5

    B. Screening and incident history confirm the statute's deterrent effect. .........................................................................8

II. If the statute is invalidated, the Team Amici would be left with materially weaker tools to maintain a firearms-free environment. ................ 9

    A. The availability of other criminal trespass statutes on government-owned property is uncertain, and their penalties are materially weaker........................................................10

    B. Civil authority to exclude is legally untested for lessees on government-owned property and cannot replicate the statute's front-end deterrent effect. ..................................................14

III. Invalidation would have severe consequences for the Team Amici. ............16

    A. Screening at the gate becomes unworkable when firearms may be lawful. ......................................................................... 17

B. Existing staffing cannot scale to meet the needs of an uncontrolled environment. 17

C. Firearms would complicate threat identification and emergency response. 18

D. Legal uncertainty threatens safety and compliance. 19

CONCLUSION 21

CERTIFICATE OF SERVICE 22

ECF CERTIFICATION 22

CERTIFICATE OF COMPLIANCE 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Deprez v. Brewer*,
No. 05-94-01540-CV, 1995 WL 547094 (Tex. App.—Dallas Sept. 8, 1995, no writ) .......... 14

*Esteras v. United States*,
606 U.S. 185 (2025) .......... 8

*Johnson Cnty. Sheriff's Posse, Inc. v. Endsley*,
926 S.W.2d 284 (Tex. 1996) .......... 14

*LaFave v. Cnty. of Fairfax*,
149 F.4th 476 (4th Cir. 2025) .......... 5

*Levesque v. Wilkens*,
57 S.W.3d 499 (Tex. App.—Houston [14th Dist.] 2001, no pet.) .......... 14

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) .......... 4, 10

*In re State of Tex.*,
698 S.W.3d 904 (Tex. 2024) (orig. proceeding) .......... 14

*State of Tex. v. City of Dall.*,
-- S.W.3d --, No. 15-25-00122-CV, 2026 WL 2266933 (Tex. App.—15th Dist., Aug. 6, 2026, no pet. h.) .......... 6, 10, 13

*United States v. Class*,
930 F.3d 460 (D.C. Cir. 2019) .......... 4

*United States v. Rahimi*,
602 U.S. 680 (2024) .......... 4, 5

*Wolford v. Lopez*,
116 F.4th 959 (9th Cir. 2024) .......... 10

*Wolford v. Lopez*,
146 S. Ct. 2032 (2026) .......... 9

**Statutes**

Tex. Code Crim. Proc. art. 2A.052 .......... 7

Tex. Gov't Code § 411.172 .......... 12

Tex. Gov't Code § 411.186 .......... 12

Tex. Gov't Code § 411.187 .......... 12

Tex. Gov't Code § 411.192 .......... 17

Tex. Gov't Code § 411.209 .......... 10, 12

Tex. Occ. Code § 1701.001 .......... 6

Tex. Penal Code § 12.21 .......... 12

Tex. Penal Code § 30.05 .......... 10, 11, 12, 14, 17

Tex. Penal Code § 30.06 .......... 3, 5, 10–14

Tex. Penal Code § 30.07 .......... 3, 5, 10–12

Tex. Penal Code § 46.03 .......... *passim*

Tex. Penal Code § 46.15 .......... 6

**Rules**

Fed. R. App. P. 29 .......... 1

**Other Authorities**

Carina Bentata Gryting & Mark Anthony Frassetto, *NYSRPA v. Bruen and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. REV. (Elec. Supp.) I.-60 (2022) .......... 4

Cybersecurity & Infrastructure Security Agency, *Public Venue Security Screening Guide* (July 2026) .......... 7

Joseph Blocher & Reva Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 NW. U. L. REV. 139 (2021) .......... 5

Nat'l Ctr. for Spectator Sports Safety & Sec., *Spectator Sports Safety and Security Survey: 2025 Industry Research Report* 6-12 (2025) .......... 19

Tex. S.B. 1065, 89th Leg., R.S. (2025) .......... 13

## STATEMENT OF INTEREST OF AMICI CURIAE

Together, the Houston Astros, Houston Dynamo, Houston Dash, FC Dallas, and Austin FC host hundreds of professional sporting events across Texas every year.[1] The challenged statute, which criminalizes the carrying of firearms "on the premises where a . . . professional sporting event . . . is taking place," Texas Penal Code § 46.03(a)(8), is critical to the Teams' security arrangements and to public safety at their events.

**Houston Astros LLC** owns and operates the Houston Astros, a Major League Baseball franchise. The Astros operate Daikin Park in downtown Houston—a 40,000-plus seat stadium—hosting 81 regular-season home games and drawing millions of attendees, including 2.25 million in 2025. The Astros lease Daikin Park from the Harris County-Houston Sports Authority.

**Houston Dynamo FC** (Major League Soccer) and **Houston Dash** (National Women's Soccer League) are professional soccer teams that play in Shell Energy Stadium in east downtown Houston. Shell Energy Stadium accommodates over 21,000 spectators. Dynamo Stadium, LLC operates and manages the stadium and leases it from the City of Houston and Harris County. Annually, the Dynamo and Dash host 17 MLS regular-season home games and 15 NWSL regular-season home games, respectively; last year, more than 327,000 attendees passed through the stadium gates.

[1] The Team Amici file this brief with the consent of all parties. Fed. R. App. P. 29(a)(2). Amici certify that counsel for amici authored this brief in whole; that no counsel for a party authored this brief in any respect; and that no person or entity, other than amici and their counsel, contributed monetarily to this brief's preparation or submission. Fed. R. App. P. 29(a)(4).

**FC Dallas** is a professional Major League Soccer team operated by FC Dallas Soccer, LLC, which has fielded the team since 2003—though the franchise dates to the league's founding in 1996. FC Dallas plays its home games at Toyota Stadium in Frisco, Texas, a soccer-specific stadium with a capacity of approximately 20,000. FC Dallas leases Toyota Stadium from the City of Frisco. It hosts 17 regular-season home games per year; in 2024, the last year before stadium renovations began, FC Dallas drew over 326,000 attendees, averaging approximately 19,000 fans per game.

**Austin FC** is a professional Major League Soccer team in Austin operated by Austin TeamCo LLC, which is owned by Two Oak Ventures LLC. Austin FC plays at Q2 Stadium, a 20,738-seat stadium operated by Austin StadCo LLC (a 100% subsidiary of Two Oak Ventures LLC) pursuant to a lease and development agreement with the City of Austin. Each year, Austin FC hosts at least 17 regular-season home games, drawing a sellout crowd for every match in its 6-year history.

These organizations each have a direct operational stake in this case: Section 46.03(a)(8) is central to their security programs and to public safety at their events.

## INTRODUCTION

Every year, millions of Texans attend professional sporting events expecting to root for their favorite teams in safe, family-friendly environments. Amici curiae—the Houston Astros, Houston Dynamo, Houston Dash, FC Dallas, and Austin FC—deliver on that expectation by grounding their security architecture on a simple rule: no firearms, other than those carried by authorized security and law enforcement.

That rule hinges on Texas Penal Code § 46.03(a)(8), which criminalizes firearm possession "on the premises where a . . . professional sporting event . . . is taking place." Appellants challenge the statute on Second Amendment grounds, seeking reversal of the district court's judgment upholding it. This Court should affirm.

Section 46.03(a)(8) provides a clear, bright-line rule that patrons, security personnel, and law enforcement can readily understand and enforce: no firearms at professional sporting events. Without it, amici would be plunged into a gray area of legal uncertainty. Appellants argue that private property rights and criminal trespass statutes would fill any void, but that theory glosses over amici's operational reality: they operate on government-owned property, where the availability of Sections 30.06 and 30.07 is itself in question if the anchor of their government-property exception falls, and where the reach of civil remedies is unresolved and, in any event, cannot match the front-end deterrent force of a criminal prohibition.

Invalidation would not merely leave a doctrinal gap—it would cascade into severe operational consequences. Gate screening would become unworkable when security personnel cannot verify license status in real time. Current staffing levels—calibrated to a firearms-free baseline—could not scale to meet the demands of an uncontrolled environment. And threat identification during emergencies would grow far more dangerous, as responding officers attempt to distinguish lawful carriers from active shooters in crowds of tens of thousands. These are the predictable consequences of dismantling the statutory foundation on which amici's security architecture depends.

## ARGUMENT AND AUTHORITIES

### I. Section 46.03(a)(8) is the foundation for the Team Amici's security programs and is critical for public safety at their events.

The Team Amici have built every layer of their security architecture around Section 46.03(a)(8)'s firearms prohibition. Their operational experience confirms how critical that statute is to public safety at their events.

That experience bears directly on the doctrinal inquiry. A modern firearms regulation survives if it is "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). The relevant principle here is that a location is sensitive because of "the people found there" or "the 'activities that take place there'"—not simply because it is crowded. *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019) (citation omitted); *see also New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30–31 (2022) (approving analogies to "legislative assemblies, polling places, and courthouses"); *id.* at 81 (Kavanaugh, J., concurring) (sensitive-places laws are presumptively constitutional). The professional sporting events at issue are discrete, ticketed gatherings marked by alcohol service, intense emotions, and the presence of children and families—precisely the combination of people and activities that make a location sensitive. They are held at government-leased venues under controlled access and coordinated public-private security partnerships. That is the tradition *Bruen* preserves—not the "crowdedness alone" theory it rejects. *Id.* at 31.[2]

---

[2] Appellants contend that historically, "sensitive places" share "one important characteristic: where the people were disarmed, the government provided comprehensive security." Appellants' Br. 25. That framework finds little historical support. *See* Carina Bentata Gryting & Mark Anthony

Appellants try narrowing their facial challenge on appeal to Section 46.03(a)(8)'s application to events off school grounds and where the property owner has not separately restricted carrying. Appellants' Br. 4, 8, 39. That is precisely the amici's operational setting: professional sporting events at government-leased venues where, for the reasons detailed in Part II, private posting of criminal trespass notices under Sections 30.06 and 30.07 is unavailable or legally uncertain. The operational record thus speaks directly to the applications Appellants actually target. *See LaFave v. Cnty. of Fairfax*, 149 F.4th 476, 483 (4th Cir. 2025) (facial challenge failed where plaintiffs' concessions foreclosed the "no set of circumstances" showing under *Rahimi*).

The facts that follow are legislative facts about how Section 46.03(a)(8) operates in that setting, offered to inform the Court's inquiry into whether the statute is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692.

### A. Complex, layered security programs rely on the no-firearms rule derived from Section 46.03(a)(8).

The Teams' security programs are designed to protect everyone on the premises—patrons, competitors, vendors, staff, and security personnel. Tactics

---

Frassetto, *NYSRPA v. Bruen and the Future of the Sensitive Places Doctrine: Rejecting the Ahistorical Government Security Approach*, 63 B.C. L. REV. (Elec. Supp.) I.-61–62, I.-68 (2022) (critiquing the "metal detectors and security guards" approach as untethered to historical tradition); Joseph Blocher & Reva Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under Heller*, 116 NW. U. L. REV. 139, 181–83 (2021) (same). But even accepting Appellants' narrow standard, Section 46.03(a)(8) satisfies it at amici's events given their extensive coordination with state and federal authorities. *See infra* Part I.A.

differ by venue, but every program rests on the same rule: no firearms. That rule derives from Section 46.03(a)(8), which prohibits "possess[ing] or go[ing] with a firearm . . . on the premises where a . . . professional sporting event . . . is taking place." Tex. Penal Code § 46.03(a)(8);[3] *see also State of Tex. v. City of Dall.*, -- S.W.3d --, No. 15-25-00122-CV, 2026 WL 2266933, at *5 (Tex. App.—15th Dist., Aug. 6, 2026, no pet. h.) (recognizing that Section 46.03 "bars the possession of firearms 'on the premises,'" and that the prohibitions "reside in the properties themselves and are not contingent on the conduct of the owners or possessors of these properties.").

That statutory foundation supports a layered pre-event architecture. Before guests arrive, the Teams coordinate with private security firms, emergency managers, and law enforcement at the local, state, and federal level. They conduct risk and threat assessments, participate in league-driven security audits, and maintain active-assailant, evacuation, and mass-casualty response plans.

The Teams check for firearms at every entrance, pairing physical infrastructure with trained personnel who use screening technology—magnetometers, weapons-detection systems, handheld devices, and bag inspections—to identify prohibited items. Inside the controlled environment, uniformed and, at some venues, plain-clothes security personnel work alongside surveillance systems, access-control protocols, credentialing checkpoints,

---

[3] Texas law carves out peace officers, including law enforcement, as well as first responders and tactical medical professionals whose roles support safety and crowd management. Tex. Penal Code §§ 46.15(a)(1), (r)-(s); *see* Tex. Occ. Code § 1701.001.

behavioral-observation staff, TABC-certified alcohol-service controls, on-site medical resources, and comprehensive emergency-response plans. Collectively, the Team Amici invest tens of millions of dollars annually to sustain these programs. The system is sequential, and each step assumes no firearms.

These operational choices align with federal guidance and industry standards, which independently support a categorical prohibition on patron firearms at large events. DHS's *Patron Screening Best Practices Guide* and *Public Venue Security Screening Guide* identify stadiums as "attractive targets" and list firearms first among prohibited items. *See* Cybersecurity & Infrastructure Security Agency, *Public Venue Security Screening Guide* at 3, 27 (July 2026), *available* here.

This security architecture is not merely private. Each of the amici's venues operates on government-owned property under municipal or county lease: Daikin Park is owned by the Harris County-Houston Sports Authority; Shell Energy Stadium is owned by the City of Houston and Harris County; Toyota Stadium is owned by the City of Frisco; and Q2 Stadium is owned by the City of Austin.

The screening operations that Section 46.03(a)(8) makes possible are coordinated with government partners—municipal and county law enforcement deploy officers at events; state and federal agencies, including the Department of Homeland Security and the FBI, participate in threat assessments, site surveys, and planning for major events; and professional leagues mandate security protocols and conduct regular audits. Texas law itself embeds peace officers into that framework, expressly protecting their authority to carry at sports venues even where firearms are otherwise prohibited. *See* Tex. Code Crim. Proc. art. 2A.052. The result is a

coordinated public-private security regime in which the categorical firearms prohibition is the operational fulcrum.

Because Section 46.03(a)(8)'s categorical prohibition anchors amici's security architecture, its removal, as Part III explains, would leave the same coordinated regime unable to function.

**B. Screening and incident history confirm the statute's deterrent effect.**

Appellants concede that Section 46.03's criminal penalty is an effective deterrent. In their opening brief, they state that they "intend and desire to carry firearms in locations barred by the Carry Bans, and only decline to do so for fear of arrest and prosecution." Appellants' Br. 5 (citing declarative testimony at ROA.115-116 [¶¶4-8]; ROA.123 [¶¶4-7]; ROA.119 [¶¶4-7]); *see also Esteras v. United States*, 606 U.S. 185, 191 (2025) (recognizing that deterrence—the goal of discouraging targeted criminal conduct through the threat of punishment—is a core objective of the criminal law).

The amici's on-the-ground experience bears out that deterrent effect. Over the past five years, they have experienced virtually no firearms-related incidents involving patrons at their games. The rare detections that have occurred were immediately intercepted at screening or discovered outside the secured perimeter. The pattern is clear: fans leave firearms at home because bringing one is a crime.

The no-firearms rule also shapes how the Teams manage crowd incidents at their large-scale events. Every event involves alcohol service, responsibly managed through third-party TABC-certified staff, purchase limits, cutoff times, and trained

intervention protocols. Visible security, ejection policies, and law-enforcement coordination address alcohol-related incidents as they arise. Alcohol predictably fuels intoxication and altercations; what is remarkable is how consistently those incidents are contained without serious injury. Relative to the millions of attendees that amici have collectively hosted at hundreds of events over the past five years, intoxication- and altercation-related incidents remain rare—and none involved a firearm. All have been resolved through removal, not escalation, because security has never faced an armed patron. That is Section 46.03(a)(8) at work.

## II. If the statute is invalidated, the Team Amici would be left with materially weaker tools to maintain a firearms-free environment.

Appellants argue that private property owners and lessees can readily fill any gap left by Section 46.03(a)(8)'s invalidation, invoking "the general rule that private property owners may condition the terms on which guests may enter the property." Appellants' Br. 8. That theory ignores amici's reality. On the government-owned property on which they operate, the availability and reach of other tools (both the criminal-trespass framework that ordinarily backstops firearm exclusion and the civil-exclusion authority appellants invoke) is limited and unclear. Section 46.03(a)(8) supplies a clear, uniform rule; without it, amici would be forced to navigate a patchwork of statutory limitations, open questions, and untested legal theories—none of which offers the front-end certainty or deterrent force of the current criminal prohibition.[4]

[4] *Wolford v. Lopez*, 146 S. Ct. 2032 (2026), does not disturb this conclusion. *Wolford* struck down Hawaii's default rule presuming that licensed carry on private property open to the public was

### A. The availability of other criminal trespass statutes on government-owned property is uncertain, and their penalties are materially weaker.

Whether other criminal trespass statutes could reliably backstop Section 46.03(a)(8) for the amici is far from clear. Sections 30.06 and 30.07 of the Texas Penal Code criminalize the licensed carry of concealed handguns (Section 30.06) and openly carried handguns (Section 30.07)—after a license holder receives notice that entry with a handgun is forbidden. Tex. Penal Code §§ 30.06(a), 30.07(a). But both statutes contain a government-property exception: they do not apply when "the property on which the license holder carries a handgun is owned or leased by a governmental entity and is not a premises . . . on which the license holder is prohibited from carrying the handgun under Section 46.03." Tex. Penal Code §§ 30.06(e), 30.07(e).[5] So if Section 46.03(a)(8) falls, the predicate for applying

---

prohibited absent the owner's express consent, holding that flipping the common-law default imposed a new burden on the Second Amendment right recognized in *Bruen*. *Id*. at 2041. Although the Supreme Court reversed the Ninth Circuit's judgment in *Wolford*, its decision addressed only Hawaii's private-property default rule and did not reach the sensitive-places doctrine. *Id.* at 2042, 2046. The Ninth Circuit's separate ruling that stadium and place-of-amusement restrictions are consistent with that doctrine, *see Wolford v. Lopez*, 116 F.4th 959, 987-89 (9th Cir. 2024), rested on a different statute that was not before the Supreme Court and thus remains persuasive authority.

Section 46.03(a)(8) is neither a default rule for private property open to the public nor a general firearms prohibition of the sort at issue in *Wolford*; it is a targeted, event- and location-specific criminal statute whose constitutionality rests on the sensitive-places tradition *Wolford* left intact. If anything, *Wolford* reinforces the amici's position: the majority, concurrence, and dissent all agreed that property owners retain the right to exclude armed patrons, *id*. at 2049 (majority op.); *id*. at 2054 (Barrett, J., concurring); *id*. at 2064 (Jackson, J., dissenting)—which is precisely why the amici's inability to rely on those private-property remedies on their government-leased venues, as detailed below, makes Section 46.03(a)(8) indispensable.

[5] *State of Texas v. City of Dallas* addressed only whether Section 411.209 of the Government Code barred the State Fair of Texas's handgun ban on government-leased property. 2026 WL 2266933, at *2–3. It did not consider Sections 30.05–.07 of the Penal Code or the government-property exception in Sections 30.06(e) and 30.07(e). The court's distinction between the two statutory

Sections 30.06 and 30.07 on government property may well fall with it, at least at professional sporting events.[6] Because the amici all operate venues owned by local governments, whether they could rely on the statutory trespass-notice regime that ordinarily backstops the criminal prohibition would be an open question likely to invite protracted litigation.

General criminal trespass under Section 30.05 provides a materially weaker fallback, for two independent reasons. First, Section 30.05 allows property owners to post notice that firearms are prohibited. Tex. Penal Code § 30.05(c). But the statute affords licensed handgun carriers (like Appellants in this case) a potential defense: it does not apply to a person who "was carrying: . . . a license . . . to carry a handgun; and . . . a handgun: in a concealed manner; or in a holster." Tex. Penal Code § 30.05(f). Section 30.05 thus reaches only unlicensed handgun carriers or carriers of firearms that do not qualify as handguns—leaving the licensed handgun carriers who make up the bulk of Appellants' concern, and the organizational plaintiff's members, outside its coverage.

Second, even for the unlicensed carriers Section 30.05 does reach, its penalty structure does not match Section 46.03(a)(8)'s deterrent effect. When the sole basis

regimes is instructive: Section 411.209 regulates government conduct, while Section 46.03's prohibitions "reside in the properties themselves." *Id.* at *5. The court did not decide the question here: whether private lessees of publicly-owned stadiums can post effective Section 30.06 and 30.07 notices if Section 46.03(a)(8) falls and the government-property exception no longer applies.

[6] Even if Sections 30.06 and 30.07 were available, neither applies to long guns or shotguns. Tex. Penal Code §§ 30.06(a), 30.07(a). Section 30.05 could reach long-gun carriers, but only with weaker penalties: a Class C misdemeanor ($200 maximum fine), escalating to Class A only upon personal oral notice and refusal to depart. *Id.* § 30.05(d), (d-3).

for forbidding entry is that entry with a firearm was forbidden, a Section 30.05 violation is only a Class C misdemeanor punishable by a fine not to exceed $200. Tex. Penal Code § 30.05(d-3). The offense escalates to a Class A misdemeanor only if, after entering, the actor is personally given oral notice by the owner or someone with apparent authority and then fails to depart. *Id.* The same is true of Sections 30.06 and 30.07 as to licensed handgun carriers: a violation is a Class C misdemeanor with a $200 maximum fine, escalating to Class A only upon personal oral notice after entry followed by refusal to depart. Tex. Penal Code §§ 30.06(d), 30.07(d). By contrast, a violation of Section 46.03(a)(8) is a Class A misdemeanor at the point of entry—no personal notice or refusal-to-depart trigger required—punishable by up to one year in jail and a fine of up to $4,000, and a charge triggers mandatory license suspension under Texas Government Code § 411.187(a)(1), with a conviction supporting revocation, *see id.* §§ 411.186(a)(3), 411.172(a)(3), (8). *See* Tex. Penal Code §§ 46.03(g-2), 12.21. The prospective-patron calculus that appellants concede governs their own behavior—refraining from carrying only to avoid arrest and prosecution, Appellants' Br. 5—is calibrated to Class A criminal exposure and license consequences on entry, not to a $200 fine contingent on individualized notice by stadium personnel to armed patrons streaming through the gates.

Nor is it clear that the Teams could look to their government lessors to independently ban firearms at the venues they own. Texas Government Code Section 411.209 bars a governmental entity from "tak[ing] any action, including an action consisting of the provision of notice" under Sections 30.06 or 30.07 "that states or implies that a license holder who is carrying a handgun . . . is prohibited

from entering or remaining on a premises . . . owned or leased by the governmental entity unless license holders are prohibited from carrying a handgun on the premises . . . by Section 46.03, Penal Code, or other law." Tex. Gov't Code § 411.209(a).

In interpreting the Government Code, the Fifteenth Court of Appeals recently confirmed that Section 411.209 prohibits government *conduct*, but "does not place a restriction on the government property itself." *State of Tex. v. City of Dall.*, 2026 WL 2266933, at *5. The distinction matters because a government lessor's passivity—like not precluding a private lessee from setting its own policies—does not violate Section 411.209, but active government assistance to a private lessee's firearms prohibition—like providing trespassing notices—may trigger attorney general investigations and escalating fines. *See* Tex. Gov't Code § 411.209(d). The upshot is substantial uncertainty about the extent to which the Teams could count on affirmative support from their government landlords to backstop enforcement.

Beyond the inadequacies inherent in these statutory backstops, their continued existence is a matter of teetering legislative grace. In the 2025 regular session, the Texas Senate and a House Committee each passed SB 1065, a bill that would have barred contractors using government-owned property from restricting handguns under Sections 30.06-.07 unless Section 46.03 independently applied. Tex. S.B. 1065, 89th Leg., R.S. (2025). That bill could well become law in 2027.

### B. Civil authority to exclude is legally untested for lessees on government-owned property and cannot replicate the statute's front-end deterrent effect.

Although the Team Amici retain rights as private lessees to set and enforce rules about who may enter and remain on the premises they operate, those rights do not solve the immediate security problem at the gate the way a categorical criminal prohibition does. As lessees in possession, they may have authority to treat an armed patron as a civil trespasser—on the theory that when a landlord hands over possession, the tenant controls who enters. *See Johnson Cnty. Sheriff's Posse, Inc. v. Endsley*, 926 S.W.2d 284, 285 (Tex. 1996); *Levesque v. Wilkens*, 57 S.W.3d 499, 504 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *accord In re State of Tex.*, 698 S.W.3d 904, 905 (Tex. 2024) (orig. proceeding) (Blacklock, J., concurring in denial of petition for writ of mandamus). Ticket revocation offers another possible path: a venue can refuse entry or remove a ticket holder based on contractual terms. *Deprez v. Brewer*, No. 05-94-01540-CV, 1995 WL 547094, at *2 (Tex. App.—Dallas Sept. 8, 1995, no writ). But no Texas court has yet resolved whether a lessee-operator can invoke these theories to keep out a licensed handgun carrier at a government-owned venue, or whether the carrier's criminal defenses under Section 30.05(f) would apply to a civil trespass claim or a wrongful denial of admission or ejection—leaving amici with legitimate, well-founded reasons to doubt whether these theories would provide comparable protection to Section 46.03(a)(8).

Whatever the ultimate reach of these civil remedies, they cannot replicate Section 46.03(a)(8)'s front-end deterrent effect. A criminal prohibition tells every prospective patron, in advance, that carrying a firearm onto the premises is a crime

punishable by arrest and prosecution. Civil trespass and ticket-revocation theories send no comparable message. A patron weighing whether to bring a firearm faces, at most, the risk of being turned away at the gate, ejected mid-event, or sued for damages long after the fact—consequences that pale beside criminal exposure.

Appellants themselves illustrate the point. The fear of arrest and prosecution is all that stands between them and their stated desire to carry at prohibited events like Amici's games. Appellants' Br. 5. That admission identifies the operational baseline on which amici's security architecture rests. Absent Section 46.03(a)(8), a materially larger number of patrons would attempt to bring firearms to events. Civil trespass and ticket-revocation regimes are calibrated for edge-case violators; they are ill-suited to absorb the volume Appellants' own admission projects. More patrons attempting to bring firearms means more firearms at the screening line, longer entry queues, and gate personnel—who cannot verify license status in real time, *see infra* Section III.A—shouldering the entire interdiction burden. Even where amici retain civil authority to exclude, a civil-only regime shoulders enormous front-end pressure while offering back-end remedies calibrated for edge cases—inverting the operational assumptions on which amici's security architecture rests.

Nor is it clear that civil enforcement can provide the back-end response that Section 46.03(a)(8) provides today. If a licensed carrier refuses to leave, can the Teams count on law enforcement to remove them from government-owned property? Or is their recourse limited to a civil action for trespass damages or injunctive relief—remedies that arrive long after the game is over and the crowd has

gone home? The criminal statute answers these questions clearly: entry with a firearm is a crime, law enforcement can act, and patrons know the consequences.

The point is not that the amici would be left without recourse, but that no alternative supplies the clear, real-time, front-end deterrence on which their security operations—and their government partners—depend.

## III. Invalidation would have severe consequences for the Team Amici.

Loss of that statutory foundation would produce adverse operational, staffing, tactical, and compliance consequences: threat identification would grow more dangerous, and downstream compliance and insurance obligations could compound the harm. But one point bears emphasis at the outset. What sustains the Teams' coordinated security regimes is not raw personnel volume but the operating model the statute permits.

Section 46.03(a)(8) allows security personnel and their government partners to operate on a binary detection model: detect a firearm, deny entry. Invalidation would not reduce the number of officers on hand; it would change the model those officers must use. The same coordinated architecture that renders these venues "sensitive places" in the constitutional sense, *supra* Part I, cannot function once the categorical prohibition that structures it is removed.

### A. Screening at the gate becomes unworkable when firearms may be lawful.

Today, screening is binary: security detects a firearm; security denies entry. The criminal sanction creates the deterrent—patrons leave firearms at home because bringing one is a crime. Detection is enough.

If Section 46.03 is stricken and amici (operating on government property) are forced to rely on Section 30.05, the gate-level problem changes fundamentally. Security personnel face a different question: is this person licensed to carry? A patron may present a license-to-carry card, but private event operators have no way to verify it—they lack access to law-enforcement databases, and license information is confidential.[7] *See* Tex. Gov't Code § 411.192(a). So when security detects a firearm, they must decide whether the patron is licensed—but they have no way to find out. They lack clear authority to exclude a licensed carrier who refuses to leave. They cannot be assured that police will remove someone from government property. This is a real-time public-safety problem.

### B. Existing staffing cannot scale to meet the needs of an uncontrolled environment.

Current staffing levels—officers, contracted security, screening personnel—assume that firearms are categorically excluded, and the amici's security programs are calibrated to that baseline. Invalidation would require more staff and more

[7] An off-duty peace officer working an event could theoretically verify a license by calling dispatch. But this theoretical option is unworkable: dispatch handles license inquiries one at a time, typically in the context of a reported crime—not as thousands of attendees rapidly pass through security screenings at amici's events.

resources, but the amici face a constraint beyond budget: there may not be enough qualified personnel available to protect the five-figure crowds they welcome to dozens of home games every season.

Even in Texas's biggest cities, finding, training, and retaining security professionals at venue scale is difficult. The teams, reliant on third-party staffing, can expect some officers to refuse to work events where firearms are allowed inside the perimeter. Other teams that coordinate with local law enforcement to enhance venue security confirm off-duty officers are already in short supply.[8] Another team worries about retaining staff who would be asked to handle more dangerous situations. That concern is especially acute given that screening personnel would be asked to make on-the-spot judgments about whether each patron is licensed to carry.

Current staffing levels work because firearms are not in play. Crowds routinely top tens of thousands. Alcohol is served at every event. Fights happen—and under the current rule, they stay contained because no one is armed. Introduce firearms, and every altercation, every intoxicated patron, and every heated exchange risks the kind of escalation that has no place at family-friendly events.

### C. Firearms would complicate threat identification and emergency response.

When an incident begins, responding officers are trained to neutralize the threat quickly. In a firearms-free setting, threat identification is simple: anyone

[8] The amici have no guarantee of law enforcement staffing: agencies understandably treat off-duty work as a privilege subject to restriction and the public safety needs of their jurisdictions, policies exclude entire categories of officers from extra employment, and supervisor-to-officer ratios constrain scalability.

armed is presumptively the threat. If firearms are allowed, officers must assess every armed person in a crowd of thousands—distinguishing lawful carriers from active shooters in seconds, under stress, with incomplete information. Well-meaning patrons who draw firearms during an emergency make the real threat far harder to find, make friendly-fire incidents far more likely, and complicate every tactical decision during an evacuation.

### D. Legal uncertainty threatens safety and compliance.

In the resulting climate of legal uncertainty, the foundation of the Team Amici's security strategies would be imperiled. Gate personnel would confront armed patrons without clear legal backing—uncertainty that would deter workers from taking these positions and families from attending events where firearms may be present. Fans share those concerns: in a recent Dynamo and Dash fan survey, patrons rated safety and security as extremely important to the guest experience.[9]

Invalidation could also create untenable compliance, contractual, and risk-management problems in at least three related respects.

- ***League rules.*** The Teams' leagues—MLB, MLS, and NWSL—require firearms-free environments as a condition of hosting games, and the amici would be unable to reliably comply if the categorical prohibition is invalidated.

[9] This metric aligns with spectator perspectives nationwide, which matters to the Teams as they welcome fans from across the country. *See* Nat'l Ctr. for Spectator Sports Safety & Sec., *Spectator Sports Safety and Security Survey: 2025 Industry Research Report* 6-12 (2025), *available* here.

- ***Sponsor, advertiser, and broadcaster contracts.*** Many of the amici's sponsorship, advertising, broadcasting, ticketing, and suite agreements require compliance with all applicable laws and assume a firearms-free venue. If Section 46.03(a)(8) falls, sponsors, advertisers, and broadcasters can be expected to demand renegotiated terms, new security commitments, or event-specific security modifications at substantial cost.
- ***Insurance and uninsurable risk.*** Some amici carry standard liability policies that exclude coverage for firearms-related incidents, and terrorism coverage available under the Terrorism Risk Insurance Act reaches only politically or religiously motivated attacks meeting a multi-million-dollar property-damage threshold, while excluding many active-assailant and workplace-violence events. Firearms-related incidents at amici's venues could therefore fall outside coverage entirely, leaving the Teams exposed to the very losses they would no longer be able to prevent.

The precise consequences of invalidation cannot be predicted. But one thing is certain: if Section 46.03(a)(8) falls, the Teams will lose their most critical tool for keeping events safe.[10]

[10] Invalidation could also have a harmful economic impact on Texas. Organizers of marquee professional sporting events like Super Bowls, All-Star Games, and the recent FIFA World Cup matches expect firearms-free venues. Amici's inability to guarantee those environments would put Texas at a severe competitive disadvantage in attracting such events, with adverse economic consequences for the state.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment and uphold the constitutionality of Section 46.03(a)(8).

Respectfully submitted,

*/s/ Mark Trachtenberg*
Mark Trachtenberg
Shayna Goldblatt Proler
HAYNES AND BOONE, LLP
1221 McKinney, Suite 4000
Houston, Texas 77010
(713) 547-2000
*mark.trachtenberg@haynesboone.com*
*shayna.proler@haynesboone.com*

***Attorneys for Amici Curiae***

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2026, I electronically transmitted the attached document to the Clerk of the Court of the Fifth Circuit Court of Appeals using the ECF System of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Mark Trachtenberg*
Mark Trachtenberg

## ECF CERTIFICATION

I hereby certify that (i) the required privacy redactions have been made pursuant to Fifth Circuit Rule 25.2.13; (ii) this electronic submission is an exact copy of the paper document pursuant to Fifth Circuit Rule 25.2.1; (iii) this document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses; (iv) the original paper document was signed by the attorney of record and will be maintained for a period of three years after mandate or order closing the case issues, pursuant to Fifth Circuit Rule 25.2.9.

*/s/ Mark Trachtenberg*
Mark Trachtenberg

## CERTIFICATE OF COMPLIANCE

1. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G) and 32(g)(1), this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,327 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, which is not more than one-half of the type-volume limitation set out in Federal Rule of Appellate Procedure 32(a)(7)(B) for a party's principal brief.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Equity A.

Dated: August 21, 2026

*/s/ Mark Trachtenberg*
Mark Trachtenberg